**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

MICHAEL MUEHE, ELAINE HAMILTON, CRYSTAL EVANS, and COLLEEN FLANAGAN, on behalf of themselves and all others similarly situated,

s,

vs.

CITY OF BOSTON, a public entity,

.

Case No.:  1:21-cv-11080-RGS

**UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND MEMORANDUM IN SUPPORT THEREOF**

## I.      INTRODUCTION

Plaintiffs Michael Muehe, Elaine Hamilton, Crystal Evans, and Colleen Flanagan, on behalf of a proposed Settlement Class of individuals with mobility disabilities who live in, work in, or visit Boston, request that the Court: (1) grant preliminary approval of the proposed Settlement; (2) grant class certification for settlement purposes; (3) appoint Named Plaintiffs as Settlement Class Representatives and their counsel as Settlement Class Counsel; (4) approve the form and manner of notice of the Settlement to the Settlement Class; and (5) schedule a fairness hearing for final approval, service payments to Named Plaintiffs, and an award to Class Counsel for reasonable attorneys' fees, expenses, and costs. Defendant City of Boston does not oppose this motion.

Federal law requires cities to provide people with mobility disabilities full and equal access to public pedestrian paths, including by installing curb ramps that comply with federal design standards.  Such curb ramps allow people who use wheelchairs and other mobility devices

1

to travel on the same sidewalks as their nondisabled counterparts.  Such curb ramps also must meet technical standards in order to be navigable by most people with mobility disabilities: for instance, if a curb ramp is too steep or narrow, it may be impossible, unsafe, or burdensome to maneuver in a wheelchair or other assistive device.

This Settlement will bring the City of Boston (the "City") into full compliance with these mandates.  It requires the City to install or remediate an average of 1,630 curb ramps per year until a compliant curb ramp is present at every required location in the City's pedestrian right of way.  Based on the Parties' current estimates, this is likely to occur by the end of 2030.  The Settlement also requires the City to conduct a comprehensive survey of its curb ramps, already underway, which will further refine the Parties' understandings of the work that is necessary to provide full and equal access to people with mobility disabilities.  In addition, the City must maintain a curb ramp request system that allows people with mobility disabilities to report missing curb ramps and other problems.  It must keep all curb ramps in good condition and provide regular reports to Class Counsel, who will continuously verify the City's compliance.

This Settlement will markedly improve public access for Boston residents and visitors with mobility disabilities.  It therefore provides the Settlement Class with an outstanding benefit. It is the result of serious, non-collusive, arm's-length negotiations and is fair, reasonable, and adequate.  All prerequisites for preliminary approval of a class action settlement are met, and the proposed notice to class members satisfies due process.  In addition, the Settlement Class meets the standards for certification under Fed. R. Civ. P. 23(a) and (b)(2).

## II.    BACKGROUND

The pedestrian right of way—the system of sidewalks, curb ramps, crosswalks, and other walkways that separate pedestrian travel from vehicular traffic—is among the "most vital organs" of the modern American city.  Jane Jacobs, The Death and Life of Great American Cities

794366.7
**794366.13**

29 (Vintage Books Ed. 1992). Curb ramps are particularly critical for people with mobility disabilities, especially those who use wheelchairs, scooters, walkers, or other assistive devices. Without adequate, compliant curb ramps with which to access the sidewalk, people with mobility disabilities are often forced to risk their safety by traveling in the street. They may be deterred from using the pedestrian right of way at all. In Boston, thousands of sidewalk corners are missing curb ramps altogether or have curb ramps that do not comply with access standards.

A.    **Named Plaintiffs**

Named Plaintiffs are individuals with mobility disabilities who have been denied full and equal access to the pedestrian right of way in Boston due to missing and noncompliant curb ramps. Plaintiff Michael Muehe is a Boston resident who has been a fulltime wheelchair user for over 43 years due to spinal cord injury paralysis. *See* Declaration of Michael Muehe in Support of Motion for Preliminary Approval of Class Action Settlement ("Muehe Decl.") ¶ 3. Plaintiff Muehe travels extensively throughout the City for work, recreation, shopping, medical care, socializing, leisure, and entertainment and is frequently affected by missing and noncompliant curb ramps. *Id.* ¶ 4. He has encountered many missing and noncompliant curb ramps in his home neighborhood of Jamaica Plain, as well as in and around Downtown Crossing, the Theater District, and the Financial District. *Id.* ¶¶ 4-5. As a result of missing curb ramps, Plaintiff Muehe has been forced to either double back from his intended path of travel or risk physical danger by travelling in the street. *Id.* ¶ 6. When he encounters a curb ramp that is in disrepair, is too steep, or has a high lip where it meets the street, he must choose whether or not to risk using the ramp, which could cause him to fall or get stuck. *Id.*

Plaintiff Elaine Hamilton lives in Boston. *See* Declaration of Elaine Hamilton in Support of Motion for Preliminary Approval of Class Action Settlement ("Hamilton Decl.") ¶ 3. She is a

794366.7
**794366.13**

double-amputee and wheelchair user who maneuvers Boston's pedestrian right of way to shop, vote, socialize, and attend church, and in doing so, she encounters many intersections with missing or noncompliant curb ramps.  *Id.* ¶¶ 3-4.  At times, Plaintiff Hamilton has nearly fallen out of her wheelchair on her way to the store or to visit her mother, and her wheelchair has also been damaged by traversing broken curb ramps.  *Id.* ¶ 5.  Because of her difficulties getting around Boston due to missing or noncompliant curb ramps, Plaintiff Hamilton often avoids travelling in the City's pedestrian right of way, such as taking paratransit to a grocery store in Quincy, at personal cost and inconvenience.  *Id.* ¶ 6.

Plaintiff Crystal Evans lives in Braintree but frequently visits Boston, such as for medical appointments, advocacy meetings, shopping, and taking her nine-year-old daughter to parks and museums.  *See* Declaration of Crystal Evans in Support of Motion for Preliminary Approval of Class Action Settlement ("Evans Decl.") ¶¶ 3-4.  Plaintiff Evans has a neuromuscular disease and uses a power wheelchair and a ventilator.  *Id.* ¶ 4.  She has encountered many intersections lacking compliant curb ramps in many locations around South Station, Chinatown, the Financial District, and School Street.  *Id.* ¶ 5.  In addition, Plaintiff Evans has had difficulty accessing medical care and sometimes arrived late to appointments as a result of missing and noncompliant curb ramps in the areas surrounding Tufts Medical Center and Boston Medical Center.  *Id.* ¶ 6. In various parts of the City, she has encountered curb ramps with a design flaw that causes water to pool at the base.  This forces wheelchair users to maneuver through deep puddles to access sidewalks, which can damage wheelchair motors.  *Id.*

Plaintiff Colleen Flanagan lives in the Jamaica Plain neighborhood of Boston.  She has Osteogenesis Imperfecta, and as a result is non-ambulatory and a fulltime wheelchair user.  *See* Declaration of Colleen Flanagan in Support of Motion for Preliminary Approval of Class Action

794366.7
**794366.13**

Settlement ("Flanagan Decl.") ¶ 3.  Plaintiff Flanagan frequently encounters intersections in Boston that lack curb ramps, including on an intersection leading to the Massachusetts State House.  *Id.* ¶ 5.  She has also been affected by curb ramps that are noncompliant, such as many that are too steep for her to use, and others that are so weather damaged that they are no longer safely navigable.  *Id.*.  Plaintiff Flanagan is three feet tall, and because of her small stature feels especially unsafe navigating in the street alongside vehicular traffic when there is no curb ramp to access the sidewalk.  *Id.* ¶ 4.  The City's lack of compliant curb ramps has caused Plaintiff Flanagan to miss employment opportunities and family outings, and it has put her physical safety in danger.  *Id.*

The missing, unsafe, and otherwise noncompliant curb ramps that Plaintiffs have encountered are typical of the City's pedestrian right of way and have similar impacts on other Boston residents and visitors who have mobility disabilities.  *See* Declaration of Linda M. Dardarian in Support of Motion for Preliminary Approval of Class Action Settlement ("Dardarian Decl.") ¶ 3.

**B.     Legal Framework**

Two federal statutes govern the accessibility of the pedestrian right-of-way to people with mobility disabilities: Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, which applies to public entities; and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, which applies to recipients of federal financial assistance.

Under these statutes and their implementing regulations, when a covered entity constructs new facilities or alters existing facilities, it must comply with certain standards of accessibility for people with disabilities.  *See* 28 C.F.R. § 35.151(c) (requiring compliance with either the ADA Accessibility Guidelines ("ADAAG") or the Uniform Federal Accessibility Standards

794366.7
**794366.13**

("UFAS"), depending on when the facilities were constructed or altered); 45 C.F.R. § 84.23(c) (requiring compliance with UFAS).  Under Section 504, recipients of federal financial assistance have been required to make all newly constructed and altered facilities fully accessible to people with disabilities since June 3, 1977.  *See* Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 42 Fed. Reg. 22676, 22681 (May 4, 1977).  Under the ADA, this requirement was effective on January 26, 1992.  28 C.F.R. § 35.151(a)(1), (b)(1).

For example, when a covered entity constructs or alters a street, road, or highway, it must install curb ramps at all locations where a road-level walkway joins a raised sidewalk.  *See* 28 C.F.R. § 35.151(i).  These curb ramps are in turn subject to technical requirements regarding the width, slope, and smoothness of various surfaces and the transitions between those surfaces, in order to be navigable by most individuals using wheelchairs, scooters, walkers, and other assistive devices.  *See, e.g.*, 2010 ADAAG § 406.  The regulations provide narrow exceptions for "structural impracticability"—where "the unique characteristics of terrain prevent the incorporation of accessibility features," 28 C.F.R. § 35.151(a)(2)(i), and technical infeasibility— where construction of an accessibility feature is impossible because of physical or site constraints, *see* 2010 ADAAG § 106.5.

Facilities that have not been newly constructed or altered since the effective dates of these regulations are subject to a somewhat more lenient standard: they must be readily accessible to people with disabilities, viewed in their entirety.  *See* 28 C.F.R. § 35.150; 45 C.F.R. § 84.22.  ADA regulations also require government entities to maintain accessible features of their facilities in "operable working condition," 28 C.F.R. § 35.133(a), and to establish a procedure for addressing accessibility-related complaints received from constituents, *id.*

§ 35.107(b).  The ADA, Section 504, and their implementing regulations apply to pedestrian rights of way maintained by municipalities.  *See, e.g.*, *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002); *Frame v. City of Arlington*, 657 F.3d 215, 221 (5th Cir. 2011).

**C.**    **Settlement Negotiations**

On May 7, 2018, Plaintiffs, on behalf of themselves and all others similarly situated, sent a letter to City officials detailing how the missing and noncompliant curb ramps throughout Boston deny people with mobility disabilities full and equal access to the pedestrian right of way.  *See* Declaration of Tim Fox in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Fox Decl.") ¶ 16.  Based on extensive investigation of curb ramps throughout the City and Named Plaintiffs' own experiences encountering access barriers in the pedestrian right of way, the letter asserted that the City's failure to install and maintain adequate, compliant curb ramps violated the ADA and Section 504.  *Id.* ¶ 17.  Plaintiffs proposed that the parties work cooperatively to resolve their claims through structured negotiations rather than litigation.  *Id.* ¶ 18.

The City agreed, and in June 2018, the Parties entered into an agreement that tolled the statute of limitations on Plaintiffs' claims and identified issues to be addressed through structured negotiations.  Dardarian Decl. ¶ 5 & Ex. 1.  Over the course of three years, the parties exchanged information regarding the status of existing curb ramps in the City's pedestrian right of way, the City's past and present policies concerning curb ramp construction and remediation, the City's legal obligations under the ADA and Section 504, the City's system for receiving accessibility-related requests from residents, and the resources available to the City for constructing and remediating curb ramps.  *Id.* ¶ 6.  The parties discussed their settlement positions at length through regular phone calls, several in-person meetings, and many email

exchanges.  *Id*.  In June 2020, the City began a comprehensive survey of its curb ramps, which is still in progress.  *Id*.

The parties reached a final agreement on all aspects of the settlement on June 30, 2021. Because Named Plaintiffs represent a proposed class of individuals with mobility disabilities, the settlement requires court approval.  The agreement also contemplates enforcement as a consent decree.  Accordingly, Plaintiffs filed their Complaint in this action on June 30, 2021.  (ECF No. 1.)

## III.   TERMS OF THE SETTLEMENT

The Proposed Consent Decree is included in its entirety as Exhibit 2 to the Dardarian Declaration.  The following summarizes its most important terms.

### A.   The Proposed Settlement Class

The proposed Settlement Class, as set forth in the Consent Decree, is defined as follows:

> [A]ll persons (including residents of and/or visitors to the City of Boston) with any Mobility Disability, who, at any time prior to court judgment granting final approval to this Consent Decree have been denied full and equal access to the City's pedestrian right of way due to the lack of a Curb Ramp or a Curb Ramp that was damaged, in need of repair, or otherwise in a condition not suitable or sufficient for use.

Consent Decree § 1.18; Dardarian Decl. ¶ 9.  The Consent Decree defines "Mobility Disability" as "any impairment or medical condition . . . that limits a person's ability to walk, ambulate, maneuver around objects, or ascend or descend steps or slopes," regardless of whether the person uses an assistive device.  Consent Decree § 1.13.

As further explained in Part VI below, Plaintiffs seek certification of the Settlement Class only under Fed. R. Civ. P. 23(b)(2), for injunctive relief.

794366.7
**794366.13**

**B.**     **Injunctive Relief**

**1.**     **Installation and Remediation of Curb Ramps**

The Consent Decree establishes a schedule for the City to install and remediate curb ramps that will culminate in "curb ramp saturation"—a compliant curb ramp at every corner of the pedestrian right of way.  Based on their extensive investigations, Plaintiffs estimate that the City currently has at least 15,000 missing or noncompliant curb ramps.  *See* Dardarian Decl. ¶ 3.

For each year during the term of the Consent Decree, the City must install or remediate a minimum number of missing and noncompliant curb ramps.  This requirement, known as the "Annual Commitment," is as follows:

| Year | Accessible Curb Ramp Minimum |
|------|------------------------------|
| 2021 | 1,200 |
| 2022 | 1,350 |
| 2023 | 1,500 |
| 2024 | 1,630 |
| 2025 through 2030 | 1,630, plus a sufficient number each calendar year to increase the average number of Accessible Curb Ramps installed and or remediated annually from 2020 through 2030 to 1,630 per year ("Additional Portion of Annual Commitment"). |
| 2031 and thereafter | 1,630, until all corners of the City's Pedestrian Walkways have Accessible Curb Ramps. |

Consent Decree § 5.1.1.  Beginning in late 2024, the Parties will meet and confer to determine the City's Additional Portion of Annual Commitment for each calendar year from 2025 through 2030, which will average out to 340 additional curb ramps per year unless the City will otherwise achieve curb ramp saturation by the end of 2030 or the City can demonstrate extreme impracticability, difficulty, or expense.  *Id.* §§ 5.1.3-4.

794366.7
**794366.13**

Thus, based on Plaintiffs' estimate of the current number of missing and noncompliant curb ramps, the City is likely to achieve curb ramp saturation by the end of 2030 or sooner.  If not, the Consent Decree will stay in effect, and the City will continue installing and remediating at least 1,630 curb ramps per year until it reaches curb ramp saturation.  *Id.* § 2; Dardarian Decl. ¶ 11.  All curb ramps installed or remediated under the Consent Decree must meet the most up-to-date design standards required under the ADA at the time of their construction or remediation. Consent Decree §§ 1.3, 5.2.  The City will inspect each curb ramp within 120 days of completion, and only curb ramps that comply with the most up-to-date design standards will count toward the Annual Commitment.  *Id.* §§ 5.2.3, 5.2.5.

The Consent Decree gives the City some flexibility in meeting the Annual Commitment by allowing it to carry over extra curb ramps from one year to the next.  In addition, if the City experiences unexpected delays in major capital improvement projects based on factors outside of its control, it may reduce the Annual Commitment for that year by up to 250 curb ramps, but the deficit must be brought to zero within the subsequent two years by installing and remediating extra curb ramps.  *Id.* § 5.3.

### 2.   <u>Survey</u>

The City is required to conduct a comprehensive survey of missing and noncompliant curb ramps in its pedestrian right of way, which is already underway.  *Id.* § 3.1.  At each and every street corner, the City must record whether or not a curb ramp is present.  If a curb ramp is present, the City must collect data sufficient to determine whether or not the ramp complies with the most up-to-date technical standards applicable under the ADA and Section 504, including: (1) the type and position of the ramp; (2) the maximum running slope and cross-slope of each run within the ramp; (3) the width of each run within the ramp; (4) the maximum slope, length, and width of the ramp's top and bottom landings; (5) whether cracks or other damage to the

10

surface of the ramp might affect accessibility; and (6) whether there is a lip, or abrupt change in elevation, at the bottom of the ramp. *Id.* § 3.2. The results of the survey will be provided to Class Counsel within thirty days of its completion. *Id.* § 3.2.5.

### 3.   Prioritization and Implementation Plan

The Consent Decree requires the City to install and remediate curb ramps in certain locations more urgently than in others. In accordance with 28 C.F.R. § 35.150(d)(2), the City will prioritize curb ramps that are located near: (1) government offices and facilities, schools, and parks; (2) transportation corridors; (3) hospitals, medical facilities, assisted living facilities, and other similar facilities; (4) places of public accommodation, such as commercial and business zones; (5) places of employment; and (6) residential neighborhoods. Consent Decree § 8.2.1. Within two years of the effective date of the Consent Decree, the City will create an "Implementation Plan" that takes these priorities into account. *Id.* § 9.1. The City must give Class Counsel and the public an opportunity to comment on the Implementation Plan. *Id.* § 9.3.

### 4.   Curb Ramp Request Program

The Consent Decree also requires the City to maintain a program through which people with mobility disabilities may submit requests for the construction or remediation of curb ramps in specific locations throughout the City. *Id.* § 10.1. Curb ramp requests can be made through an easily locatable form on the City's website or by phone, and each request must be logged with an identification number or other identifying information. *Id.* §§ 10.1-2. The City must notify requestors of the status of their request. In addition, it must use best efforts to investigate each request within 30 days and to install or remediate each requested curb ramp within one year of submission. *Id.* § 10.3. Information about how to request a curb ramp and the timeline for fulfilling curb ramp requests will be publicly available on the City's website or an equivalent

medium.  *Id.* § 10.5.  Curb ramps that are installed or remediated in response to a request will count toward the Annual Commitment.

5.    **Maintenance**

The City will maintain all compliant curb ramps within its jurisdiction in good working order so that they are readily accessible to and usable by people with mobility disabilities, except for isolated or temporary interruptions due to construction, maintenance, or repairs.  Consent Decree § 11.1.  When compliant curb ramps are temporarily unavailable, the City will provide an alternative route that is accessible to people with mobility disabilities.  *Id.* § 11.2.  In addition, throughout the term of the Consent Decree, the City must continue to engage in public education regarding removal of snow and other debris from curb ramps and sidewalks.  It will use best efforts to ensure timely removal of such snow and debris, including through rigorous enforcement of City of Boston Ordinance 16-12.16, which requires property owners and tenants to remove snow and ice from sidewalks abutting their property.  *Id.* § 11.3.  The City will also promptly respond to complaints concerning puddles of water that form on curb ramp landings. *Id.* § 11.4.

6.    **Reporting**

The City must provide Plaintiffs with annual written reports regarding the status of the City's compliance with the Consent Decree, including the number of curb ramps constructed and remediated and their locations, and the number and locations of curb ramps constructed and remediated via the curb ramp request program described above.  If applicable to the reporting period, the report will also include: (1) the status of all pending curb ramp requests received by the City during the reporting period, including applicable response times; (2) the number of noncompliant curb ramps that the City contends it cannot install or fully remediate because it

794366.7
**794366.13**

would be technically infeasible within the meaning of 2010 ADAAG § 106.5 or structurally impracticable within the meaning of 28 C.F.R. § 35.151(2)(i); (3) documents demonstrating that curb ramps installed and remediated under the Consent Decree comply with the most up-to-date federal technical standards; and (4) documentation of all inspections performed of newly installed and remediated curb ramps. *Id.* § 12.1.

The City will also provide Plaintiffs with information from its pavement, sidewalk, and curb ramp asset management database, or equivalent database, upon reasonable request. *Id*. § 12.2.

## C.     **Monitoring and Dispute Resolution**

Throughout the term of the Consent Decree, Class Counsel will monitor the City's compliance and ensure that the City stays on track to achieve curb ramp saturation.  The City is required to notify Plaintiffs and Class Counsel of any changes to the City's drawings and/or designs regarding Accessible Curb Ramps and provide Plaintiffs and Class Counsel with updated curb ramp drawings and/or designs.  Consent Decree § 13.  Plaintiffs and Class Counsel may inspect newly constructed or altered curb ramps and review the City's survey and curb ramp construction databases. *Id.*

The Court will retain jurisdiction to enforce the Consent Decree.  If either party believes that the other has violated or failed to perform any of the provisions, the Parties will attempt to resolve the dispute through a meet-and-confer process, after which either party may file a motion with the Court to enforce the Consent Decree. *Id*. § 16.

## D.     **Release of Class Claims**

In exchange for this comprehensive injunctive relief, Plaintiffs and members of the Settlement Class will release any injunctive, declaratory, or non-monetary claims against the

794366.7
**794366.13**

City that were brought, could have been brought, or could be brought now or in the future by the

Settlement Class relating to or arising from any of the City's alleged actions, omissions,

incidents, or conduct related to the installation, remediation, repair or maintenance of curb ramps

in the City's pedestrian right of way at any time prior to the effective date of the Consent Decree

through the end of the term.  Consent Decree § 18.1.  The release excludes claims for monetary

damages, personal injury, or property damage with respect to unnamed Settlement Class

Members.  *Id.*  It also excludes claims based on components of the City's sidewalk system other

than curb ramps.  *Id.*  Named Plaintiffs, unlike unnamed Settlement Class Members, release all

claims related to the City's curb ramps, including for monetary relief.  *Id.* § 18.2.

### E.      Service Awards to Named Plaintiffs

Subject to Court approval, the City will pay each of the Named Plaintiffs $5,000 in

recognition of their services to the Settlement Class.  *Id.* § 17.  Plaintiffs will file a separate

motion for approval of these proposed service awards along with their motion for reasonable

attorneys' fees, expenses, and costs.

### F.      Reasonable Attorneys' Fees, Expenses, and Costs

Plaintiffs will move separately for an award of their counsel's reasonable attorneys' fees,

expenses, and costs, based on the "lodestar" method.  Consent Decree § 19; *see, e.g.*, *In re*

*Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 465 (1st Cir. 2011); *In re Thirteen*

*Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 (1st Cir.

1995).  Although the City acknowledges that Plaintiffs are prevailing parties and thus entitled to

an award of fees and costs under 42 U.S.C. § 12205, the Consent Decree has no "clear sailing"

provision; the City may contest the amount of attorneys' fees, expenses, and costs sought by

Plaintiffs.  Consent Decree § 19.

794366.7
**794366.13**

In addition, the City will pay Plaintiffs' reasonable attorneys' fees, expenses, and costs for work done in connection with monitoring the City's compliance with the Consent Decree, subject to limitations, including caps of $70,000 per year for the first five years of the agreement and $60,000 per year thereafter. *Id.* § 20.1. The Consent Decree also provides compensation to the prevailing party for dispute resolution under civil rights law. *Id.* § 20.4.

## IV.   THE PROPOSED SETTLEMENT MEETS THE STANDARDS FOR APPROVAL.

Rule 23(e) of the Federal Rules of Civil Procedure governs settlements of class action lawsuits. It provides that a class action "may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). The court approval process has three principal steps: (1) a preliminary approval hearing, at which the court makes a preliminary determination regarding the fairness, reasonableness, and adequacy of the settlement terms; (2) notice to class members of the proposed settlement and given an opportunity to express any objections; and (3) a formal fairness hearing, at which the court decides whether the proposed settlement should be finally approved as fair, adequate, and reasonable to the class. Federal Judicial Center, Manual for Complex Litigation, § 21.632-34 (4th ed. 2018).

In the First Circuit, district courts determine whether a class action settlement is fair, adequate, and reasonable by "balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement." *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 82 (1st Cir. 2015) (quoting *Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 44 (1st Cir. 2009)). "If the parties negotiated at arm's length and conducted sufficient discovery, the district court must presume the settlement is reasonable." *Bezdek*, 809 F.3d at 82 (quoting *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 32-33 (1st Cir. 2009)). Other factors relevant to the preliminary fairness determination include: (1) "the

15

complexity, expense and likely duration of the litigation"; (2) "the stage of the proceedings and the amount of discovery completed"; (3) the risks of further litigation, with respect to establishing liability and damages as well as to "maintaining the class action through the trial"; and (4) "the range of reasonableness of the settlement" in light of both "the best possible recovery" and "all of the attendant risks of litigation." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (cited approvingly in *Nat'l Ass'n of Chain Drug Stores*, 582 F.3d at 44 n.13), *overruled on other grounds by Missouri v. Jenkins*, 491 U.S. 274 (1989)).

These factors weigh in favor of approving the Settlement Agreement.

## A.  The Settlement Is the Product of Serious, Arm's-Length Negotiation.

This Settlement is the result of a prolonged and vigorous negotiation between the Parties that began shortly after Plaintiffs sent the City a demand letter on May 7, 2018.  Dardarian Decl. ¶ 4.  Settlement discussions were then conducted under a formal agreement that preserved all parties' rights and clearly identified the topics that would be addressed through structured negotiations. *Id.* ¶ 5.  Over the course of the next three years, the Parties engaged in regular telephone calls in which they exchanged detailed information regarding the City's pedestrian right of way, budgetary concerns, and obligations under the ADA and Section 504, including technical requirements applicable to curb ramps. *Id.* ¶ 6.

Moreover, Plaintiffs will apply to the Court for reasonable attorneys' fees, expenses, and costs, which the City may contest.  The absence of a "clear sailing" agreement in a class action settlement is a strong indicator that there was no collusion. *See, e.g.*, *Tyler v. Michaels Stores, Inc.*, 150 F. Supp. 3d 53, 57 n.8 (D. Mass. 2015).  Thus, the Settlement is the product of an arm's length negotiation between capable and experienced counsel and is entitled to a presumption of fairness, reasonableness, and adequacy. *See, e.g.*, *Rolland v. Cellucci*, 191 F.R.D. 3, 6 (D. Mass. 2000); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280-81 (S.D.N.Y. 1999).

**B.**      **The Complexity, Expense, and Risk of Litigation Weigh in Favor of Approval.**

Approval of this settlement would promote judicial economy because litigation, trial, and potential appeal of this matter would demand significant resources from the Parties and the Court, including extensive fact and expert discovery, data analysis, and depositions of class members, City employees, and experts.  *See* Dardarian Decl. ¶ 49.  Prior cases against cities for inaccessible pedestrian rights of way illustrate the complexity and expense that litigation would entail.  In *Ochoa v. City of Long Beach*, Case No.: 2:14-cv-04307-DSF (FFMx) (C.D. Cal.),[1] a settlement was reached only after two-and-a-half years of contested litigation, including extensive discovery and motion practice.  *Id*.  The parties propounded and responded to hundreds of discovery requests, exchanged over 30,000 pages of documents, and conducted twenty-four depositions.  *Id*.  Similarly, in *Willits v. City of Los Angeles*, Case No. CV 10-05782 CBM (C.D. Cal.), the parties engaged in several years of extremely contentious litigation that involved proceedings in state and federal court at the trial and appellate court levels.  Dardarian Decl. ¶ 50.  Before reaching a settlement, the parties propounded and responded to hundreds of discovery requests, exchanged over 4 million pages of documents, and conducted thirty-four depositions.  *Id*.  Litigation of this matter would be similarly protracted and costly.

Moreover, proceeding in litigation without settling would raise significant risks to Plaintiffs and the Class.  First, the City might argue that pedestrian paths are not "services, programs, or activities" within the meaning of Title II of the ADA.  The First Circuit has not addressed this question, and some federal courts have applied a less demanding framework to pedestrian rights of way.  *See, e.g.*, *Babcock v. Michigan*, 812 F.3d 531, 536 (6th Cir. 2016).

---

[1] Goldstein, Borgen, Dardarian & Ho, which represents Plaintiffs and the Settlement Class here, served as class counsel in both the *Ochoa* and *Willits* matters as well.  Dardarian Decl. ¶ 32.

794366.7
**794366.13**

The City might also argue that Plaintiffs' claims are barred by the statute of limitations, and although it is doubtful that the City would prevail on this defense, defeating it would consume time and resources.  Dardarian Decl. ¶ 51.  Finally, even if Plaintiffs prevailed on the merits, there is a significant risk that the Court would decline to order injunctive relief as robust and comprehensive as that required under the Consent Decree.  *Id.*

As a result, approval of the Settlement Agreement would obviate significant effort, expense, and risk and therefore serves judicial economy.  *See, e.g.*, *Hill v. State St. Corp.*, 1:09-cv-12146-GAO, 2015 WL 127728, at *7 (D. Mass. Jan. 8, 2015) ("The complexity of this case and the expense and delay that would result if this case were litigated through further motion practice, trial and appeals strongly support approval of the Settlement.").

C.  **The Amount of Investigation and Informal Discovery Completed Weighs in Favor of Approval.**

A class action settlement is likely appropriate for judicial approval where "sufficient evidence has been obtained through discovery to determine the adequacy of the settlement."  *Rolland*, 191 F.R.D. at 10.  Here, although the Parties did not conduct formal discovery through litigation, Plaintiffs thoroughly investigated the City's pedestrian right of way before even sending their demand letter.  This investigation included: (1) a careful review of documents available on the City's website, such as its ADA transition plan; (2) documents obtained through the Massachusetts Public Records Law, Mass. Gen. Laws ch. 66, § 10, such as spreadsheets showing dates and types of alterations to the City's streets since 1992, curb ramps constructed or repaired from 2011 to 2016, and the results of noncomprehensive surveys of the City's curb ramps that it conducted in 2009 and 2014; and (3) images of the City's pedestrian right of way available on Google Street View.  Fox Decl. ¶ 15.

18

Furthermore, over the course of the negotiation, the Parties exchanged information regarding the status of existing curb ramps in the City's pedestrian right of way, the City's past and present policies concerning curb ramp construction and remediation, the City's legal obligations under the ADA and Section 504 (including the technical standards that apply to curb ramps), the City's existing system for receiving accessibility-related requests from residents, and the resources available to the City for constructing and remediating curb ramps.  Dardarian Decl. ¶ 6.  This investigation and information exchange have enabled Plaintiffs to understand the scope of the problem and evaluate the City's realistic capabilities, leading to a Settlement that is fair, adequate, and reasonable in all respects.  *Id.* ¶ 53.

### D.   The Excellent Result for Class Members Weighs in Favor of Approval.

Finally, the excellent outcome for the Settlement Class strongly indicates that the Settlement is fair, adequate, and reasonable.  The Consent Decree requires the City to install and remediate an average of 1,630 curb ramps per year until it reaches curb ramp saturation, which will likely occur by the end of 2030.  As explained in greater detail in the declarations of Class Counsel filed herewith, this timeline compares very favorably with those required under comparable settlements.  *Id.* ¶ 53.  While ambitious, the timeline is also realistic in light of the City's budgetary and other constraints and builds in flexibility in the event of unforeseen circumstances.  *Id.* ¶ 54.  It is doubtful that Plaintiffs could have achieved a superior outcome through litigation.  *Id.*

In sum, the Settlement was reached after arms-length negotiation and thorough investigation.  It represents an outstanding result for the Settlement Class and avoids the complexity, expense, and risk of litigation.  The Settlement should be approved.

## V.     THE PROPOSED NOTICE PLAN SHOULD BE APPROVED.

Under Rule 23(e) and due process requirements, the parties to a class action settlement must distribute notice that "is reasonably calculated to reach the class members and inform them of the existence of and the opportunity to object to the settlement." *Nilsen v. York County*, 382 F. Supp. 2d 206, 210 (D. Me. 2005) (citation omitted); *see also Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The settlement must provide "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see also* W. Rubenstein, A. Conte, & H. Newberg, Newberg on Class Actions § 8.5 (5th ed. 2014).

The notice standard is satisfied here. Within 30 days after issuance of the Preliminary Approval Order, the City will cause notice of the settlement to be published once each week for four consecutive weeks in The Boston Globe and the Boston Herald, newspapers of general circulation. Consent Decree § 14.4.1. The notice will include: (i) a brief statement of this action, the Settlement, and the claims released by the Settlement Class; (ii) the date and time of the fairness hearing and/or final approval hearing of the proposed Consent Decree; (iii) the deadline for submitting objections to the proposed Consent Decree; and (iv) the web page, address, and telephone and fax numbers that may be used to obtain a copy of the notice. *Id.* § 14.4.2.

The City and all of the firms making up Class Counsel will post the notice on their official websites. Copies of the notice will be available in various languages, and in a format accessible to individuals with visual impairments. *Id.* §§ 14.4.3, 14.4.5. After consultation with the City's Disabilities Commission, Class Counsel will also provide the notice to numerous organizations that serve individuals with mobility disabilities in the Boston area, which are listed in Exhibit D to the Consent Decree.

The Parties have developed this proposed plan for distribution of the Notice taking into account the breadth and magnitude of the Settlement Class. Distribution of the Notice through

794366.7
**794366.13**

publication in a local newspaper and posting on multiple accessible websites, coupled with direct notice to organizations that serve Settlement Class Members, will ensure that the notice reaches the maximum number of members of the Settlement Class in the most efficient and cost-effective manner possible.  The proposed form of Notice and the proposed distribution plan will fairly apprise members of the Settlement Class of the settlement and their options with respect thereto, and fully satisfy due process requirements for a Rule 23(b)(2) settlement class with no opt-out rights.  Accordingly, the Court should approve the proposed Notice and direct that it be distributed.

## VI.     THE CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES.

Under Federal Rule of Civil Procedure 23(a), class certification is proper if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  In addition, the proposed class must be certifiable under one of the three sub-provisions of Rule 23(b).  Here, Plaintiffs seek certification under Rule 23(b)(2), pursuant to which class certification is proper if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

### A.     The Rule 23(a) Requirements Are Met.

#### 1.     The Settlement Class Is Sufficiently Numerous that Joinder Is Impracticable.

Rule 23(a) requires the class to be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Classes of 40 or more have been found to be

794366.7
**794366.13**

sufficiently numerous under Rule 23(a)(1)." *DeRosa v. Mass. Bay Commuter Rail Co.*, 694 F. Supp. 2d 87, 98 (D. Mass 2010).  According to the U.S. Census, in 2019, there were approximately 75,184 individuals with mobility disabilities residing in Boston.  *See* U.S. Census Bureau, American Fact Finder, Table B99185, Allocation of Ambulatory Difficulty for the Civilian Noninstitutionalized Population 5 Years and Over, available at https://censusreporter.org/data/table/?table=B99185&geo_ids=16000US2507000&primary_geo_id=16000US2507000#valueType|estimate.  This figure does not include visitors with mobility disabilities.  Accordingly, the Settlement Class likely exceeds 100,000, making joinder highly impracticable, and satisfying Rule 23(a).

2. **There are Questions of Law and Fact Common to the Class.**

Under Rule 23(a)(2), "[a] question is common if it is 'capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 28 (1st Cir. 2019) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  Plaintiffs' claims raise numerous common issues of law and fact, including:

a.      Whether pedestrian rights of way are "programs, services, or activities" within the meaning of Title II of the ADA;

b.      Whether the City violates the ADA by failing to install or remediate curb ramps that make the City's pedestrian right of way program, service, or activity accessible to and useable by persons with mobility disabilities;

c.      Whether the City has performed "new construction" or "alterations" to its pedestrian right of way within the meaning of 28 C.F.R. § 35.151 and 45 C.F.R. § 84.23, triggering an obligation to comply with technical accessibility standards;

d.      Whether Boston violates Section 504 by failing to install or remediate curb ramps that make the City's pedestrian right of way program, service, or activity accessible to and useable by persons with mobility disabilities; and

e.      Whether the City violates Section 504 by failing to install or remediate curb ramps that make facilities in which City programs, services, and activities are made available to the public accessible to and useable by persons with mobility disabilities.

These common questions of law and fact rely on common contentions that are not affected by the circumstances of any individual class member.  Such questions are therefore capable of generating common answers and are thus appropriate for classwide resolution.  *Wal-Mart*, 564 U.S. at 351; *see also Willits v. City of Los Angeles*, No. CV 05782 CBM (RZx), 2011 U.S. Dist. LEXIS 155103, at *9-10 (C.D. Cal. Jan. 3, 2011) (plaintiffs challenging access barriers in Los Angeles pedestrian right of way met commonality requirement).

### 3.      Plaintiffs' Claims Are Typical of the Proposed Class.

To meet typicality, "the claims of the entire class need not be identical, but the class representatives must generally 'possess the same interests and suffer the same injury' as the unnamed class members." *Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 296 (D. Mass. 2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982).)  Here, like all members of the Settlement Class, Named Plaintiffs have mobility disabilities.  *See* Muehe Decl. ¶ 3; Hamilton Decl. ¶ 3; Evans Decl. ¶ 3; Flanagan Decl. ¶ 3.  Plaintiffs allege the same harm, rely on the same legal theories, and seek the same declaratory and injunctive relief as all members of the Settlement Class.  Like all members of the Settlement Class, Plaintiffs allege that they are routinely denied access to the City's pedestrian right of way as a result of the City's systemic policies and practices regarding the construction, repair, and maintenance of curb ramps.  Accordingly, typicality is met.  *See Willits*, 2011 U.S. Dist. LEXIS 155103, at *11-12

23

(typicality was met where plaintiffs alleged that they "suffer[ed] the same harm as members of the class—to wit, lack of meaningful access to the City's public pedestrian rights of way").

    **4.**    <u>**Plaintiffs Will Adequately Represent the Interests of the Proposed Class.**</u>

Plaintiffs satisfy the adequacy requirement of Rule 23(a)(4) if they have no conflicts of interest with the Class and are represented by qualified, competent counsel. *See Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012) (to meet adequacy requirement, "intra-class conflict" must not be "so substantial as to overbalance the common interests of the class members as a whole"). Here, Plaintiffs have no conflict of interest with the proposed Classes. *See* Muehe Decl. ¶ 10; Hamilton Decl. ¶ 9; Evans Decl. ¶ 10; Flanagan Decl. ¶ 8. Plaintiffs' declarations reflect their understanding of the nature of the claims and their duties to the Settlement Class. *See* Muehe Decl. ¶ 11; Hamilton Decl. ¶ 8; Evans Decl. ¶ 9; Flanagan Decl. ¶ 7. They have demonstrated enthusiasm in pursuing their and class members' rights to relief. *See* Muehe Decl. ¶ 8; Hamilton Decl. ¶ 7; Evans Decl. ¶ 8; Flanagan Decl. ¶ 6. Accordingly, Plaintiffs will adequately represent the Settlement Class and should be appointed as class representatives.

    **5.**    <u>**Plaintiffs' Counsel Are Adequate to Represent the Class and Satisfy the Requirements of Rule 23(g).**</u>

Federal Rule of Civil Procedure 23(g)(1)(A) provides four factors for consideration in appointing class counsel: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Here, all four factors weigh in favor of appointing Goldstein Borgen Dardarian & Ho ("GBDH"), the Civil Rights

Education and Enforcement Center ("CREEC"), and the Disability Law Center ("DLC") as class counsel.

First, through their extensive investigation of the City's pedestrian right of way and thorough exchange of information with the City during settlement negotiations, Class Counsel gained a comprehensive understanding of the class claims being resolved by the Consent Decree. *See supra* section II.C.  With that information in hand, the Parties were able to negotiate a settlement that will bring the City's curb ramps into full compliance with the ADA and Section 504 on an ambitious but realistic schedule.  In short, proposed Class Counsel have fully vetted the Class's claims.

Second, GBDH, CREEC, and DLC have extensive experience in handling class actions and complex litigation generally, and systemic disability access cases specifically.  GBDH and CREEC have successfully settled class actions against numerous cities for access to the pedestrian right of way on behalf of people with mobility disabilities.  GBDH served as class counsel in *Willits v. City of Los Angeles*, No. CV 10-05782 CBM RZX (C.D. Cal.) and *Ochoa v. City of Long Beach*, No. CV 14-04307 DSF FFM (C.D. Cal.).  CREEC served as class counsel in *Denny v. City and County of Denver*, Case Number 2016CV030247 (Denver District Court) and *King v. City of Colorado Sprin*gs, No. 1:19-cv-00829-JLK (D. Colo.).  GBDH and CREEC both served as class counsel in *Lashbrook v. City of San Jose*, 20-CV-01236-NC (N.D. Cal.); *Reynoldson v. City of Seattle*, No. CV 15-01608 BJR (W.D. Wash.), and *Hines v. City of Portland*, No. 3:18-cv-00869-HZ (D. Or.).  Dardarian Decl. ¶ 56-59; Fox Decl. ¶¶ 4-8.  DLC is a private nonprofit organization, and the designated protection and advocacy system for people with disabilities in Massachusetts, pursuant to federal statutory authority, litigating many systemic access claims on behalf of people with disabilities.  *See* 29 U.S.C. § 794e; Declaration

of Thomas P. Murphy in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement ("Murphy Decl.") ¶¶ 2.

Third, all three firms are highly knowledgeable regarding disability access laws.  Class Counsel's declarations elaborate further on their extensive qualifications.  *See* Dardarian Decl. ¶¶ 28-38; ("Fox Decl.") ¶¶ 3-9; Murphy Decl. ¶¶ 4-6.

Fourth, proposed Class Counsel have committed significant resources to this matter. Dardarian Decl. ¶ 46; Fox Decl. ¶ 13; Murphy Decl. ¶ 9.  Over the course of three years, they have vigorously negotiated this Settlement on behalf of people with mobility disabilities without any compensation.  Dardarian Decl. ¶ 46; Fox Decl. ¶ 13; Murphy Decl. ¶ 9.  The dedication of those resources have produced a Consent Decree that will greatly enhance access to the City's pedestrian right of way for persons with mobility disabilities.  Proposed Class Counsel are also committed to ensuring that the City complies with the Consent Decree throughout the term of the agreement.  Dardarian Decl. ¶ 46; Fox Decl. ¶ 13; Murphy Decl. ¶ 9.  Finally, proposed Class Counsel have no conflicts of interest with the Settlement Class that affect their ability to fairly and adequately represent the Class.  Dardarian Decl. ¶ 47; Fox Decl. ¶ 12; Murphy Decl. ¶ 10.

**B.      The Rule 23(b)(2) Requirements Are Met.**

A class action may be certified under Rule 23(b)(2) where the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples [of 23(b)(2) class actions]."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997); *Nat'l Ass'n of the Deaf v. Mass. Inst. of Tech.*, Case No. 3:15-cv-30024-KAR, 2020 WL 1495903, at *2 (D. Mass. Mar. 27, 2020) (challenge to MIT's failure to caption online content

was "a quintessential Rule 23(b)(2) case"); *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972) (Rule 23(b)(2) is "uniquely suited to civil rights actions") (quoting Comm.'s Notes to Rule 23).

The claims brought in this case are precisely the type of claims that Rule 23(b)(2) was intended to cover.  Plaintiffs seek broad declaratory and injunctive relief—system-wide improvements to the City's pedestrian rights of way—on behalf of a large class of all City residents and visitors with mobility disabilities who are being denied access due to alleged deficiencies in the City's policies and practices.  Additionally, the Settlement Class seeks only class-wide injunctive relief to address the alleged deficiencies, and does not seek any damages.

Similar cases alleging that state or local governments violated the ADA and/or Section 504 by failing to provide access to the pedestrian right of way for persons with mobility disabilities have routinely been certified for class treatment under Rule 23(b)(2), either for settlement purposes or not.  *See Willits* 2011 U.S. Dist. LEXIS 155103; *Californians for Disability Rights, Inc. et al. v. Cal. Dep't of Transp.*, 249 F.R.D. 334 (N.D. Cal. Mar. 13, 2008); *see also* Dardarian Decl., Exs. 5-9 (Order Granting Final Approval of Class Action Settlement, *Lashbrook v. City of San Jose*, No. 5:20-cv-01236-NC (N.D. Cal. Sept. 2, 2020): Order Approving Class Action Settlement, *Hines, et al. v. City of Portland*, No. 3:18-cv-00869-HZ, Dkt. 40 (D. Or. Sept. 27, 2018); Order Granting Stipulated Motion Regarding Class Certification, *Reynoldson, et al. v. City of Seattle,* No. 2:15-cv-01608 (W.D. Wash. May 2, 2016), ECF No. 30; Stipulation and Order Approving Certification of a Class, *Barden, et al. v. City of Sacramento*, No. 2:99-cv-00497-MCE-JFM (E.D. Cal. July 11, 2000), ECF No. 15 Order Granting Class Certification, *Ochoa, et al. v. City of Long Beach*, No. 2:14-cv-04307-DSF-FFM (C.D. Cal. Sept. 15, 2015), ECF No. 90).

In sum, the Settlement Class satisfies Rule 23 and should be certified.  Plaintiffs should also be appointed Settlement Class Representatives, and Plaintiffs' counsel should be appointed Settlement Class Counsel pursuant to Rule 23(g).

### VII.   <u>CONCLUSION</u>

Plaintiffs respectfully request that the Court: (1) preliminarily approve the Settlement Agreement; (2) certify the proposed Settlement Class; (3) appoint Named Plaintiffs as Settlement Class Representatives and their counsel as Settlement Class Counsel; (4) approve the form and manner of notice of the Settlement to the Settlement Class; and (5) schedule a Fairness Hearing, as set out in greater detail in the attached Proposed Preliminary Approval Order.

Dated: July 2, 2021                         Respectfully submitted,

*/s/ Raymond Wendell*
Linda M. Dardarian (*pro hac vice*)
ldardarian@gbdhlegal.com
Raymond Wendell (*pro hac vice*)
rwendell@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
(510) 763-9800; (510) 835-1417 (Fax)

Thomas P. Murphy (SBN 630527)
DISABILITY LAW CENTER, INC.
11 Beacon Street, Suite 925
Boston, MA 02108
(617) 723-8455; (617) 723-9123 (Fax)

Timothy Fox
tfox@creeclaw.org
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
104 Broadway, Suite 400
Denver, CO 80203
(303) 757-7901

Attorneys for Plaintiff and the Proposed Class

794366.7
**794366.13**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated on the NEF as non-registered participants on July 2, 2021.

                                        */s/ Raymond Wendell*                          
                                        Raymond Wendell

794366.7
**794366.13**