Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL MUEHE, ELAINE HAMILTON, CRYSTAL EVANS, and COLLEEN FLANAGAN, on behalf of themselves and all others similarly situated, <br><br> vs. <br><br> CITY OF BOSTON, a public entity. | Case No.:  1:21-cv-11080-RGS <br><br> **CONSENT DECREE** <br><br> **CLASS ACTION** |

This Class Action Consent Decree ("Consent Decree") is made and entered into by and between: (i) the City of Boston (the "City"), and (ii) Named Plaintiffs Michael Muehe, Elaine Hamilton, Crystal Evans, and Colleen Flanagan, on behalf of themselves and the proposed Settlement Class ("Plaintiffs").  The City and Plaintiffs shall be referred to in this Consent Decree individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, Named Plaintiff Michael Muehe lives and works in Boston, has a mobility disability that substantially limits his ability to walk, and uses a wheelchair for mobility due to his disability.  Plaintiff Muehe is a "qualified person with a disability" and a person with a "disability" within the meaning of all applicable statutes and regulations, including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.108, and 29 U.S.C. § 705(20)(B).

WHEREAS, Named Plaintiff Elaine Hamilton lives and works in Boston, has a mobility disability that substantially limits her ability to walk, and uses a wheelchair for mobility due to her disability.  Plaintiff Hamilton is a "qualified person with a disability" and a person with a "disability" within the meaning of all applicable statutes and regulations, including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.108, and 29 U.S.C. § 705(20)(B).

WHEREAS, Named Plaintiff Crystal Evans lives in Braintree, Massachusetts and is a frequent visitor to Boston.  Plaintiff Evans has a mobility disability that substantially limits her ability to walk and uses a power wheelchair for mobility.  Plaintiff Evans is a "qualified person with a disability" and a person with a "disability" within the meaning of all applicable statutes and regulations, including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.108, and 29 U.S.C. § 705(20)(B).

WHEREAS, Named Plaintiff Colleen Flanagan lives and works in Boston.  Plaintiff Flanagan has a mobility disability that substantially limits her ability to walk and uses a wheelchair for mobility.  Plaintiff Flanagan is a "qualified person with a disability" and a person with a "disability" within the meaning of all applicable statutes and regulations, including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.108, and 29 U.S.C. § 705(20)(B).

WHEREAS, on May 7, 2018, Plaintiffs sent the City a letter asserting that Plaintiffs and similarly situated people with mobility disabilities have been denied access to the City's pedestrian right of way because of a lack of accessible curb ramps throughout the City (the "Dispute").  Plaintiff offered to engage in structured negotiations, in lieu of litigation, to resolve the Dispute.  On June 22, 2018, the Parties executed a tolling agreement to protect the interests of all Parties during those negotiations and to avoid the burden, expense, and potential risks of litigation.

WHEREAS, the Parties have engaged in good faith negotiations and shared relevant information regarding the Dispute.  The Parties have also conducted a thorough examination and investigation of the facts and law relating to the matters set forth in this Consent Decree, and have engaged in extensive arms-length negotiations.

2

WHEREAS, the City does not admit, and specifically denies, that it has violated or failed to comply with or has any liability to Plaintiffs or the proposed Settlement Class under any provisions of the ADA or Section 504 relating to accessibility for persons with mobility disabilities to the pedestrian right of way, any regulations or guidelines promulgated pursuant to those statutes, or any other applicable laws, regulations, or legal requirements.  This Consent Decree and its terms and provisions shall not be offered or received as evidence for any purpose whatsoever against the City in any action or proceeding, other than a proceeding to enforce the Consent Decree's terms.

WHEREAS, this Consent Decree and the releases contained herein cover only curb ramps on street segments with Pedestrian Walkways, and do not apply to components of the City's sidewalk system other than curb ramps.

WHEREAS, based upon extensive analysis of the facts and the applicable law and taking into account the risks and uncertainties associated with litigation and the delays that may result from trial and appeals, as well as the fair, cost-effective and assured method of resolving the potential claims of the Settlement Class represented by this Consent Decree, Class Counsel has concluded that this Consent Decree provides substantial benefit to the Settlement Class and is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class.

WHEREAS, the City has similarly concluded that this Consent Decree is desirable to avoid the time, risk, and expense of defending protracted litigation, to fulfill its long-standing commitment to promoting and enhancing the rights of those with disabilities, to ensure compliance with laws protecting the rights of individuals with Mobility Disabilities, and to resolve potential claims of Plaintiffs and the Settlement Class.

824681.8

WHEREAS, this Consent Decree will be submitted to the United States District Court for the District of Massachusetts for preliminary and final approval under Rule 23 of the Federal Rules of Civil Procedure, as described below.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Definitions**

For purposes of this Consent Decree, the following terms have the following definitions:

1.1.    "2010 ADA Standards for Accessible Design" or "2010 ADA Standards" means the Department of Justice's revised regulations for Titles II and III of the Americans with Disabilities Act of 1990 effective March 15, 2012.

1.2.    "2013 DOJ/DOT Alteration Guidance" means the 2013 Department of Justice/Department of Transportation Joint Technical Assistance on the Title II of the Americans with Disabilities Act Requirements to Provide Curb Ramps when Streets, Roads, or Highways are Altered through Resurfacing, and the Briefing Memo, Questions & Answers Supplement, and Glossary of Terms related thereto, which are attached hereto as Exhibit A.

1.3.    "Accessible," with respect to the installation or modification of curb ramps required by this Consent Decree, means compliant with the applicable provisions of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., codified at 28 C.F.R. § 35.151 and 36 C.F.R. part 1191, and Appendices B and D (hereafter "2010 ADA Standards"), or any subsequent ADA standards adopted by the U.S. Department of Justice and U.S. Department of Transportation for application in the pedestrian right of way.

4

1.4.    "Alter," "Altered," or "Alteration," when used in reference to work performed as part of street, roadway, or highway resurfacing, means those alterations identified in the 2013 DOJ/DOT Alteration Guidance (Exhibit A).  Specified alterations include but are not limited to the addition of a new layer of asphalt, asphalt and concrete, cape seals, concrete pavement rehabilitation and reconstruction, micro-surfacing and thin lift overlays, mill & fill, mill & overlay, open-graded surface course, and in-place asphalt recycling.  Alterations also include roadway resurfacing projects that affect pedestrian crosswalks, even if the projects do not span the full width of the road.  *See* 28 C.F.R. § 35.151(i).  Maintenance activities, such as re-striping crosswalks, filling potholes, or pavement patching do not constitute Alterations.  When used in reference to work performed on a Pedestrian Walkway or Existing Curb Ramp, "Alter," "Altered," or "Alteration" has the same meaning as under 28 C.F.R. § 35.151(b).

1.5.    "Americans with Disabilities Act" or "ADA" means the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq.

1.6.    "Best Efforts" means the efforts that a reasonable entity in the City's position would use to perform an obligation in good faith.

1.7.    "Class Counsel" means collectively the Civil Rights Education and Enforcement Center (CREEC), Disability Law Center, Inc. of Massachusetts (DLC-MA), and the law firm Goldstein, Borgen, Dardarian & Ho.

1.8.    "Compliant Curb Ramp" means, for a curb ramp designed, built or Altered between March 15, 2012 and the Effective Date, built in compliance with the 2010 ADA Standards.  For a curb ramp built or Altered prior to March 15, 2012, "Compliant Curb Ramp" means a curb ramp that is compliant with either the 2010 ADA Standards or the 1991 Americans

5

with Disabilities Act Standards for Accessible Design ("ADAAG"), codified at 28 C.F.R., Part 36, including Appendix A.

1.9.    "Curb Ramp" shall have the same meaning found in 36 C.F.R. part 1191, Appendix A, § 106.5, i.e., "a short ramp cutting through a curb or built up to it."

1.10.    "Effective Date" means the date upon which the Consent Decree becomes a final judgment of the District Court presiding over this Action.  In the event that any objection to the Settlement is filed, the Consent Decree becomes effective when the time to appeal the final approval order expires without the filing of an appeal; or, if an appeal is filed, when the appeal is finally adjudicated or resolved in favor of affirming the approval of the Consent Decree.

1.11.    "Existing Curb Ramp," for purposes of this Consent Decree, means any Curb Ramp completed prior to the Effective Date.

1.12.    "Initial Review" means a preliminary evaluation of a recently installed or remediated Curb Ramp for any readily apparent defects.  The Initial Review is not a thorough evaluation of the Curb Ramp's Accessibility.  It is instead intended to identify obvious non-Compliant conditions or safety hazards.

1.13.    "Mobility Disability" or "Mobility Disabilities" means any impairment or medical condition, as defined by 42 U.S.C. § 12102, that limits a person's ability to walk, ambulate, maneuver around objects, or ascend or descend steps or slopes.  A person with a Mobility Disability may or may not use a wheelchair, scooter, electric personal assisted mobility device, crutches, walker, cane, brace, orthopedic device, or similar equipment or device to assist their navigation along sidewalks, or may be semi-ambulatory.

1.14.    "New Construction and Alterations" means all work required to be performed, pursuant to 28 C.F.R. § 35.151, in connection with newly-constructed or Altered intersections,

6

streets, roads, highways, and Pedestrian Walkways in the City during the Term of the Consent Decree.

1.15.   "Pedestrian Facility" or "Pedestrian Facilities" means any portion of an intersection or street that is provided for pedestrian travel, and any Pedestrian Walkway, crosswalk, curb, Curb Ramp, walkway, pedestrian right of way, pedestrian undercrossing, pedestrian overcrossing, or other pedestrian pathway or walk of any kind, that is, in whole or in part, owned, controlled, maintained by, or otherwise within the responsibility of the City of Boston.

1.16.   "Pedestrian Walkway" means a sidewalk or other prepared exterior surface provided for pedestrian travel in the public right of way that is, in whole or in part, owned, controlled, maintained by, or otherwise within the responsibility of the City of Boston.

1.17.   "Remediate" or "Remediation" means the correction of an existing non-Compliant Curb Ramp or associated Curb Ramp landings to create an Accessible Curb Ramp.

1.18.   "Settlement Class" means the class of individuals ultimately defined and certified by a Court in this matter, in particular: "all persons (including residents of and/or visitors to the City of Boston) with any Mobility Disability, who, at any time prior to court judgment granting final approval to this Consent Decree, have been denied full and equal access to the City's pedestrian right of way due to the lack of a Curb Ramp or a Curb Ramp that was damaged, in need of repair, or otherwise in a condition not suitable or sufficient for use."

1.19.   "Section 504" means Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq.

1.20.    "Structural Impracticability" or "Structurally Impracticable" has the same definition as under 28 C.F.R. § 35.151, i.e., when the unique characteristics of terrain prevent incorporation of Accessible Curb Ramps into New Construction of Pedestrian Facilities.

1.21.    "Technical Infeasibility" or "Technically Infeasible" means instances when an Accessible Curb Ramp cannot be constructed during Alterations to Existing Pedestrian Facilities because of physical or site constraints.

1.22.    "WCAG" means version 2.1 AA of the "Web Content Accessibility Guidelines" published by the Web Accessibility Initiative (WAI) of the World Wide Web Consortium (W3C).

## 2.    Term of the Consent Decree

The Consent Decree shall become effective on the Effective Date and shall remain in effect until the completion of the City's construction and Remediation of Accessible Curb Ramps required under this Consent Decree.  If Class Counsel dispute that the City has fulfilled all of its obligations under this Consent Decree, this Consent Decree shall remain in effect pending the conclusion of any dispute resolution proceedings or action to enforce the Consent Decree.  The foregoing time period is referenced herein as the "Term of the Consent Decree."

## 3.    Curb Ramp Survey

The City shall, at its own expense, perform a survey of all corners at street segments with Pedestrian Walkways to identify the number and types of Curb Ramps at each corner as well as Curb Ramps and associated ramp landings that are missing or are not Compliant (the "Survey"). Requirements for the Survey are as follows.

3.1.    The Survey shall be commenced by September 1, 2020, and shall be completed by August 1, 2021.

824681.8

3.2.    The City shall use a reliable methodology to collect, at a minimum, the following data for the Survey:

      3.2.1.   Locations that are missing Curb Ramps (including traffic islands and mid-block crossings);

      3.2.2.   Locations where Curb Ramps exist (including traffic islands and mid-block crossings).

      3.2.3.   For locations where Curb Ramps exist, the following data shall be collected:

            3.2.3.1.    Whether the ramp is a parallel ramp, a perpendicular ramp, a diagonal ramp, or a combination ramp;

            3.2.3.2.    The ramp position (*e.g.*, diagonal or unidirectional (and if the latter, which direction));

            3.2.3.3.    The maximum running slope and cross slope of each run within the ramp;

            3.2.3.4.    The width of each run within the ramp;

            3.2.3.5.    The maximum slope in any direction of the ramp's top landing;

            3.2.3.6.    Whether the length and width of the clear space within the four-foot square area at the ramp's top landing are compliant based on the 2010 ADA Standards for Accessible Design, as well as the surface condition of that four-foot square area; whether the ramp has side-flares, and if so, the slope of each;

            3.2.3.7.    The rating of the ramp's surface condition as either: "Excellent" condition: no damage, "Fair" condition: hairline cracks/slight surface wear that have

9

no impact on accessibility, or "Poor" condition: any cracks/damage that would impact

accessibility, or any gaps, cracks, uplift, or obstacles.

        3.2.3.8.      The existence and condition of any detectible warnings;

        3.2.3.9.      The gutter slope at the bottom transition of the ramp;

        3.2.3.10.      The counter-slope of the four-foot square area extending

into the street from the bottom transition of the ramp;

        3.2.3.11.      The existence of any lip (i.e., abrupt change of elevation) at

the bottom landing of the Curb Ramp;

        3.2.3.12.      The rating of the condition of the pavement in the four-foot

square area extending into the street from the bottom transition of the ramp as "Excellent"

condition: no damage, "Fair" condition: hairline cracks/slight surface wear but has no impact on

accessibility, or "Poor" condition: any cracks/damage that would impact accessibility, including

the presence of any gaps, cracks, uplift, grates or other obstacles;

        3.2.3.13.      Whether the four-foot lower landing of the ramp (i.e., the

four-foot square extending into the street from the bottom transition of the ramp) is entirely

within any striped crosswalk;

        3.2.3.14.      The existence of any objects or barriers within the path of

travel at the top landing, within the ramp, or at the bottom landing, including utility or signal

poles, hydrants, storm drains, trees, electrical boxes, benches, trash receptacles, etc.); and

        3.2.3.15.      Existence of raised traffic islands without a level cut-

through or without ramps.

      For purposes of the Survey, the City shall use a two-foot-long electronic (digital) level to

measure slopes, and slopes shall be measured where they appear to be steepest.

3.2.4.   Notwithstanding the above, for locations where Curb Ramps exist, if any measurement taken in accordance with Section 3.2.3 establishes that the subject ramp does not conform to the 2010 ADA Standards for Accessible Design and, in the opinion of the City, requires full design and reconstruction in order to Remediate, the City may choose not to collect all data set forth in Section 3.2.3 for that ramp and instead note that the ramp requires full reconstruction.

3.2.5.   Within thirty days of the Survey's completion, the City shall provide electronic records of the information set forth above in Section 3.2.1-.3 to Class Counsel in machine-readable format.  If, within sixty days of receiving the results from the Survey, Class Counsel request a meeting with the City, the City shall meet with Class Counsel to review and discuss the results of the Survey.

**4.**     **ADA Coordinator**

4.1.     Within 90 days of the Effective Date, the City will designate an ADA Coordinator for the City's Public Works Department ("PWD"), whose responsibilities shall include overseeing and facilitating implementation of the Consent Decree.  The City may designate either an employee or a contractor as the ADA Coordinator, but the ADA Coordinator must have available a minimum of 20 hours per week to devote solely to responsibilities related to access for people with Mobility Disabilities to the City's Pedestrian Facilities.  Throughout the Term of the Consent Decree, the ADA Coordinator position shall be filled with an individual who has the following minimum qualifications: (i) experience in evaluating or assisting public entities in evaluating the accessibility of facilities under Title II of the ADA and Section 504; (ii) knowledge of current federal and state disability access standards; and (iii) a minimum of five years' experience related to ADA-accessible facilities; and the following preferred qualifications:

824681.8

(iv) a degree in civil engineering, urban planning, or architecture; and (v) experience specific to Accessible Pedestrian Facilities. The City shall have final authority in hiring an ADA Coordinator but shall confer with Class Counsel in creating a job description for and selecting the ADA Coordinator and use Best Efforts to incorporate Class Counsel's feedback. The ADA Coordinator shall assist in developing and implementing the work set forth below.

**5.** **Annual Accessible Curb Ramp Commitment**

5.1. Commencing on January 1, 2021, and continuing throughout the Term of the Consent Decree, the City shall install and/or Remediate, at a minimum, the number of Accessible Curb Ramps in the City's Pedestrian Walkways each calendar year, set forth below. This number shall be known as the "Annual Commitment." The Annual Commitment will continue until all corners of the City's Pedestrian Walkways have Accessible Curb Ramps.

5.1.1. The Annual Commitment is as follows:

| Year | Accessible Curb Ramp Minimum |
|---|---|
| 2021 | 1,200 |
| 2022 | 1,350 |
| 2023 | 1,500 |
| 2024 | 1,630 |
| 2025 through 2030 | 1,630, plus a sufficient number each calendar year to increase the average number of Accessible Curb Ramps installed and or remediated annually from 2020 through 2030 to 1,630 per year ("Additional Portion of Annual Commitment"). |
| 2031 and thereafter | 1,630, until all corners of the City's Pedestrian Walkways have Accessible Curb Ramps. |

5.1.2    The Additional Portion of Annual Commitment is designed to make up the difference between the Annual Commitment for calendar years 2020 through 2023 and an Accessible Curb Ramp installation and remediation rate of 1,630 per year.

5.1.3    Commencing in the Fourth Quarter of 2024, the Parties shall begin meeting and conferring to determine the City's Additional Portion of Annual Commitment for each calendar year from 2025 through 2030.  The meet and confer process shall be completed by the end of the First Quarter of 2025.  If the Parties have not reached agreement on the Additional Portion of Annual Commitment for years 2025 through 2030 by the end of the First Quarter of 2025, they shall submit the matter to dispute resolution pursuant to the Section 16 of this Consent Decree.

5.1.4    Unless the City will otherwise achieve an Accessible Curb Ramp at each corner of the City's Pedestrian Walkways by the end of calendar year 2030, or unless the City can demonstrate extreme impracticability, difficulty or expense, the Additional Portion of the City's Annual Commitment for the years 2025 to 2030 shall be an average of 340 Accessible Curb Ramps.  The actual Additional Portion for any calendar year shall be determined by the Parties' meet and confer process.  For purposes of this Consent Decree, the Annual Commitment includes all Accessible Curb Ramps installed or Remediated by the City, its contractors, and any other third parties acting within the City's authority, on its behalf, or pursuant to a permit issued by the City in connection with New Construction, Alterations, fulfillment of requests made through the Curb Ramp Request System set forth in Section 10, below, and Remediation of Existing non-Compliant Curb Ramps set forth in Section 8, below.

5.2.    Throughout the Term of the Consent Decree, all Curb Ramps installed or Remediated by the City, its contractors, or any other third parties acting within the City's

authority, or on its behalf, or pursuant to a permit issued by the City, shall be Accessible Curb Ramps.  The City shall ensure compliance as follows:

5.2.1.   The City shall require that the design and construction of all Curb Ramps to be installed or Remediated during the Term of the Consent Decree be subject to the City's review and approval.

5.2.2.   The City shall perform an Initial Review of each Curb Ramp installed or Remediated within thirty (30) days of the City's Department of Public Works' receiving notification of the ramp's completion.  If, in the City's judgment, the Curb Ramp presents a safety hazard or other readily apparent defect or Non-Compliant Condition, the City shall notify the entity that constructed or Remediated the Curb Ramp and require its replacement within thirty (30) days of the Initial Review.

5.2.3.   In addition, the City shall inspect each installed or Remediated Curb Ramp to verify whether it is an Accessible Curb Ramp ("Access Inspection") within one hundred twenty (120) days of the ramp's completion.  For purposes of these Access Inspections, the City shall use a two-foot-long electronic (digital) level to measure slopes, and slopes shall be measured where they appear to be steepest.  The City shall only give approval to verified Accessible Curb Ramps.

5.2.4.   In the event that the City determines that any of the Curb Ramps evaluated as part of the Access Inspection and approval process are not Accessible Curb Ramps, it shall notify the entity that constructed or Remediated the Curb Ramp and require its replacement within thirty (30) days of the notification.

824681.8

5.2.5.   Any Curb Ramp installed or Remediated pursuant to this Consent Decree shall count toward fulfillment of the City's Annual Commitment only after it has passed the Access Inspection and approval process.

5.3.   If in any annual period other than the final year of the Term of the Consent Decree, more Accessible Curb Ramps are installed within the City than the applicable Annual Commitment, the City may bank the additional Accessible Curb Ramps to be credited to any year in which fewer than the applicable Annual Commitment of Accessible Curb Ramps are installed to bring the total to the required number for that year.  This excess shall be referred to as the "credit bank."  The credit bank may be replenished and drawn down in the City's discretion.  If in any such annual period, the City experiences unexpected delays in major capital improvement projects based on factors outside of the City's control, then the applicable Annual Commitment may be reduced in an amount not to exceed 250 Accessible Curb Ramps.  This number shall be referred to as the "deficit bank."  No ramps will be added to the credit bank until the deficit bank is reduced to zero.  The deficit bank shall be reduced to zero within two years, during which time the deficit ramps shall be installed in addition to the applicable Annual Commitment.  During any year in which there are ramps in the deficit bank, the City may not reduce its Annual Commitment based on ramps in the credit bank.

6.   **Prioritization of Annual Commitment**

6.1.   On an annual basis throughout the Term of the Consent Decree, the City shall provide Class Counsel with a "Curb Ramp List," or a list of the locations at which the Curb Ramps are planned to be installed or Remediated during the upcoming year.  The Curb Ramp List shall be provided to Class Counsel no later than thirty (30) days prior to the commencement of each year of the Annual Commitment.  The Curb Ramp List shall indicate whether each Curb

Ramp is an installation or Remediation and, if the latter, the type of Remediation to be performed (e.g., grinding of lip, repainting of crosswalk, ramp replacement, etc.). The Curb Ramp List shall also indicate the reasons for prioritizing Existing Curb Ramps for Remediation under the factors set forth in Section 8.2, below. Class Counsel shall have fifteen (15) days from receipt to provide feedback on the Curb Ramp List, which the City shall incorporate to the extent practicable.

6.2.    In each year, the City will use Best Efforts to adhere to the Curb Ramp List, but it may make changes based on field conditions, requests submitted through Curb Ramp Request System, or other operational necessity. The City shall promptly notify Class Counsel of all changes to the Curb Ramp List and give Class Counsel a reasonable opportunity to provide feedback, to which the City will give good faith consideration.

7.    **New Construction and Alteration Requirements**

7.1.    Throughout the Term of the Consent Decree, whenever the City, the City's contractors, or any other party acting within the City's authority, on its behalf, or, pursuant to a permit issued by the City performs an Alteration to or constructs a street, road, or highway within City right of way, the City will install or Remediate, or require the installation or Remediation of, Accessible Curb Ramps where a Pedestrian Walkway adjacent to the constructed or Altered street, road, or highway crosses a curb and no Accessible Curb Ramp currently exists.

7.2.    Throughout the Term of the Consent Decree, whenever the City, the City's contractors, or any other party acting within the City's authority, on its behalf, or pursuant to a permit issued by the City Alters a Pedestrian Walkway or constructs a new Pedestrian Walkway, the City will install or Remediate, or require the installation or Remediation of, Accessible Curb

Ramps if and where the Altered or new portion of the Pedestrian Walkway crosses a curb or is adjacent to a corner where pedestrians are permitted to cross the street.

7.3.    Throughout the Term of the Consent Decree, whenever the City, the City's contractors, or any other party acting within the City's authority, on its behalf, or pursuant to a permit issued by the City Alters an Existing Curb Ramp or installs a new Curb Ramp, the City will accept the installed or Remediated Curb Ramp only if it is Accessible.

7.4.    Throughout the Term of the Consent Decree, whenever the City, the City's contractors, or any other party acting within the City's authority, on its behalf, or pursuant to a permit issued by the City newly constructs or Alters Pedestrian Facilities, or adjacent construction projects obstruct the pedestrian right of way, the City shall ensure that Accessible temporary routes are provided through and around such projects with appropriate signage directing persons with Mobility Disabilities to such Accessible temporary routes.

7.5.    The obligation of the City, the City's contractors, any other party acting within the City's authority on its behalf, and third parties acting pursuant to a permit to install or Remediate an Accessible Curb Ramp as set forth in this Section shall be subject to the following:

7.5.1.   Technical Infeasibility:  Where the Consent Decree would otherwise require the installation or Remediation of a Curb Ramp in connection with an Alteration, but existing physical or site constraints prohibit such installation, then the Curb Ramp shall be made Accessible to the maximum extent feasible.  *See* 2010 ADA Standards for Accessible Design, DOJ Technical Assistance Manual for Title II of the ADA, II-6.3100(4) (9-12-06).  Such accessibility work shall be performed at the same time that the Alteration project is being performed or reasonably thereafter.  The City will document findings of Technical Infeasibility and make this documentation available to Class Counsel.

7.5.2.   Structural Impracticability:  In the rare circumstances when the unique characteristics of terrain prevent the installation of an Accessible Curb Ramp during new construction, the Curb Ramp shall comply to the extent that it is not Structurally Impracticable, as further described in 28 C.F.R. § 35.151(a)(2)(i).  The City will document findings of Structural Impracticability and make this documentation available to Class Counsel.

7.5.3.   In circumstances of Structural Impracticability or Technical Infeasibility, the City shall consider the extent to which physical or site constraints can be addressed by alternative Curb Ramp designs or a raised crosswalk that meets applicable federal and state Access standards.  Such consideration shall also be documented, and the City shall make this documentation available to Class Counsel.

## 8.    **Remediation of Existing Pedestrian Facilities**

8.1.    As part of the Annual Commitment, and to the extent not otherwise covered by planned New Construction and Alterations, or by the Curb Ramp Request System set forth in Section 10, below, the City shall Remediate all Non-Compliant Curb Ramps identified in the results of the Survey of Existing Pedestrian Facilities.

8.2.    Locations for Accessible Curb Ramps to be installed or Remediated on Existing Pedestrian Facilities throughout the Term of the Consent Decree will be prioritized in accordance with the following:

8.2.1.   The priorities set forth in 28 C.F.R. § 35.150 (which are also reflected in the City's High Priority Sidewalk Network and Snow Maps based on MAPC raw walk scores), which include proximity to:

8.2.1.1.        Government offices, facilities, schools, and parks (including the pedestrian rights of way adjacent to facilities owned or operated by the City, and

18

the paths of travel leading from such adjacent pedestrian rights of way to the primary entrances to such facilities);

        8.2.1.2.      Transportation corridors;

        8.2.1.3.      Hospitals, medical facilities, assisted living facilities, and other similar facilities;

        8.2.1.4.      Places of public accommodation, such as commercial and business zones;

        8.2.1.5.      Facilities containing employers; and

        8.2.1.6.      Residential neighborhoods; and

    8.2.2.   Ramps requested by or on behalf of a person with a mobility disability through the Curb Ramp Request System as set forth in Section 10, below.

    8.2.3.   Ramps found to be non-Compliant in response to a 311 maintenance request as set forth in Section 11.4, below.

## 9.    Consent Decree Implementation Plan

    9.1.    As soon as possible, but no later than two years after the Effective Date, the City shall create a Consent Decree Implementation Plan to expressly address the Curb Ramp priorities, obligations and milestones set forth in this Consent Decree ("Implementation Plan").

    9.2.    The Implementation Plan shall include a schedule for Accessible Curb Ramp installation and Remediation that is consistent with this Consent Decree.  To the extent known, the Implementation Plan shall take into account locations of planned New Construction or Alterations that trigger the obligation to install new Accessible Curb Ramps.  To the extent feasible, the Implementation Plan shall also memorialize the prioritization of Existing Pedestrian Facilities to be Remediated pursuant to Section 8.2.

824681.8

9.3.     The City shall provide a draft of the Implementation Plan to Class Counsel for their review and comment at least thirty (30) days prior to finalizing the Implementation Plan for adoption.  The City will meet and confer with Class Counsel about any comments Class Counsel have on the Implementation Plan, and will give good faith consideration to such comments.  The City shall solicit public comment on the Implementation Plan from community members who have Mobility Disabilities.

## 10. Curb Ramp Request System

10.1.    Throughout the Term of the Consent Decree, the City shall continue to maintain a program through which people with Mobility Disabilities may submit requests for the construction and maintenance of Accessible Curb Ramps and the Remediation of non-Compliant Curb Ramps ("Curb Ramp Request System").  Curb Ramp Requests may be submitted through an easily locatable form on the City's website, a telephone number, or other electronic format. The request form may require the following information: (i) the requestor's name, address and other contact information; (ii) a statement that the requestor is a person with a Mobility Disability or is making the request on behalf of a person with a Mobility Disability; (iii) the location of the requested Curb Ramp; and (iv) the method preferred by the requestor to receive the City's response to the Curb Ramp Request (e.g., by telephone, text message, electronic mail, or standard mail).  The request form shall allow a requestor to indicate that they are a person with a Mobility Disability or are making the request on behalf of a person with a Mobility Disability.

10.2.    The City shall document receipt of each Curb Ramp Request, assign each request a specific identification number (or other identifying information), and log the request into a software program or other electronic database that records the requestor's name and contact

824681.8

information, the date of the request, and the location of the requested Curb Ramp construction, Remediation, or maintenance.  The City's program shall continue to immediately, or at least within ten (10) days of receipt, indicate to the requestor that their request has been received, and provide the requestor with the identification number or other identifying information assigned to the request.

10.3.    The City will investigate each request within thirty (30) days of its submission, and provide the requestor with information about when the City estimates that the Accessible Curb Ramp will be constructed, Remediated or maintained.  Given that the City is only able to perform construction in the pedestrian right of way during six months of the year due to weather conditions, the City shall use Best Efforts to construct each requested Accessible Curb Ramp or Remediate each identified non-Compliant Curb Ramp within one year of the submission of the request.  If the City determines that it is unable to fulfill a Curb Ramp Request within one year of submission because of the prioritization of other locations for Curb Ramp installation and Remediation for that year's Annual Commitment, the City shall use Best Efforts to fulfill the Curb Ramp Request as soon as practicable in the next calendar year.

10.4.    In any such circumstance where the construction of an Accessible Curb Ramp requested pursuant to the City's Curb Ramp Request System would be Technically Infeasible or Structurally Impracticable, the subject Curb Ramp shall be Accessible to the maximum extent feasible, and physical or site constraints shall be addressed by alternative Curb Ramp designs or a raised crosswalk that meets applicable federal and state Access standards.  If the City determines that construction of a requested Curb Ramp is Technically Infeasible or Structurally Impracticable, the City shall notify the requestor that the subject ramp shall be made Accessible to the maximum extent feasible.  As set forth in Section 7.5., above, the City will document

findings of Technical Infeasibility and Structural Impracticability and make this documentation available to Class Counsel.

10.5.    Through the Term of Consent Decree, the City shall maintain a website, or an equivalent manner of electronic communication to the general public, which describes the methods for making Curb Ramp Requests and the process and timeline for fulfilling those Requests.  The webpage(s) describing the Curb Ramp Request System shall, at a minimum, be available from an easily findable location on the City of Boston's website homepage.

**11.    <u>Maintenance</u>**

11.1.    Throughout the Term of the Consent Decree, the City shall maintain all Accessible Curb Ramps over which it has responsibility, ownership, or control so that those facilities are readily accessible to and usable by persons with Mobility Disabilities, except for isolated or temporary interruptions in access due to maintenance or repairs.

11.2.    In circumstances where Accessible Curb Ramps are not available due to construction, maintenance, or repairs, the City shall provide an Accessible alternative route.

11.3.    Throughout the Term of the Consent Decree, the City shall continue its annual public initiative to educate the public regarding the necessity for timely removal of snow and other debris from Curb Ramps, and from sidewalks that provide access to bus stops.  The City will also use Best Efforts to ensure timely removal of such snow and debris, including through rigorous enforcement of City of Boston Ordinance 16-12.16, and in accordance with M.G.L c. 85 § 5.

11.4.    Throughout the Term of the Consent Decree, City will promptly respond to and investigate complaints made through the City's 311 system that concern puddles of water forming on Curb Ramp landings.  Within thirty days of receiving the complaint, the City will

confirm whether the Curb Ramp is non-Compliant.  Any such complaint regarding a Curb Ramp that the City determines is non-Compliant will be treated as a Curb Ramp Request subject to the terms of Section 10 above and prioritized in accordance therewith.

**12.**     **Annual Reporting**

12.1.     On an annual basis and by the end of each calendar year of the Consent Decree, the City will provide a written Annual Report to Class Counsel regarding the status of the City's compliance with the terms of the Consent Decree.  The Annual Report shall include summary information detailing the number of Accessible Curb Ramps constructed and/or Remediated and their locations, and the number and locations of Accessible Curb Ramps constructed and/or Remediated via the Curb Ramp Request System.  Each of the reports shall include the following information, if applicable to the reporting period:

12.1.1. Detailed information demonstrating the number and locations of Curb Ramps installed or Remediated by the City, its contractors, or third parties in the preceding calendar year, including links to view the design data, photographs, and sign-offs for each completed ramp;

12.1.2. Documentation demonstrating locations where ramps have been installed and Remediated to the maximum extent feasible, or were not installed, due to Technical Infeasibility or Structural Impracticability;

12.1.3. Documentation showing the number ramps requested via the Curb Ramp Request System and respective response times from notification of receipt of request through time of Accessible Curb Ramp installation or Remediation; and

12.1.4. Documentation, including photographs, showing the measurements set forth in Section 3.2.3., above, of a random sampling of Curb Ramps installed or Remediated in the previous year.

12.1.5. Documentation of all inspections performed pursuant to Section 5.2.3, including whether any Curb Ramps were deemed not to be Accessible, and if so, whether such Curb Ramps were promptly corrected.

12.2.    Additionally, throughout the Term of the Consent Decree, the City shall provide Class Counsel with requested information from PWD's pavement, sidewalk and Curb Ramp asset management database(s), or equivalent databases, upon Plaintiffs' reasonable request.  The information shall be provided in Microsoft Excel format, or in such other searchable/sortable electronic format as the Parties mutually agree upon.

12.3.    Within forty-five (45) calendar days of City's issuance of the Annual Report to Class Counsel, if so needed, Class Counsel may request to meet with the City via telephone or videoconference, or if reasonable, in person, to discuss the City's efforts to implement the Consent Decree and attempt to resolve any disputes.

**13.    <u>Monitoring</u>**

Throughout the Term of the Consent Decree, the City shall notify Class Counsel of any changes to the City's drawings and/or designs regarding Accessible Curb Ramps, and shall provide Plaintiffs and Class Counsel with any updated drawings and/or designs regarding Accessible Curb Ramps.  Plaintiffs and Class Counsel may also inspect work being done in the City's pedestrian rights of way to construct Accessible Curb Ramps and Remediate non-Compliant Curb Ramps in order to monitor compliance with the Consent Decree.  Additionally, as set forth in Section 12.2, above, the City will provide requested information from its relevant

824681.8

asset management database to Plaintiffs and Class Counsel for their review upon reasonable request.  The information shall be provided in Microsoft Excel format, or in such other searchable/sortable electronic format as the Parties mutually agree upon.

**14.    Settlement Approval Process**

14.1.    This Consent Decree will be subject to approval by the District Court.  However, nothing in this Consent Decree will be deemed to authorize the District Court to change or modify any of its terms.  Any change, modification or rejection of any of the provisions of this Consent Decree by the District Court or any other court will constitute a material modification of this Consent Decree, will prevent the Judgment from becoming final, and will give any Party the right to terminate this Consent Decree in its entirety.

14.2.    By no later than ten (10) days after circulating the fully executed Consent Decree, Plaintiffs will file their Complaint in the United States District Court for the District of Massachusetts (the "Muehe Action").  The Parties will then jointly move the court for preliminary approval of this Consent Decree, certification of the Settlement Class as defined in Section 1.18 of this Consent Decree, appointment of Class Counsel and Plaintiffs to represent the Settlement Class, and approval of the form and content of notice (substantially in the form attached to this Consent Decree as Exhibit B) and a plan for distribution of notice to the Settlement Class.  Along with their joint motion for preliminary approval, the Parties will submit the proposed Preliminary Approval Order attached to this Consent Decree as Exhibit C (the "Preliminary Approval Order.").  Alternatively, Plaintiffs may file the motion for preliminary approval, which the City agrees not to oppose.

14.3.    The Parties agree that the Settlement Class will be certified in accordance with the standards applicable under Rule 23(b)(2) of the Federal Rules of Civil Procedure and that,

accordingly, no Settlement Class member may opt out of any of the provisions of this Consent Decree.

14.4.    Following the District Court's issuance of the Preliminary Approval Order, the Parties will circulate the Notice of Settlement, advising the members of the Settlement Class of the terms of the proposed Consent Decree and their right to object to the proposed Consent Decree.  This Notice will be published as follows:

14.4.1. Within thirty (30) days after the District Court has issued the Preliminary Approval Order, the City will cause Notice of the Settlement to be published once each week for four (4) consecutive weeks in The Boston Globe and the Boston Herald.  The City will also cause Notice of the Settlement to be published in additional publications as the District Court may order.

14.4.2. The Notice will include the terms required by the District Court, which are anticipated to be as follows: (i) a brief statement of the Muehe Action, the settlement embodied in this Consent Decree, and the claims released by the Settlement Class; (ii) the date and time of the fairness hearing and/or final approval hearing of the proposed Consent Decree; (iii) the deadline for submitting objections to the proposed Consent Decree; and (iv) the web page, address, and telephone and fax numbers that may be used to obtain a copy of the Notice of Settlement.  The City will pay the costs for the publication of the Notice.

14.4.3. Within twenty (20) days after the District Court has issued the Preliminary Approval Order, the City will cause a copy of the Notice of Settlement to be posted and remain posted on the City's official website (www.boston.gov) for four (4) consecutive weeks.   The website will also make a copy of the Notice of Settlement available in English, Spanish, Haitian Creole, Traditional Chinese, Vietnamese, Cabo Verdean Creole, Brazilian Portuguese, Russian,

Arabic, French, Somali, or any other language required by the City of Boston's Language and Communications Access Policy, and in an accessible electronic format that can be recognized and read by software commonly used by individuals with visual impairments to read web pages. All pages or content on these websites that are part of the process for accessing the information in the Notice of Settlement will comply with WCAG.  The City will pay the costs for the publication of the Notice.

14.4.4. Within ten (10) days after the District Court has issued the Preliminary Approval Order, Class Counsel will cause a copy of the Notice of Settlement to be provided (via email or U.S. Mail) to the organizations listed on Exhibit D to this Consent Decree.

14.4.5. Within twenty (20) days after the District Court has issued the Preliminary Approval Order, each firm making up Class Counsel will post on its website a copy of the Notice of Settlement in English, Spanish, Haitian Creole, Traditional Chinese, Vietnamese, Cabo Verdean Creole, Brazilian Portuguese, Russian, Arabic, French, Somali, or any other language required by the City of Boston's Language and Communications Access Policy, and in an accessible electronic format that can be recognized and read by software commonly used by individuals with visual impairments to read web pages.  In addition, the websites will provide information about how Settlement Class Members may obtain a copy of the Consent Decree.  All pages or content on the websites that are part of the process for accessing the information in the notice will comply with WCAG.

14.5.   Prior to the fairness hearing, and as directed by the District Court, Plaintiffs will file a motion for an award of attorneys' fees, costs, and expenses, and service award to Plaintiffs consistent with the terms of this Consent Decree.  Plaintiffs' motion will seek service awards to Plaintiffs of no more than $5,000.00 each (as set forth in Section 17, below).  The Parties will

also file a joint motion requesting that the District Court schedule and conduct a fairness hearing to decide whether the Court will grant final approval of the Consent Decree, as set forth below.

14.6.    Prior to the fairness hearing, the Parties will jointly move for entry of the Judgment (substantially in the form as attached to this Consent Decree as Exhibit E) providing for: (i) final approval of this Consent Decree as fair, adequate, and reasonable; (ii) final certification of the Settlement Class for settlement purposes only; (iii) final approval of the form and method of notice of the Judgment to the Settlement Class; (iv) final approval of the appointment of Class Counsel for the Settlement Class; (v) final approval of the appointment of Plaintiffs as representatives of the Settlement Class; (vi) final approval of the release of the City from the Released Claims, defined in Section 18, below; (vii) final approval of an order that the Settlement Class members will be enjoined and barred from asserting any of the Released Claims against the City following entry of Judgment and up to and including the completion of the Term; (viii) the Parties and all members of the Settlement Class to be bound by the Judgment; and (ix) the District Court's retention of jurisdiction over the Parties to enforce the terms of the Judgment throughout the Term of this Consent Decree.

14.7.    Members of the Settlement Class will have an opportunity to object to the proposed Consent Decree but may not opt-out.  The Parties will request that the District Court order the following procedures for assertion of objections, if any, to the Consent Decree:

14.7.1.    Any Settlement Class member may object to this Consent Decree by filing, within sixty (60) calendar days of the commencement of the issuance of the Notice to the Settlement Class, written objections with the District Court, with a copy of such objections served concurrently on Class Counsel by messenger delivery, FedEx or other overnight carrier

delivery, or First Class U.S. Mail delivery; and/or by appearing at the Court's fairness hearing and speaking to the Court.

        14.7.2.     With respect to any and all objections to this Consent Decree received by Class Counsel, Class Counsel will provide a copy of each objection to counsel of record for the City, by messenger delivery or electronic-mail delivery, within two (2) court days after receipt of such objection.

        14.7.3.     Responses by Class Counsel and/or the City to any timely-filed objections may be filed with the District Court no less than five (5) days before the fairness hearing, or as otherwise ordered by the Court.

        14.8.    The Parties will take all procedural steps regarding the fairness hearing that may be requested by the District Court and will otherwise use their respective Best Efforts to consummate the settlement embodied in this Consent Decree, and to obtain approval of this Consent Decree and entry of the Judgment.

        14.9.    The Parties agree that, upon final approval, the District Court will enter the Judgment under Rule 54(b) of the Federal Rules of Civil Procedure (substantially in the form attached to this Consent Decree as Exhibit E) dismissing the Muehe Action with prejudice, subject to the District Court's continuing jurisdiction to resolve any Dispute regarding compliance with this Consent Decree that cannot be resolved through the Dispute Resolution Process set forth below, and to rule on Plaintiffs' motion for reasonable attorneys' fees, costs, and expenses.

        14.10.    The City will not assert, after the Judgment has become final, that the District Court lacks jurisdiction to enforce the terms of this Consent Decree, or raise any jurisdictional defense to any enforcement proceedings permitted under the terms of this Consent Decree.

14.11.     Should the District Court deny the Parties' request to enter the Judgment, should this Consent Decree not receive final approval by the District Court for any reason, or should this Consent Decree not become final for any reason in accordance with its terms:  (i) this Consent Decree will be null and void and of no force and effect; (ii) nothing in this Consent Decree will be deemed to prejudice the position of any of the Parties with respect to any matter; and (iii) neither the existence of this Consent Decree, nor its contents, will be admissible in evidence, referred to for any purpose in any litigation or proceeding, or be deemed an admission by the City of any fault, wrongdoing, or liability.

14.12.     This Consent Decree, upon final approval, will be binding upon the City, Plaintiffs, and all Settlement Class members and, to the extent specifically set forth in this Consent Decree, upon Class Counsel; will extinguish all Released Claims; and will constitute the final and complete resolution of all issues addressed herein.  This Consent Decree is the complete and final disposition and settlement of any and all Released Claims.

## 15.    <u>Media Communications Regarding Settlement</u>

The Parties shall negotiate a joint press release to announce the Consent Decree at the time that it is submitted for preliminary approval to the federal court.

## 16.    <u>Dispute Resolution</u>

16.1.    If any Party believes that a dispute exists relating to any violation of or failure to perform any of the provisions of this Consent Decree, it shall notify the other Party in writing and describe the alleged violation or failure to perform with particularity.  The Party alleged to have committed the violation or failure to perform shall provide a written response within ten (10) business days of receipt of such notice, and shall have a period of thirty (30) days to cure the alleged violation or failure to perform.  In the event the alleged violation cannot reasonably be

824681.8

cured within thirty (30) days, the Parties shall meet and confer to attempt to agree on an appropriate period of time required to cure the alleged violation or failure to perform.  If the Party alleging a violation or failure to perform maintains that the violation or failure to perform has not been cured, the Parties shall meet and confer, in person or by telephone, and attempt to resolve the dispute on an informal basis for a period of at least thirty (30) days.

16.2.    If the Parties are unable to resolve a dispute regarding either Party's performance under the Consent Decree through the process described in the Section 16.1., above, either Party may provide the other with written notice of its intent to enforce the Consent Decree.  Thereafter, either Party may file a motion with the District Court to enforce the Settlement Consent Decree.

16.3.    The terms of this Consent Decree shall be construed pursuant to the laws of the State of Massachusetts with respect to principles of common law contract interpretation, and in accordance with the substantive law of ADA and Section 504, as applicable.

## 17.    **Named Plaintiff Payments**

In exchange for the Release of Claims set forth in Section 18, below, and for all services rendered to the Settlement Class, and conditioned upon the District Court granting final approval of the Consent Decree as well as Plaintiffs' application for service awards to Plaintiffs Muehe, Hamilton, Evans and Flanagan in the amounts set forth in this Section, within thirty (30) days of the Effective Date, the City will pay each of the Named Plaintiffs $5,000.00.  This payment shall be in full and final settlement of Plaintiffs' claims that are being released in Section 18.

## 18.    **Release of Claims**

18.1.    Effective upon entry of judgment on final approval of the Consent Decree by the District Court and in consideration for the City's commitments set forth in the Consent Decree, Plaintiffs and Settlement Class Members, on behalf of themselves and their respective heirs,

824681.8

assigns, successors, executors, administrators, agents, and representatives ("Releasing Parties") will, upon the Effective Date, fully and finally release, acquit, and discharge the City from any and all claims, allegations, demands, charges, complaints, actions, lawsuits, rights, liabilities, losses, injuries, obligations, disputes and causes of action of any kind, and whether known or unknown, suspected or unsuspected, asserted or unasserted, or actual or contingent, for injunctive, declaratory, or other non-monetary relief, however described, that were brought, could have been brought, or could be brought now or in the future by the Releasing Parties relating to or arising from any of the City's alleged actions, omissions, incidents, or conduct related to the construction, Remediation, repair, or maintenance of Curb Ramps in the City's pedestrian right of way at any time prior to the Effective Date and through the end of the Term of the Consent Decree (the "Released Claims").  Such Released Claims, however, shall not include any claims to enforce the terms of the Consent Decree, any claims for relief arising from the City's violation of any term of the Consent Decree, or any claims related to monetary damages, personal injuries, or property damage.  Such Released Claims also exclude any claims based on or arising from missing or non-Compliant Curb Ramps that remain in existence after the expiration of the Term of Consent Decree.  In addition, as explained in the Recitals above, the Releases contained herein only cover Curb Ramps on the City's street segments with Pedestrian Walkways and do not apply to components of the City's sidewalk system other than Curb Ramps.

18.2.    In addition to the Released Claims, the Named Plaintiffs also release the City from any and all claims arising at any time prior to the Effective Date for monetary relief relating to or arising from any of the City's alleged actions, omissions, incidents, or conduct related to

the installation, remediation, repair or maintenance of curb ramps in the City's pedestrian right of way.

**19.**     **Attorneys' Fees, Costs, and Expenses Up to the Effective Date**

The City agrees that for the purpose of awarding attorneys' fees, costs, and expenses, Plaintiffs are to be considered the prevailing parties in this matter and Class Counsel are entitled to an award of reasonable attorneys' fees, costs, and expenses incurred for work performed through the Effective Date, the amount of which will be determined by the District Court. Within thirty (30) days of the Effective Date, and conditioned upon the District Court's granting final approval of the Consent Decree and issuance of an order on Plaintiffs' application for an award of attorney's fees, costs, and expenses, the City shall deliver payment to Class Counsel for the full amount of their reasonable attorneys' fees, costs, and expenses awarded by the District Court in connection with this matter incurred up to the Effective Date.  No additional amounts shall be owed to Plaintiffs or their Counsel in attorney's fees, expenses, or costs for time or expenses incurred up to the Effective Date.

**20.**     **Attorneys' Fees, Costs, and Expenses for Implementing the Consent Decree**

Subject to the following terms, the City shall pay Class Counsel their reasonable attorneys' fees, costs, and expenses incurred between the Effective Date and the expiration of the Term of Consent Decree for performing all work reasonably necessary to monitor, implement, and administer the Consent Decree.

20.1.   No later than thirty (30) days after the first anniversary of the Effective Date, and annually thereafter during the Term of the Consent Decree, Class Counsel shall submit to the City a statement of reasonable attorneys' fees, costs, and expenses incurred during the prior 12-month period for performing all work reasonably necessary to monitor, implement, and

33

administer the Consent Decree and confirm that the City has met its obligations under this Consent Decree, subject to a maximum amount of $70,000 per year for the first through fifth years, and a maximum amount of $60,000 per year for each of the remaining years through the expiration of the Term of the Consent Decree ("Annual Monitoring Fees Cap").  Class Counsel shall not seek more than $15,000 per year in attorneys' fees for the limited tasks of reviewing the Annual Report and having one or more telephonic conferences totaling fewer than four hours that confirms that the City is in compliance with the Consent Decree.  The Annual Monitoring Fees Cap is stated in 2021 dollars, and shall be adjusted annually based on the Consumer Price Index for the Boston Area as calculated by the United States Bureau of Labor Statistics.  Where Plaintiffs' reasonable attorneys' fees, costs, and expenses are less than the Annual Monitoring Fees Cap for a given year, the remainder shall be set aside for use in subsequent years of this Consent Decree ("Banked Remainder") during which Plaintiffs' attorneys' fees, costs, and expenses exceed the Annual Monitoring Fees Cap.  (There shall be a cap of $90,000 on the amount of "Banked Remainder," and the Banked Remainder will replenish up to this cap, depending on the amount of the remainder that may accrue at any time).  The Annual Fees Cap and the Banked Remainder available for use in any given year shall be no more than $100,000 combined.  Each statement submitted to the City pursuant to this Consent Decree shall be supported by a description of services by date and by biller.  In submitting their statement of attorneys' fees, Class Counsel will use the hourly rates that the Court approves as reasonable when it rules on Plaintiffs' motion for attorneys' fees, costs, and expenses related to time spent through the Effective Date of the Consent Decree, adjusted annually based on the Consumer Price Index for the Boston Area as calculated by the United States Bureau of Labor Statistics.

20.2.    The City shall review each statement submitted, and within sixty (60) days of receiving such statement, shall pay those amounts it determines in good faith were reasonably incurred by Class Counsel.  Any objections or disputes regarding the statement shall be handled pursuant to the Dispute Resolution procedure set forth in Section 16 of the Consent Decree.

20.3.    The City shall pay Class Counsel their reasonable attorneys' fees, costs, and expenses incurred between the Effective Date and the expiration of the Term of the Consent Decree for performing all work reasonably necessary to resolve Disputes under Section 16 of the Consent Decree subject to a maximum amount of $75,000 per Dispute.  The $75,000 maximum amount is stated in 2021 dollars and shall be adjusted annually based on the Consumer Price Index for the Boston Area as calculated by the United States Bureau of Labor Statistics.  As part of resolving disputes as set forth in Section 16, the Parties may agree upon the reasonable attorneys' fees, costs, and expenses to be paid to Class Counsel.  In the absence of such agreement Class Counsel shall provide the City with a statement of reasonable attorneys' fees, costs, and expenses incurred for each dispute, supported by a description of services by date and by biller; the City shall review each statement and pay the amounts in compliance with the Section 20.2.  This provision shall not apply where either Party seeks resolution of a dispute before the District Court, which shall be subject to Section 20.4.

20.4.    In the event either Party finds that it is necessary to seek resolution of a dispute through a motion for enforcement before the District Court, the prevailing party shall be entitled to reasonable attorneys' fees, costs, and expenses in accordance with the standards of the ADA and Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421-22 (1978) for all time, costs, and expenses reasonably incurred pursuing their position in the dispute under Section 16.

21. **Drafting of this Consent Decree**

The Parties acknowledge and agree that this Consent Decree shall for all purposes be deemed jointly-drafted and fully-negotiated, and as a result, shall not in any manner be interpreted in favor of, or against, any particular Party by reason of being the drafting Party. Any rule of law that would require interpretation of any ambiguities or uncertainties in this Consent Decree against one of the Parties, shall have no application and is hereby expressly waived.

22. **Voluntary Agreement**

Each of the Parties represents, warrants, and agrees that they have read this Consent Decree carefully and know and understand its contents, that this Consent Decree has been voluntarily entered into, that they have received independent legal advice from their attorneys with respect to the advisability of executing this Consent Decree, and that any and all investigation and analysis of the facts deemed necessary or desirable have been conducted prior to the execution of this Consent Decree.

23. **Binding Effect**

All of the terms and provisions of this Consent Decree shall be binding upon and shall inure to the benefit of the Parties, their heirs, successors, and assigns.

24. **Authority**

Each of the Parties represents, warrants, and agrees that they have the full right and authority to enter into this Consent Decree, and that the person executing this Consent Decree has the full right and authority to commit and bind such Party.

25. **Force Majeure**

The obligations of the City with respect to constructing or Remediating Accessible Curb Ramps at a particular location may also be postponed if the postponement is caused by or

36

attributable to a force majeure—that is, due to acts of God, pandemic, war, government regulations (other than regulations by the City), terrorism, disaster (including power outages), strikes, civil disorder, government declared fiscal emergency, or an emergency beyond the City's control, that make it illegal or impossible for the City to perform construction, Alteration, or repair work.  Under this provision, the City's obligations may be tolled for the period of the force majeure's effect.

26.    **Paragraph Headings**

The headings, or lack thereof, preceding each of the paragraphs in this Consent Decree are for convenience only, and shall not be considered in the Consent Decree's construction or interpretation.

27.    **Counterparts**

This Consent Decree may be executed by the Parties in separate counterparts, and all such counterparts taken together shall be deemed to constitute one and the same Consent Decree.

28.    **Notices**

For Plaintiffs:

     Linda M. Dardarian
     Raymond A. Wendell
     GOLDSTEIN, BORGEN, DARDARIAN & HO
     155 Grand Avenue, Suite 900
     Oakland, CA  94612
     510-763-9800

     Timothy Fox
     CIVIL RIGHTS EDUCATION AND
     ENFORCEMENT CENTER
     104 Broadway, Suite 400
     Denver, CO  80203
     303-757-7901

Tom Murphy
DISABILITY LAW CENTER, INC. – MASSACHUSETTS
11 Beacon Street, Suite 925
Boston, MA 02108
617-723-9125

For the City of Boston:

Henry C. Luthin, Corporation Counsel
City of Boston
1 City Hall Square, Room 615
Boston, MA 02201
617-635-4034

IN WITNESS WHEREOF, the Parties hereto have approved and executed this Consent

Decree on the dates set forth opposite their respective signatures.

EXECUTED by the Parties as follows:

Dated: _____June 29_____, 2021        THE CITY OF BOSTON,

By: _____
Henry C. Luthin, Corporation Counsel

Dated: _____, 2021

By: _____
Michael Muehe

Dated: _____, 2021

By: _____
Elaine Hamilton

Dated: _____, 2021

By: _____
Crystal Evans

Dated: _____, 2021

By: _____
Colleen Flanagan

38

824681.8

Tom Murphy
DISABILITY LAW CENTER, INC. – MASSACHUSETTS
32 Industrial Drive East
Northampton, MA 01060
413-584-6524

For the City of Boston:

Henry C. Luthin, Corporation Counsel
City of Boston
1 City Hall Square, Room 615
Boston, MA 02201
617-635-4034

IN WITNESS WHEREOF, the Parties hereto have approved and executed this Consent

Decree on the dates set forth opposite their respective signatures.

EXECUTED by the Parties as follows:

Dated: _____, 2021       THE CITY OF BOSTON

By: _____
    Henry C. Luthin, Corporation Counsel

Dated: __June 20_____, 2021

By: _____
    Michael Muehe

Dated: __July 2,_____, 2021

By: _____
    Elaine Hamilton

Dated: __June 17_____, 2021

By: _____
    Crystal Evans

Dated: __6-25_____, 2021

By: _____
    Colleen Flanagan

38

824681.8

**APPROVED AS TO FORM:**

Dated: _____ June 24 _____, 2021     GOLDSTEIN BORGEN DARDARIAN & HO

By: _____
     Linda M. Dardarian
     Raymond Wendell
     *Attorneys for Plaintiffs*

Dated: _____, 2021     CIVIL RIGHTS EDUCATION AND
     ENFORCEMENT CENTER

By: _____
     Timothy Fox
     *Attorneys for Plaintiffs*

Dated: _____, 2021     DISABILITY LEGAL CENTER –
     MASSACHUSETTS

By: _____
     Tom Murphy
     *Attorneys for Plaintiffs*

Dated: _____, 2021     THE CITY OF BOSTON

By: _____
     Adam Cederbaum
     *Attorneys for City of Boston*

824681.8

**APPROVED AS TO FORM:**

Dated: _____, 2021          GOLDSTEIN BORGEN DARDARIAN & HO


By: _____
          Linda M. Dardarian
          Raymond Wendell
          *Attorneys for Plaintiffs*

Dated: _____June 28_____, 2021          CIVIL RIGHTS EDUCATION AND
                                       ENFORCEMENT CENTER


By: _____
          Timothy Fox
          *Attorneys for Plaintiffs*

Dated: _____, 2021          DISABILITY LEGAL CENTER –
                                         MASSACHUSETTS


By: _____
          Tom Murphy
          *Attorneys for Plaintiffs*

Dated: _____, 2021          THE CITY OF BOSTON


By: _____
          Adam Cederbaum
          *Attorneys for City of Boston*

39

**APPROVED AS TO FORM:**

Dated: _____, 2021          GOLDSTEIN BORGEN DARDARIAN & HO

                                       By: _____
                                            Linda M. Dardarian
                                            Raymond Wendell
                                            *Attorneys for Plaintiffs*

Dated: _____, 2021          CIVIL RIGHTS EDUCATION AND
                                       ENFORCEMENT CENTER

                                       By: _____
                                            Timothy Fox
                                            *Attorneys for Plaintiffs*

Dated: _June 2_, 2021                  DISABILITY LEGAL CENTER –
                                       MASSACHUSETTS

                                       By: _____
                                            Tom Murphy
                                            *Attorneys for Plaintiffs*

Dated: _____, 2021          THE CITY OF BOSTON

                                       By: _____
                                            Adam Cederbaum
                                            *Attorneys for City of Boston*

39

**APPROVED AS TO FORM:**

Dated: _____, 2021          GOLDSTEIN BORGEN DARDARIAN & HO


By: _____
   Linda M. Dardarian
   Raymond Wendell
   *Attorneys for Plaintiffs*

Dated: _____, 2021          CIVIL RIGHTS EDUCATION AND
                                      ENFORCEMENT CENTER


By: _____
   Timothy Fox
   *Attorneys for Plaintiffs*

Dated: _____, 2021          DISABILITY LEGAL CENTER –
                                      MASSACHUSETTS


By: _____
   Tom Murphy
   *Attorneys for Plaintiffs*

Dated: ___June 29___, 2021            THE CITY OF BOSTON


By: _____
   Adam Cederbaum
   *Attorneys for City of Boston*

824681.8

Exhibit A

U.S. Department of Transportation

# Federal Highway Administration

1200 New Jersey Avenue, SE
Washington, DC 20590
202-366-4000

---

## FHWA Office of Civil Rights



**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*



U.S. Department of Transportation
**Federal Highway Administration**

# Department of Justice/Department of Transportation Joint Technical Assistance[1] on the Title II of the Americans with Disabilities Act Requirements to Provide Curb Ramps when Streets, Roads, or Highways are Altered through Resurfacing

Title II of the Americans with Disabilities Act (ADA) requires that state and local governments ensure that persons with disabilities have access to the pedestrian routes in the public right of way. An important part of this requirement is the obligation whenever streets, roadways, or highways are *altered* to provide curb ramps where street level pedestrian walkways cross curbs.[2] This requirement is intended to ensure the accessibility and usability of the pedestrian walkway for persons with disabilities.

An alteration is a change that affects or could affect the usability of all or part of a building or facility.[3] Alterations of streets, roads, or highways include activities such as reconstruction, rehabilitation, *resurfacing*, widening, and projects of similar scale and effect.[4] Maintenance activities on streets, roads, or highways, such as filling potholes, are not alterations.

Without curb ramps, sidewalk travel in urban areas can be dangerous, difficult, or even impossible for people who use wheelchairs, scooters, and other mobility devices. Curb ramps allow people with mobility disabilities to gain access to the sidewalks and to pass through center islands in streets. Otherwise, these individuals are forced to travel in streets and roadways and are put in danger or are prevented from reaching their destination; some people with disabilities may simply choose not to take this risk and will not venture out of their homes or communities.

Because resurfacing of streets constitutes an alteration under the ADA, it triggers the obligation to provide curb ramps where pedestrian walkways intersect the resurfaced streets. See *Kinney v. Yerusalim*, 9 F 3d 1067 (3rd Cir. 1993). This obligation has been discussed in a variety of technical assistance materials published by the Department of Justice beginning in 1994.[5] Over the past few years, state and local governments have sought further guidance on the scope of the alterations requirement with respect to the provision of curb ramps when streets, roads or highways are being resurfaced. These questions have arisen largely due to the development of a variety of road surface treatments other than traditional road resurfacing, which generally involved the addition of a new layer of asphalt. Public entities have asked the Department of Transportation

and the Department of Justice to clarify whether particular road surface treatments fall within the ADA definition of alterations, or whether they should be considered maintenance that would not trigger the obligation to provide curb ramps. This Joint Technical Assistance addresses some of those questions.

### Where must curb ramps be provided?

Generally, curb ramps are needed wherever a sidewalk or other pedestrian walkway crosses a curb. Curb ramps must be located to ensure a person with a mobility disability can travel from a sidewalk on one side of the street, over or through any curbs or traffic islands, to the sidewalk on the other side of the street. However, the ADA does not require installation of ramps or curb ramps in the absence of a pedestrian walkway with a prepared surface for pedestrian use. Nor are curb ramps required in the absence of a curb, elevation, or other barrier between the street and the walkway.

### When is resurfacing considered to be an alteration?

Resurfacing is an alteration that triggers the requirement to add curb ramps if it involves work on a street or roadway spanning from one intersection to another, and includes overlays of additional material to the road surface, with or without milling. Examples include, but are not limited to the following treatments or their equivalents: addition of a new layer of asphalt, reconstruction, concrete pavement rehabilitation and reconstruction, open-graded surface course, micro-surfacing and thin lift overlays, cape seals, and in-place asphalt recycling.

### What kinds of treatments constitute maintenance rather than an alteration?

Treatments that serve solely to seal and protect the road surface, improve friction, and control splash and spray are considered to be maintenance because they do not significantly affect the public's access to or usability of the road. Some examples of the types of treatments that would normally be considered maintenance are: painting or striping lanes, crack filling and sealing, surface sealing, chip seals, slurry seals, fog seals, scrub sealing, joint crack seals, joint repairs, dowel bar retrofit, spot high-friction treatments, diamond grinding, and pavement patching. In some cases, the combination of several maintenance treatments occurring at or near the same time may qualify as an alteration and would trigger the obligation to provide curb ramps.

### What if a locality is not resurfacing an entire block, but is resurfacing a crosswalk by itself?

Crosswalks constitute distinct elements of the right-of-way intended to facilitate pedestrian traffic. Regardless of whether there is curb-to-curb resurfacing of the street or roadway in general, resurfacing of a crosswalk also requires the provision of curb ramps at that crosswalk.

---

1 The Department of Justice is the federal agency with responsibility for issuing regulations implementing the requirements of title II of the ADA and for coordinating federal agency compliance activities with respect to those requirements. Title II applies to the programs and activities of state and local governmental entities. The Department of Justice and the Department of Transportation share responsibility for enforcing the requirements of title II of the ADA with respect to the public right of way, including streets, roads, and highways.

2 See 28 CFR 35.151(i)(1) (Newly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway) and 35.151(i)(2) (Newly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways).

3 28 CFR 35.151(b)(1).

4 2010 ADA Accessibility Standards, section 106.5.

5 See 1994 Title II Technical Assistance Manual Supplement, Title II TA Guidance: The ADA and City Governments: Common Problems; and ADA Best Practices Tool Kit for State and Local Governments: Chapter 6, Curb Ramps and Pedestrian Crossings under Title II of the ADA, available at ada.gov.

Page last modified on January 28, 2019

**BRIEFING MEMO**

**SUBJECT:**   Department of Justice/Department of Transportation Joint Technical Assistance on Title II of the Americans with Disabilities Act Requirements to Provide Curb Ramps when Streets, Roads, or Highways are Altered through Resurfacing

**ISSUE**:   Throughout the nation, there are different interpretations and inconsistencies in enforcement of when curb ramps are required.

**BACKGROUND**: The Americans with Disabilities Act of 1990 (ADA) is a civil rights statute prohibiting discrimination against persons with disabilities in all aspects of life, including transportation, based on regulations promulgated by the United States Department of Justice (DOJ). DOJ's regulations require accessible planning, design, and construction to integrate people with disabilities into mainstream society.  Further, these laws require that public entities responsible for operating and maintaining the public rights-of-way do not discriminate in their programs and activities against persons with disabilities. FHWA's ADA program implements the DOJ regulations through delegated authority to ensure that pedestrians with disabilities have the opportunity to use the transportation system's pedestrian facilities in an accessible and safe manner.

FHWA and DOJ met in March 2012 and March 2013 to clarify guidance on the ADA's requirements for constructing curb ramps on resurfacing projects.  <u>Projects deemed to be alterations must include curb ramps within the scope of the project.</u>

**SUMMARY OF GUIDANCE CLARIFICATION:** This clarification provides a single Federal policy that identifies specific asphalt and concrete-pavement repair treatments that are considered to be alterations—requiring installation of curb ramps within the scope of the project—and those that are considered to be maintenance, which do not require curb ramps at the time of the improvement.



This approach clearly identifies the types of structural treatments that both DOJ and FHWA agree require curb ramps (when there is a pedestrian walkway with a prepared surface for pedestrian use and a curb, elevation, or other barrier between the street and the walkway) and furthers the goal of the ADA to provide increased accessibility to the public right-of-way for persons with disabilities.  This single Federal policy will provide for increased consistency and improved enforcement.

**MOVING FORWARD**:
Divisions are expected to initiate discussions with their Partnering Agency / State to:
1) Disseminate this clarification with regard to when curb ramps are required
   a. States are expected to inform/assist local agencies
2) Establish a plan to implement this single Federal policy as soon as practical
   a. FHWA Headquarters is not providing a set deadline for all projects to comply with this policy.
   b. Projects that are ready for Construction Advertisement or are under contract may proceed.
   c. The Division should evaluate the projects in the state pavement preservation/resurfacing program and agree on projects to comply with this policy.
   d. The Division should work with its Partnering Agencies / States to evaluate and modify, if necessary, their existing resurfacing ADA policies to comply with this policy.

**POINTS OF CONTACT**:
Brooke Struve, RC Safety & Design Team, CTSRC-LAK, 720-963-3270, Brooke.Struve@dot.gov
Candace Groudine, Director-External Civil Rights, HCR, 202-366-4634, Candace.Groudine@dot.gov
Robert Mooney, Pre-Construction Team Leader, HIPA, 202-366-2221, Robert.Mooney@dot.gov

Case 1:21-cv-11080-RGS Document 1-2 Filed 07/02/21 Page 50 of 81



**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*



U.S. Department of Transportation
**Federal Highway Administration**

# QUESTIONS & ANSWERS
## Supplement to the 2013 DOJ/DOT Joint Technical Assistance on the Title II of the Americans with Disabilities Act Requirements To Provide Curb Ramps when Streets, Roads, or Highways are Altered through Resurfacing

The *Department of Justice (DOJ)/Department of Transportation (DOT)* *Joint Technical Assistance on the Title II of the Americans with Disabilities Act [ADA] Requirements to Provide Curb Ramps when Streets, Roads, or Highways are Altered through Resurfacing* *(Joint Technical Assistance)* was published on July 8, 2013. This document responds to frequently asked questions that the Federal Highway Administration (FHWA) has received since the technical assistance document was published. In order to fully address some questions, the applicable requirements of Section 504 of the Rehabilitation Act of 1973 that apply to public entities receiving Federal funding from DOT, either directly or indirectly, are also discussed. This document is not a standalone document and should be read in conjunction with the 2013 Joint Technical Assistance.

Q1: *When a pavement treatment is considered an alteration under the ADA and there is a curb ramp at the juncture of the altered road and an existing sidewalk (or other prepared surface for pedestrian use), but the curb ramp does not meet the current ADA Standards, does the curb ramp have to be updated to meet the current ADA Standards at the time of the pavement treatment?*

A1: It depends on whether the existing curb ramp meets the appropriate accessibility standard that was in place at the time it was newly constructed or last altered.

When the Department of Justice adopted its revised title II ADA Regulations including the updated ADA Standards for Accessible Design (2010 Standards,[1] as defined in 28 CFR 35.151), it specified that "(e)lements that have not been altered in existing facilities on or after March 15, 2012, and that comply with the corresponding technical and scoping specifications for those elements in either the 1991 Standards or in the Uniform Federal Accessibility Standards (UFAS) … are not required to be modified in order to comply with the requirements set forth in the 2010 Standards." 28 C.F.R. 35.150(b)(2)(i). As a result of this "safe harbor" provision, if a curb ramp was built or altered prior to March 15, 2012, and complies with the requirements for curb ramps in either the 1991 ADA Standards for Accessible Design (1991 Standards, known prior to 2010 as the 1991 ADA Accessibility Guidelines, or the 1991 ADAAG) or UFAS, it does **not** have to be modified to comply with the requirements in the 2010 Standards. However, if that existing curb ramp did not comply with either the 1991 Standards or UFAS as of March 15, 2012, then the safe harbor does not apply and the curb ramp must be brought into compliance with the requirements of the 2010 Standards concurrent with the road alteration. *See* 28 CFR 35.151(c) and (i).

1/22/2020    QUESTIONS AND ANSWERS about the ADA and the Technical Assistance in the regulation of the Americans with Disabilitie…

Case 1:21-cv-01080-RCC   Document 12-2   Filed 07/02/21   Page 51 of 81

Note that the requirement in the 1991 Standards to include detectable warnings on curb ramps was suspended for a period between May 12, 1994, and July 26, 1998, and again between December 23, 1998, and July 26, 2001.  If a curb ramp was newly constructed or was last altered when the detectable warnings requirement was suspended, and it otherwise meets the 1991 Standards, Title II of the ADA does not require that the curb ramp be modified to add detectable warnings in conjunction with a road resurfacing alteration project.  *See* Question #14 however, for a discussion of the DOT Section 504 requirements, including detectable warnings.

**Q2:** *The Joint Technical Assistance states that "[r]esurfacing is an alteration that triggers the requirement to add curb ramps if it involves work on a street or roadway spanning from one intersection to another, and includes overlays of additional material to the road surface, with or without milling."  What constitutes "overlays of additional material to the road surface" with respect to milling, specifically, when a roadway surface is milled and then overlaid at the same height (i.e., no material is added that exceeds the height of what was present before the milling)?*

A2: A project that involves milling an existing road, and then overlaying the road with material, regardless of whether it exceeds the height of the road before milling, falls within the definition of "alteration" because it is a change to the road surface that affects or could affect the usability of the pedestrian route (crosswalk).  *See Kinney v. Yerusalim*, 9 F.3d 1067 (3rd Cir. 1993).  Alterations require the installation of curb ramps if none previously existed, or upgrading of non-compliant curb ramps to meet the applicable standards, where there is an existing pedestrian walkway.  *See* also Question 8.

**Q3:** *If a roadway resurfacing alteration project does not span the full width of the road, do I have to put in curb ramps?*

A3: It depends on whether the resurfacing work affects a pedestrian crosswalk.  If the resurfacing affects the crosswalk, even if it is not the full roadway width, then curb ramps must be provided at both ends of the crosswalk.  *See* 28 CFR 35.151(i).

Public entities should not structure the scope of work to avoid ADA obligations to provide curb ramps when resurfacing a roadway.  For example, resurfacing only between crosswalks may be regarded as an attempt to circumvent a public entity's obligation under the ADA, and potentially could result in legal challenges.

If curb ramp improvements are needed in the vicinity of an alteration project, it is often cost effective to address such needs as part of the alteration project, thereby advancing the public entity's progress in meeting its obligation to provide program access to its facilities.  *See* Question 16 for further discussion.

**Q4:** *When a road alteration project triggers the requirement to install curb ramps, what steps should public (State or local) entities take if they do not own the sidewalk right-of-way needed to install the required curb ramps?*

A4: The public entity performing the alteration is ultimately responsible for following and implementing the ADA requirements specified in the regulations implementing title II.  At the time an alteration project is scoped, the public entity should identify what ADA requirements apply and whether the public entity owns sufficient right-of-way to make the necessary ADA modifications.  If the public entity does not control sufficient

1/22/2020    QUESTIONS AND ANSWERS ABOUT the Development of a Joint Technical Assistance on the Title II of the Americans with Disabilitie…

Case 1:21-cv-11080-RGS   Document 1-2   Filed 07/02/21   Page 52 of 81

right-of-way, it should seek to acquire the necessary right-of-way. If a complaint is filed, the public entity will likely need to show that it made reasonable efforts to obtain access to the necessary right-of-way.

**Q5:** *The Joint Technical Assistance is silent on when it becomes effective. Is there an effective date for when States and local public entities must comply with the requirements discussed in the technical assistance?*

A5: The Joint Technical Assistance, as well as this Supplement to it, does not create any new obligations. The obligation to provide curb ramps when roads are altered has been an ongoing obligation under the regulations implementing title II of the ADA (28 CFR 35.151) since the regulation was initially adopted in 1991. This technical assistance was provided to respond to questions that arose largely due to the development of a variety of road surface treatments, other than traditional road resurfacing, which generally involved the addition of a new layer of asphalt. Although the Joint Technical Assistance was issued on July 8, 2013, public entities have had an ongoing obligation to comply with the alterations requirements of title II and should plan to bring curb ramps that are or were part of an alteration into compliance as soon as possible.

**Q6:** *Is the curb ramp installation work required to be a part of the Plans, Specifications and Estimate package for an alteration project or can the curb ramp work be accomplished under a separate contract?*

A6: The curb ramp installation work can be contracted separately, but the work must be coordinated such that the curb ramp work is completed prior to, or at the same time as, the completion of the rest of the alteration work. *See* 28 CFR 35.151(i).

**Q7:** *Is a curb ramp required for a sidewalk that is not made of concrete or asphalt?*

A7: The Joint Technical Assistance states that "the ADA does not require installation of ramps or curb ramps in the absence of a pedestrian walkway with a prepared surface for pedestrian use." A "prepared surface for pedestrian use" can be constructed out of numerous materials, including concrete, asphalt, compacted soil, decomposed granite, and other materials. Regardless of the materials used to construct the pedestrian walkway, if the intent of the design was to provide access to pedestrians, then curb ramps must be incorporated where an altered roadway intersects the pedestrian walkway. *See* 28 CFR 35.151(i).

**Q8:** *If an existing curb ramp is replaced as part of a resurfacing alteration, is there an obligation to address existing obstacles on the adjacent sidewalk at the same time?*

A8: No. The Joint Technical Assistance addresses those requirements that are triggered when a public entity alters a roadway where the roadway intersects a street level pedestrian walkway (28 CFR 35.151(i)). Public entities are required to address other barriers on existing sidewalks, such as steep cross slopes or obstructions, as part of their on-going program access and transition plan obligations under title II of the ADA and Section 504 and in response to requests for reasonable modifications under the ADA or reasonable accommodations under Section 504. *See* 28 CFR 35.105, 35.130(b)(7), and 35.150(d); *see also* 49 CFR 27.7(e), 27.11(c)(2).

**Q9:** *Several pavement preservation treatment types are not listed in the technical assistance. If the treatment type is not specifically on the list of maintenance treatments, is it an alteration?*

1/22/2020    Questions and Answers on the Supplement to the 2013 Joint Technical Assistance on the ADA and Americans with Disabilitie…

Case 1:21-cv-11090-RGS   Document 12-2   Filed 07/02/21   Page 53 of 81

A9: New treatments are always being developed and the best practice is for the City or other local public entity conducting the work, the State transportation agency, and FHWA to work together to come to an agreement on a reasonable determination of whether the unlisted treatment type is an alteration or maintenance and document their decisions.  If the new treatment can be deemed to be the equivalent of any of the items listed as alterations, it is a reasonable interpretation that they are in fact alterations and should be treated as such.

Q10: *When does a combination of two or more 'maintenance' treatments rise to the level of being an alteration?*

A10: The list of the pavement types that are considered maintenance, as stated in the 2013 Joint Technical Assistance document, are Chip Seals, Crack Filling and Sealing, Diamond Grinding, Dowel Bar Retrofit, Fog Seals, Joint Crack Seals, Joint Repairs, Pavement Patching, Scrub Sealing, Slurry Seals, Spot High-Friction Treatments, and Surface Sealing. The combination of two or more maintenance treatments may rise to the level of being an alteration.

The best practice is for the City or other local public entity conducting the work, the State transportation agency, and FHWA to work together to come to an agreement on a reasonable determination, document their policies, and apply that determination consistently in their locality.

Q11: *When will utility trench work require compliance with ADA curb ramp requirements?*

A11: The answer to this question depends on the scope and location of the utility trench work being done.  If the utility trench work is limited to a portion of the pavement, even including a portion of the crosswalk, repaving necessary to cover the trench would typically be considered maintenance and would not require simultaneous installation or upgrading of curb ramps.  Public entities should note that the ADA requires maintenance of accessible features, and as such, they must ensure that when the trench is repaved or other road maintenance is performed, the work does not result in a lesser level of accessibility.  *See* 28 CFR 35.133(a).  If the utility work impacts the curb at a pedestrian street crossing where no curb ramp exists, the work affecting the curb falls within the definition of "alteration," and a curb ramp must be constructed rather than simply replacing the curb.  *See* 28 CFR 35.151(b) and 35.151(i).

If a public entity is unsure whether the scope of specific trench work and repair/repaving constitutes an alteration, the best practice is for the public entity to work together with the State transportation agency and the FHWA Division to come to an agreement on how to consistently handle these situations and document their decisions.

Q12: *Is full-depth pavement patching considered maintenance?*

A12: The answer to this question depends on the scope and location of the pavement patch.  If the pavement patch work is limited to a portion of the pavement, even including a portion of the crosswalk, patching the pavement would typically be considered maintenance and would not require simultaneous installation or upgrading of curb ramps. Public entities should note that the ADA requires maintenance of accessible features, and as such, they should ensure that when the pavement is patched or other road maintenance is performed, the work does not result in a lesser level of accessibility.  *See* 28 CFR 35.133(a).  If the pavement

patching impacts the curb at a pedestrian street crossing where no curb ramp exists, the work affecting the curb falls within the definition of "alteration," and a curb ramp must be constructed rather than simply replacing the curb.  *See* 28 CFR 35.151(b) and 35.151(i).

If a public entity is unsure whether the scope of specific full-depth pavement patching constitutes an alteration, the best practice is for the public entity to work together with the State transportation agency and the FHWA Division to come to an agreement on how to consistently handle these situations and document their decisions.

*Q13: **Do any other requirements apply to road alteration projects undertaken by public entities that receive Federal financial assistance from DOT either directly or indirectly, even if such financial assistance is not used for the specific road alteration project at issue?***

A13: Yes, if a public entity receives any Federal financial assistance from DOT whether directly or through another DOT recipient, then the entity must also apply DOT's Section 504 requirements even if the road alteration project at issue does not use Federal funds. *See* 49 CFR 27.3 (applicability of DOT's Section 504 requirements) and 27.5 (definition of "program or activity").

DOT's Section 504 disability nondiscrimination regulations are found at 49 CFR Part 27.  These regulations implement Section 504 of the Rehabilitation Act of 1973 (Section 504). In 2006, DOT updated its accessibility standards by adopting the 2004 Americans with Disabilities Act Accessibility Guidelines (2004 ADAAG[2]) into its Section 504 regulations at 49 CFR 27.3 (referencing 49 CFR Part 37, Appendix A).  These requirements replaced the previously applicable ADA Standards for Accessible Design (1991) (formerly known as 1991 ADAAG).  At that time, DOT's  regulation adopted a modification to Section 406 of the 2004 ADAAG which required  the placement of detectable warnings on curb ramps.

The revised DOT Section 504 regulation also provided a "safe harbor" provision (similar to the ADA provision discussed in Question 1) that applies to curb ramps that were newly constructed or altered by entities receiving Federal financial assistance from DOT and that were in compliance with the 1991 ADAAG requirements prior to November 29, 2006.  If the "safe harbor" applies, these curb ramps are still considered compliant and do not have to be modified to add detectable warnings unless they are altered after November 29, 2006.  The DOT "safe harbor" provision is found at 49 CFR 37.9(c).  DOT's Section 504 regulations (49 CFR 27.19(a)) require compliance with 49 CFR Part 37.

The Section 504 safe harbor does not apply, however, if, at the time of the road alteration project, the existing curb ramp does not comply with the 1991 ADAAG and at that time it must be brought into compliance with the current DOT Section 504 requirements (2004 ADAAG) including detectable warnings.

Q14: ***Does the Section 504 safe harbor apply to curb ramps built in compliance with 1991 ADAAG during the time period when the requirement for detectable warnings was suspended and the roadway is now being resurfaced where it intersects the pedestrian walkway?***

A14: If the curb ramps that were built or altered prior to November 29, 2006 were fully compliant with 1991 ADAAG at the time that the detectable warnings requirements were suspended, then the DOT Section 504

safe harbor applies to them and the recipient does not have to add detectable warnings as a result of a resurfacing project.

Q15: ***In addition to the obligations triggered by road resurfacing alterations, are there other title II or Section 504 requirements that trigger the obligation to provide curb ramps?***

A15: In addition to the obligation to provide curb ramps when roads are resurfaced, both DOJ's title II ADA regulation and DOT's Section 504 regulation (applicable to recipients of DOT Federal financial assistance), require the provision of curb ramps if the sidewalk is installed or altered at the intersection, during new construction, as a means of providing program accessibility, and as a reasonable modification under title II or a reasonable accommodation under Section 504.

**New Construction and Alterations**

DOJ's title II ADA regulation provides that newly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway.   In addition, the regulation provides that newly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways.   *See* 28 CFR 35.151(i).  These curb ramps must comply with the 2010 Standards.[3]

DOT's Section 504 Federally assisted regulation also requires the provision of curb ramps in new construction and alterations.  *See* 49 CFR 27.19(a) (requiring recipients of DOT financial assistance to comply with DOJ's ADA regulation at 28 CFR Part 35, including the curb ramp requirements at 28 CFR 35.151(i)); 49 CFR 27.75 (a)(2) (requiring all pedestrian crosswalks constructed with Federal financial assistance to have curb cuts or ramps).

**Program Accessibility**

Both DOJ's title II ADA regulation and DOT's Section 504 regulation require that public entities/recipients operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.  This obligation, which is known as providing "program accessibility," includes a requirement to evaluate existing facilities in the public right-of-way for barriers to accessibility, including identifying non-existent or non-compliant curb ramps where roads intersect pedestrian access routes (sidewalks or other pedestrian walkways).  After completing this self-evaluation, a public entity/recipient must set forth a plan for eliminating such barriers so as to provide overall access for persons with disabilities.  *See* 28 CFR 35.150, and 49 CFR 27.11(c).

Since March 15, 2012, the DOJ title II regulation requires the use of the 2010 Standards for structural changes needed to provide program access.   However, in accordance with the ADA safe harbor discussed in Question 1, if curb ramps constructed prior to March 15, 2012 already comply with the curb ramp requirements in the 1991 Standards, they need not be modified in accordance with the 2010 Standards in order to provide program access, unless they are altered after March 15, 2012.

Similarly, DOT's Section 504 "safe harbor" allows curb ramps that were newly constructed or altered prior to November 29, 2006, and that meet the 1991 ADAAG to be considered compliant.[4]   Elements not covered

under the safe harbor provisions may need to be modified to provide program access and should be incorporated into a program access plan for making such modifications.  49 CFR 27.11(c)(2).

Under Section 504, self-evaluations and transition plans should have been completed by December 29, 1979.  Under the ADA, transition plans should have been completed by July 26, 1992, and corrective measures should have been completed by January 26, 1995. While these deadlines have long since passed, entities that did not develop a transition plan prior to those dates should begin immediately to complete their self-evaluation and develop a comprehensive transition plan.

**Reasonable Modification /Accommodation**

In addition to alteration and program accessibility obligations, public entities may have an obligation under title II and Section 504 to undertake curb ramp construction or alteration as a "reasonable modification/accommodation" in response to a request by, or on behalf of, someone with a disability.  Such a request may be made to address a non-compliant curb ramp outside of the schedule provided in the public entity's transition plan.  A public entity must appropriately consider such requests as they are made.  28 CFR 35.130(b)(7); 49 CFR 27.7(e).

---

1 The 2010 Standards can be found on DOJ's website at

http://www.ada.gov/2010ADAstandards_index.htm.

2 In 2004, the United States Architectural and Transportation Barriers Board (U.S. Access Board)

published the Americans with Disabilities Act Accessibility Guidelines (2004 ADAAG), which serve as

the basis of the current enforceable ADA standards adopted by both DOT and DOJ.

3 The 2010 Standards include a provision on equivalent facilitation that allows covered entities to use

other designs for curb ramps if such designs provide equal or greater access.  *See* section 103 of the 2010

Standards.

4 The DOT "safe harbor" provision is found at 49 CFR 37.9(c).  DOT's Section 504 regulations (49 CFR

27.19(a)) require compliance with 49 CFR Part 37.

The Americans with Disabilities Act authorizes the Department of Justice (the Department) to provide technical assistance to individuals and entities that have rights or responsibilities under the Act. This document provides informal guidance to assist you in understanding the ADA and the Department's regulations.

This guidance document is not intended to be a final agency action, has no legally binding effect, and may be rescinded or modified in the Department's complete discretion, in accordance with applicable laws. The Department's guidance documents, including this guidance, do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent.

Deccember 1, 2015

# Glossary of Terms for DOJ/DOT Joint Technical Assistance on the ADA Title II Requirements to Provide Curb Ramps When Streets Roads or Highways are Altered Through Resurfacing

This glossary is intended to help readers understand certain road treatments referenced on page 2 of the DOJ/FHWA Joint Technical Assistance on the ADA Title II Requirements to Provide Curb Ramps When Streets Roads or Highways are Altered Through Resurfacing. The definitions explain the meaning of these terms from an engineering perspective and are provided in the order in which they appear in the Technical Assistance document.

**Treatments that are considered alterations of the road surface**

**Reconstruction** – Reconstruction refers to removing all or a significant portion of the pavement material and replacing it with new or recycled materials. This may include full-depth reclamation, where the pavement surface is demolished in place and new pavement surface is applied. In addition, reconstruction may also include grinding up a portion of the pavement surface, recycling it and placing it back, and then adding a wearing surface, such as in cold in-place asphalt recycling. Reconstruction often includes widening or geometrical changes to the roadway profile.

**Rehabilitation** - Rehabilitation refers to significant repairs made to a road or highway surface, including activities such as full slab replacement, filling voids under slabs (slabjacking), widening, and adding additional structural capacity.

**Open-graded surface course** – Open-graded surface course, also known as "open-graded friction course," involves a pavement surface course that consists of a high-void, asphalt concrete mix that permits rapid drainage of rainwater through the course and off the shoulder of the road. The mixture consists of either Polymer-modified or rubber-modified asphalt binder, a large percentage of one-sized coarse aggregate, and a small amount of fibers. This treatment prevents tires from hydroplaning and provides a skid-resistant pavement surface with significant noise reduction.

**Microsurfacing** – Microsurfacing involves spreading a properly proportioned mixture of polymer modified asphalt emulsion, mineral aggregate, mineral filler, water, and other additives, on a paved surface. Microsurfacing differs from slurry seal in that it can be used on high volume roadways to correct wheel path rutting and provide a skid resistant pavement surface.

**Thin lift overlays** – Thin lift overlays are thin applications of mixtures of hot mix asphalt. Thin lift overlays may also require some milling along curbs, manholes, existing curb cuts, or other road structures to assure proper drainage and cross slopes.

**Cape seal** – A cape seal is a thin surface treatment constructed by applying a slurry seal or microsurfacing to a newly constructed chip seal. It is designed to be an integrated system where the primary purpose of the slurry is to fill voids in the chip seal.

**In-place asphalt recycling** - In-place asphalt recycling is a process of heating and removing around 1-2 inches of existing asphalt and remixing the asphalt with the addition of a binder additive and possible aggregate to restore the wearing surface for placement and compaction. All of this is performed in a train of equipment.

**Treatments that are considered maintenance of the road surface**

**Crack filling and sealing** – Crack filling and sealing involves placing elastomeric material directly into cracks in pavement.

**Surface sealing** - Surface sealing involves applying liquid sealant to pavement surface in order to stop water penetration and/or reduce oxidation of asphalt products. Sand is sometimes spread over liquid to absorb excess material.

**Chip seals** – Chip Seals involve placing graded stone (chips) on liquid emulsified asphalt sprayed on pavement surface. The surface is rolled to enable seating of chips.

**Slurry seal** – Slurry seals involve spraying a mixture of slow setting emulsified asphalt, well graded fine aggregate, mineral filler, and water on the pavement surface. It is used to fill cracks and seal areas of old pavements, to restore a uniform surface texture, to seal the surface to prevent moisture and air intrusion into the pavement, and to improve skid resistance.

**Fog seals** – Fog seals are a type of surface sealing.

**Scrub sealing** – Scrub sealing is type of surface sealing

**Joint crack seals** – Joint crack seals are usually associated with concrete pavement. This work consists of routing and cleaning existing cracks and joints and resealing to prevent water and non-compressibles from entering into the pavement joints and subgrade materials.

**Joint repairs** – Joint repairs are usually associated with concrete pavement. This work consists of selectively repairing portions of the pavement where the slabs are generally in good condition, but corners or joints are broken. The depth of the patch could be full depth or partial depth.

**Dowel retrofit** – Dowel retrofits are usually associated with concrete pavement. This work involves the installation of dowel bars connecting slabs in existing pavements. Pavement with dowel bar retrofits can have life extensions of as much as 20 years. Its application is almost exclusively on high-speed Interstate highways.

**Spot high-friction treatments** – Spot high-friction treatments involve using epoxy based resin liquids as a binder for an aggregate with high-friction properties. These are used in locations where drivers are frequently braking and the pavement surface has less resistance to slipping.

**Diamond grinding** – Diamond grinding involves using a gang saw to cut grooves in the pavement surface to restore smoothness and eliminate any joint faulting.

**Pavement patching** – Pavement patching involves selectively repairing portions of the pavement where the slabs are generally in good condition, but corners or joints are broken. The depth of the patch could be full depth or partial depth.

The Americans with Disabilities Act authorizes the Department of Justice (the Department) to provide technical assistance to individuals and entities that have rights or responsibilities under the Act. This document provides informal guidance to assist you in understanding the ADA and the Department's regulations.

This guidance document is not intended to be a final agency action, has no legally binding effect, and may be rescinded or modified in the Department's complete discretion, in accordance with applicable laws. The Department's guidance documents, including this guidance, do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent.

July 8, 2013

# Exhibit B

NOTICE OF PROPOSED SETTLEMENT OF CLASS ACTION LAWSUIT

ATTENTION ALL INDIVIDUALS WITH MOBILITY DISABILITIES: If you have used, or attempted to use, the pedestrian right of way in the City of Boston and have encountered corners on sidewalks or other pedestrian walkways that were missing curb ramps, or curb ramps that were inaccessible because they were damaged, in need of repair, or otherwise in a condition not suitable or sufficient for use, you may be a member of the proposed Settlement Class affected by this lawsuit. This is a court-authorized notice.

A "Mobility Disability" means any impairment or medical condition that limits a person's ability to walk, ambulate, maneuver around objects, or ascend or descend steps or slopes. A person with a Mobility Disability may or may not use a wheelchair, scooter, electric personal assisted mobility device, crutches, walker, cane, brace, orthopedic device, or similar equipment or device to assist their navigation along a pedestrian walkway, or may be semi-ambulatory.

PLEASE READ THIS NOTICE CAREFULLY.  YOUR RIGHTS MAY BE AFFECTED.

NOTICE OF CLASS ACTION

The purpose of this notice is to inform you of a proposed settlement in a pending class action lawsuit brought on behalf of individuals with Mobility Disabilities against the City of Boston. The proposed class action settlement is set out in a document called a "proposed Consent Decree." The proposed Consent Decree, which must be approved by the United States District Court before it goes into effect, was reached in the case entitled *Muehe et al. v. City of Boston*, Case No. _____, filed in the United States District Court for the District of Massachusetts.

BASIC INFORMATION

This lawsuit alleges that the City of Boston (the "City") violates federal disability access laws by failing to install and maintain adequate curb ramps to ensure that people with Mobility Disabilities can access the pedestrian right of way. The City disputes these allegations and denies that it has violated the law.

This is a class action. In a class action, one or more "Class Representatives" sue on behalf of all people who have similar legal claims. In this case, the Class Representatives are Michael Muehe, Elaine Hamilton, Crystal Evans, and Colleen Flanagan, who are long-time Boston residents or visitors with Mobility Disabilities. In a class action, one court resolves the issues for all Class Members. United States District Judge _____ is in charge of this class action. The Court has not decided in favor of either the Class Representatives or the City in this case. Instead, both sides agreed to a settlement.

THE SETTLEMENT CLASS

The Settlement Class includes all people with a Mobility Disability (including residents of and/or visitors to the City of Boston) who, at any time prior to court judgment granting final approval to the settlement, have been denied full and equal access to the City's pedestrian right of way due to missing or inaccessible curb ramps.

8232753.3

SUMMARY OF THE PROPOSED CONSENT DECREE

**The following is a summary of certain provisions of the proposed Consent Decree.  To access a copy of the full Consent Decree, see the "Further Information" section below.**

The proposed Consent Decree requires the City to install or upgrade an average of 1,630 curb ramps per year until a curb ramp that meets up-to-date federal disability access standards is present at every corner of the pedestrian right of way. Based on the Parties' best estimates, this will occur by the end of 2030.

The City must install or upgrade curb ramps when it builds new sidewalks. Also, when the City resurfaces roadways, it must install or upgrade curb ramps that adjoin the roadway. The City must prioritize installing or upgrade curb ramps at corners that are near government facilities, schools, parks, transportation corridors, medical facilities, businesses, places of employment, and residential neighborhoods, in that order. It must create an "Implementation Plan" that takes these priorities into account and give the public an opportunity to comment on the Implementation Plan.

The proposed Consent Decree also commits the City to continue to maintain a system through which people with Mobility Disabilities may submit requests that the City install or upgrade curb ramps in specific locations. The City will use its best efforts to investigate each request within 30 days and to install or upgrade each requested curb ramp within one year of submission. Information about how to submit a curb ramp request will be publicly available on the City's website (cityofboston.gov/311).

The City must maintain all curb ramps in good working order, except for temporary interruptions due to construction, maintenance, or repairs. When curb ramps are temporarily unavailable, the City will provide an alternative route that is accessible to people with Mobility Disabilities. In addition, the City must use best efforts to ensure timely removal of snow and other debris from curb ramps and sidewalks through continued enforcement of city ordinances and promptly respond to complaints concerning puddles of water that form at the bottom of curb ramps.

The proposed Consent Decree also requires the Class Representatives and the attorneys who represent the Settlement Class ("Class Counsel," identified below) to monitor the City's compliance with the terms of the proposed Consent Decree. The City must issue annual reports documenting the installation and upgrade of curb ramps.

RELEASE OF CLAIMS

The proposed Consent Decree resolves and releases, through the end of the Term of the proposed Consent Decree, all claims for injunctive, declaratory, or other non-monetary relief that were brought, could have been brought, or could be brought in the future relating to or arising from any of the City's alleged actions, omissions, incidents, or conduct related to the installation, remediation, repair, or maintenance of curb ramps in the City's pedestrian right of way. The proposed Consent Decree does not provide for any monetary relief to the Settlement Class. It does not release any monetary claims that Settlement Class Members may have, or any claims regarding components of the City's pedestrian right of way other than curb ramps.

PAYMENTS TO CLASS REPRESENTATIVES

2

Subject to Court approval, the City will pay each of the Class Representatives $5,000 in recognition of the work they performed on behalf of the Settlement Class.

## REASONABLE ATTORNEYS' FEES, COSTS AND EXPENSES

Under the proposed Consent Decree, Class Counsel can apply to the Court for an award of attorneys' fees, costs, and expenses from the City to pay them for their work on the case and to reimburse them for the costs they put into the case. Class Counsel's application for attorneys' fees will be based on the "lodestar" method, which means that Class Counsel will calculate their fees by multiplying the time the attorneys and paralegals at their offices reasonably spent working on the case by their reasonable hourly rates.

The City must also pay Class Counsel their reasonable attorneys' fees, costs, and expenses for monitoring the City's compliance with the proposed Consent Decree over the years that the Decree is in effect. Plaintiff's fees, expenses, and costs for monitoring will be capped at $70,000 per year for the first five years of the agreement and $60,000 per year thereafter.

## THE COURT'S FINAL APPROVAL/FAIRNESS HEARING

The Court has preliminarily approved the proposed Consent Decree, and has scheduled a "Final Approval" or "Fairness" hearing for **[DATE]** at 1 Courthouse Way, Boston, Massachusetts 02210, Courtroom __, to decide whether the proposed settlement is fair, reasonable, and adequate, and should be finally approved, as well as whether and how much to award to Class Counsel in reasonable attorneys' fees, costs, and expenses. At the hearing, the Court will consider any objections to the settlement and listen to individuals who wish to speak. As a Settlement Class Member, you have the right to be heard at this hearing, but you are not required to attend.

This hearing date is subject to change without further notice. If you wish to be informed of any changes to the schedule, please notify Class Counsel at the addresses listed below. You may also check www.gbdhlegal.com/cases/muehe-v-city-of-boston, CREEClaw.org/BostonCurbRamps, or the public court records on file in this action at https://www.pacer.gov/ for any updates.

## OBJECTIONS TO THE SETTLEMENT

If you do not want the proposed Consent Decree to be approved, you can ask the Court to deny approval by filing an objection. You cannot ask the Court to order a different settlement or change the settlement; the Court can only approve or reject the settlement. If the Court denies approval, the City will not be required to install and upgrade curb ramps as set out in the proposed Consent Decree. Instead, the lawsuit will continue. If that is what you want to happen, you must object. Any objection to the proposed Consent Decree must be in writing.

All written objections and supporting papers must (a) clearly identify the case name and number (*Muehe et al. v. City of Boston*, Case No. _____), (b) be submitted to the Court either by mailing them to the Clerk's Office, United States District Court for the District of Massachusetts, 1 Courthouse Way, Suite 2300, Boston, Massachusetts 02210, or by filing them in person at any location of the United States District Court for the District of Massachusetts, and (c) be filed or postmarked on or before **[deadline]**.

If you submit an objection, it should include the following information: (a) your name, address, and, if available, your telephone number and e-mail address; (b) if you are being represented by counsel, the name, address, telephone number and e-mail address of your attorney; (c) a statement identifying the specific grounds for your objections; and (d) a statement of whether your objection applies only to you, to a specific subset of the class, or to the entire class. **All objections must be submitted or postmarked on or before [deadline].**

All objections should also be sent to Class Counsel at the following address:

Thomas P. Murphy
DISABILITY LAW CENTER, INC.
32 Industrial Drive East
Northampton, MA 01060
(413) 584-6524

You may, but are not required to, appear at the Final Approval Hearing scheduled for **[date]** at 1 Courthouse Way, Boston, 02210, Courtroom __, to have your objection heard by the Court, either for yourself or through your own attorney. If you appear through your own attorney, you are responsible for hiring and paying that attorney.

**Any Class Member who does not object at or before the Final Approval Hearing will be deemed to have approved the settlement and to have waived such objections and shall not be able to make any objections (by appeal or otherwise) to the settlement.**

### IF YOU DO NOT OPPOSE THIS SETTLEMENT, YOU NEED NOT APPEAR OR FILE ANYTHING IN WRITING.

<u>BINDING EFFECT</u>

The proposed Consent Decree, if given final approval by the Court, will bind all members of the Settlement Class. This will bar any person who is a member of the Settlement Class from prosecuting or maintaining any claim or action released under the terms of the proposed Consent Decree.

<u>FURTHER INFORMATION</u>

This notice summarizes the proposed Consent Decree. For the precise and full terms and conditions of the settlement, please see the proposed Consent Decree available at www.gbdhlegal.com/cases/muehe-v-city-of-boston or CREEClaw.org/BostonCurbRamps, by contacting Class Counsel at the contact information below, by accessing the Court docket on this case through the Court's Public Access to Electronic Records (PACER) system at https://ecf.cand.uscourts.gov, or by visiting the office of the Clerk of the Court for the United States District Court for the District of Massachusetts, 1 Courthouse Way, Boston, Massachusetts 02110, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

You can also obtain more detailed information about the settlement or a copy of the proposed Consent Decree from Class Counsel at any of the following addresses:

Thomas P. Murphy
DISABILITY LAW CENTER, INC.
32 Industrial Drive East
Northampton, MA 01060
(413) 584-6524
www.dlc-ma.org

Linda M. Dardarian
Goldstein, Borgen, Dardarian & Ho
155 Grand Avenue, Suite 900
Oakland, CA 94612
(510) 763-9800
www.gbdhlegal.com

Timothy P. Fox
Civil Rights Education and Enforcement Center
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
(303) 757-7901
www.creeclaw.org

Class Members may also contact Class Counsel at the following toll-free number, 1-800-_____, to obtain further information about the settlement or settlement documents.

**Please do not telephone the Court or the Court Clerk's Office to inquire about this settlement.**

To obtain copies of this Notice or the proposed Consent Decree in alternative accessible formats, please contact Class Counsel listed above.

8232275.3

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL MUEHE, ELAINE HAMILTON, CRYSTAL EVANS, and COLLEEN FLANAGAN, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>CITY OF BOSTON, a public entity,<br><br>      Defendant. | Case No.: |

**[PROPOSED] ORDER (1) GRANTING PRELIMINARY APPROVAL OF
SETTLEMENT; (2) CERTIFYING SETTLEMENT CLASS; (3) DIRECTING NOTICE
TO THE CLASS; AND (4) SETTING DATE FOR FAIRNESS HEARING**

The Parties have applied to the Court for an order preliminarily approving the settlement of this action in accord with the Proposed Consent Decree ("Decree"), which sets forth the terms and conditions of a proposed settlement and dismissal of the action with prejudice, subject to the Court's continuing jurisdiction to enforce the Decree throughout its term.  Having read the papers submitted and carefully considered the arguments and relevant legal authority, and good cause appearing, the Court GRANTS the Parties' Joint Motion for Preliminary Approval of Class Action Settlement.

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.      This Court grants the Parties' Joint Motion for Class Certification, certifying a class for declaratory and injunctive relief.  The Court finds, for purposes of settlement only, and conditioned upon the entry of this Order and the Final Judgment and Order Approving Settlement, that the requirements of Rule 23 of the Federal Rules of Civil Procedure are met by the Settlement Class: (a) joinder of all Settlement Class Members in a single proceeding would

1

be impracticable, if not impossible, because of their numbers and dispersion; (b) there are questions of law and fact common to the Settlement Class; (c) Plaintiffs' claims are typical of the claims of the Settlement Class that they seek to represent for purposes of settlement; (d) Plaintiffs have fairly and adequately represented the interests of the Settlement Class and will continue to do so; (e) Plaintiffs and the Settlement Class are represented by qualified, reputable counsel who are experienced in preparing and prosecuting class actions, including those involving the types of allegations made in the Complaint; and (f) the City acted or refused to act on grounds that apply generally to the Settlement Class, so that final declaratory and injunctive relief is appropriate.  Accordingly, the Court hereby certifies the following Settlement Class pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2): all persons (including residents of and/or visitors to the City of Boston) with any mobility disability, who, at any time prior to Court judgment granting final approval of the Consent Decree, have been denied full and equal access to the City's pedestrian right of way due to the lack of a curb ramp or a curb ramp that was damaged, in need of repair, or otherwise in a condition not suitable or sufficient for use. Pursuant to Federal Rule Civil Procedure 23(c)(1)(B), the Court appoints named Plaintiffs and their counsel as representatives of the Settlement Class.

2.     The Court hereby preliminarily approves the Decree.  The Court finds on a preliminary basis that the Decree is fair, adequate, and reasonable to all potential Class Members.  It further appears that extensive evaluation of the merits has been conducted such that Counsel for the Parties are able to reasonably evaluate their respective positions.  It also appears to the Court that settlement at this time will avoid substantial additional costs to all Parties, as well as avoid the delay and the risks presented by further litigation.  It further appears that the Decree has been reached as the result of good faith, prolonged, serious, and non-collusive arms-

length negotiations.

3.      The Court hereby approves, as to form and content, the proposed Notice, attached as Exhibit C to the Decree.  The Court finds that the distribution of the Notice in the manner and form set forth in the Decree meets the requirements of due process and Federal Rules of Civil Procedure 23(c)(2) and 23(e).  This Notice is the best practicable under the circumstances, and shall constitute due and sufficient notice to all persons entitled thereto.  The Parties shall submit declarations to the Court as part of their Motion for Final Approval of the Class Action Settlement confirming compliance with the notice provisions of the Decree.

4.      A hearing on final approval of the Decree ("Fairness Hearing") shall be held before the Court, as set forth below, to determine all necessary matters concerning the Decree, including whether the proposed Decree's terms and conditions are fair, adequate, and reasonable, and whether the Decree should receive final approval by the Court, as well as to rule on Class Counsel's motion requesting an award of reasonable attorneys' fees, costs and expenses.

5.      Any Settlement Class Member may object to this Consent Decree by filing, no later than sixty (60) calendar days after the Notice process commences (the "Objection Deadline"), a written objection with the Court.  Any Settlement Class Member may object to any aspect of the proposed Consent Decree either on their own or through an attorney hired at their expense.  Any Settlement Class Member who wishes to object to the proposed Consent Decree may file a written statement of objection no later than the Objection Deadline.  Such statement should include: (a) the name, address, and, if available, telephone number and e-mail address of the Class Member objecting, (b) if represented by counsel, the name, address, telephone number and e-mail address of the Class Member's counsel; (c) a statement identifying the specific grounds for the Class Member's objection; and (d) a statement of whether the objection applies

to the Class Member, to a specific subset of the class, or to the entire class.

6.      Any Class Member who wishes to object to the proposed Decree may also present objections at the Fairness Hearing.

7.      The procedures and requirements for filing objections in connection with the Fairness Hearing are intended to ensure the efficient administration of justice and the orderly presentation of any Settlement Class Member's objection to the Decree, in accordance with the due process rights of all Settlement Class Members.

8.      Class Counsel shall provide copies of any objections to Defendant's counsel within two (2) court days of receipt.  Class Counsel shall also file any objections with the Court no less than ten (10) calendar days before the Fairness Hearing.

9.      Pending the Fairness Hearing, all proceedings in this Action, other than proceedings necessary to carry out and enforce the terms and conditions of the Decree and this Order, are hereby stayed.  Additionally, the Court enjoins all Settlement Class Members from asserting or maintaining any claims to be released by the Decree until the date of the Fairness Hearing.

10.     The Court adopts the following schedule:

a.      Within ten (10) calendar days after entry of the Order Granting Preliminary Approval, Class Counsel shall mail, via U.S. mail and/or email, the Notice in the form of Exhibit B to the Decree to all organizations identified in Exhibit D to the Decree.

b.      Within twenty (20) calendar days after entry of the Order Granting Preliminary Approval, Notice in the form of Exhibit B to the Decree shall be posted by Class Counsel on a case-specific website established by Class Counsel.  In addition, the websites will provide information about how Settlement Class Members may obtain a copy of the Consent

4

Decree.  By the same date, the City shall also post the Notice on its official website, where it

shall remain posted until the date of the Fairness Hearing.  Both the case-specific website

established by Class Counsel and the City's official website will post copies of the Notice in

English, Spanish, Haitian Creole, Traditional Chinese, Vietnamese, Cabo Verdean Creole,

Brazilian Portuguese, Russian, Arabic, French, Somali, or any other language required by the

City of Boston's Language and Communications Access Policy, and in an accessible electronic

format that can be recognized and read by software commonly used by individuals with visual

impairments to read web pages.

c.      Commencing within thirty (30) calendar days after entry of the Order

Granting Preliminary Approval, the City shall cause to be published Notice in the form of

Exhibit B to the proposed Consent Decree once each week for four (4) consecutive weeks in The

Boston Globe and the Boston Herald, in either the print or online versions of those publications.

d.      Each Class Member shall be given a full opportunity to object to the

proposed Settlement and Class Counsel's request for an award of reasonable attorneys' fees,

expenses, and costs, and to participate at the Fairness Hearing.  Any Class Member seeking to

object to the proposed Settlement may submit an objection to the District Court in writing, via

regular mail or filed in person, by the Objection Deadline.

e.      Twenty-one (21) calendar days prior to the Objection Deadline, Plaintiffs

shall file a Motion for an Award of Reasonable Attorneys' Fees, Expenses, and Costs.

Defendant may file an opposition brief, if any, by twenty-one (21) calendar days after Plaintiffs

file their Motion.  Plaintiffs may file a reply brief, if any, by fourteen (14) calendar days after

Defendant files its opposition brief.  The hearing on that Motion shall be concurrent with the

Fairness Hearing.

825480.2

f.      The Parties shall file a Joint Motion for Final Approval and may respond to objections, if any, no later than five (5) calendar days prior to the Fairness Hearing.  On the same date, the Parties shall also file statements of compliance with notice requirements.

g.      The Fairness hearing shall be held on _____, 2021 at _____ in Courtroom ___ of this Court.

11.     In the event the Court does not grant final approval of the Settlement, or for any reason the Parties fail to obtain a Final Judgment and Order Approving Settlement as contemplated by the Decree, or the Decree is terminated pursuant to its terms for any reason, or the Effective Date does not occur for any reason, then the Decree and all orders and findings entered in connection with the Decree and the Settlement shall become null and void and be of no further force and effect whatsoever, shall not be used or referred to for any purpose whatsoever, and shall not be admissible or discoverable in this or any other proceeding.

12.     This Order shall not be construed or used as an admission, concession, or declaration by or against the City of any fault, wrongdoing, breach, or liability.  It shall not be deemed to be a stipulation as to the propriety of class certification, or any admission of fact or law regarding any request for class certification, in any other action or proceeding, whether or not involving the same or similar claims.

13.     Nor shall this Order be construed or used as an admission, concession, or declaration by or against Plaintiffs or the other Settlement Class Members that their claims lack merit or that the relief requested is inappropriate, improper, or unavailable, or as a waiver by any Party of any defenses or claims he, she, or it may have in the Action or in any other proceeding.

**IT IS SO ORDERED.**

Dated: _____          _____

United States District Judge

6

825480.2

Exhibit D

BOSTON LIST OF NOTICE RECIPIENTS

1.    AdLib Center for Independent Living

2.    Administration for Community Living

3.    Advocates

4.    Alpha One (Portland, ME)

5.    American Association of People with Disabilities

6.    The Arc of Massachusetts

7.    Baycove

8.    Boston Center for Independent Living

9.    Boston Senior Home Care

10.   Boston University Disability Services

11.   Cape Organization for Rights of the Disabled

12.   Center for Disability Rights

13.   Center for Living and Working

14.   Central Boston Elder Services

15.   City of Boston Age Strong Commission

16.   City of Boston Mayor's Commission on Persons with Disabilities

17.   Deaf, Inc.

18.   Disability Policy Consortium

19.   Disability Resource Center

20.   Disabilities Network of Eastern Connecticut

21.   Easter Seals Massachusetts

22.   Emerson College Student Accessibility Services

23.   Ethos

24.   Granite State Independent Living

1

25.   Greater Boston Legal Services

26.   Greater New England National MS Society

27.   Independence Associates

28.   Independence Northwest

29.   Independent Living Center of the North Shore and Cape Ann, Inc.

30.   Independence Unlimited

31.   Institute for Community Inclusion

32.   Institute for Human Centered Design

33.   Massachusetts Association for the Blind and Visually Impaired

34.   Massachusetts Commission for the Blind

35.   Massachusetts Commission for the Deaf and Hard of Hearing

36.   Massachusetts Developmental Disabilities Council

37.   Massachusetts Law Reform Institute

38.   Massachusetts Office on Disability

39.   Massachusetts Rehabilitation Commission

40.   Massachusetts State House ADA Coordinator (Carl Richardson)

41.   MassADAPT

42.   Metro West Center for Independent Living

43.   National Disability Rights Network

44.   National Organization on Disability

45.   New England ADA Center

46.   Northeast Independent Living Program

47.   Northeastern University Disability Resource Center

48.   Ocean State Center for Independent Living

49.   Partners for Youth with Disabilities

50.    Rhode Island Statewide Independent Living Council

51.    Riders Transportation Access Group (RTAG)

52.    Southeast Center for Independent Living

53.    Spaulding Rehabilitation Network

54.    Stavros Center for Independent Living

55.    Suffolk University Disability Services

56.    Tempus Unlimited

57.    The Boston Home

58.    United Spinal Association

59.    Vermont Center for Independent Living

60.    Vinfen

# Exhibit E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL MUEHE, ELAINE HAMILTON, CRYSTAL EVANS, and COLLEEN FLANAGAN, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>CITY OF BOSTON, a public entity,<br><br>    Defendant. | Case No.: |

**[PROPOSED] FINAL JUDGMENT AND ORDER APPROVING CLASS ACTION SETTLEMENT**

WHEREAS, on [DATE], at [TIME], the Court held a hearing (the "Fairness Hearing") to determine, among other things, whether the settlement in this action between Defendant City of Boston (the "City") and Plaintiffs Michael Muehe, Elaine Hamilton, Crystal Evans, and Colleen Flanagan ("Plaintiffs"), as set forth in the Consent Decree, a copy of which is attached hereto as Exhibit 1 (the "Consent Decree"), is fair, reasonable, and adequate, such that an Order of final approval should be issued and a final judgment upon said Consent Decree should be entered by the Court,

WHEREAS, the Fairness Hearing was attended by the Parties, through their respective counsel of record in this action, and by such other individuals and entities as set forth in the record in this matter,

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.      The Court, for the purposes of this Judgment, adopts the terms and definitions set

825540.2

forth in the Consent Decree.

2.      The Court has jurisdiction over the subject matter of this action, Plaintiffs, the

Settlement Class, the Consent Decree, and the City.

3.      The Court finds that the Notice of Proposed Settlement of Class Action Lawsuit

("Settlement Notice") notified the Settlement Class of the pendency of this action and of the

proposed settlement and was disseminated by each of the means required under the Consent

Decree and the Order Granting Preliminary Approval of Class Action Settlement (ECF No. __)

dated _____, 2021, and was otherwise fully implemented.

4.      The Court finds that the Settlement Notice, as ordered and implemented, was

reasonably calculated under the circumstances to apprise the Settlement Class Members of the

pendency of this action, all material elements of the proposed Settlement, and their opportunity

(a) to submit written objections to the Settlement, and (b) to appear at the Fairness Hearing to

object to or comment on the Settlement.  The Settlement Notice was reasonable and the best

notice practicable to all Settlement Class Members and complied with the Federal Rules of Civil

Procedure, due process, and all other applicable laws and rules.  A full and fair opportunity has

been afforded to the members of the Settlement Class to participate during the Fairness Hearing,

and all other persons wishing to be heard have been heard.  Accordingly, the Court determines

that all members of the Settlement Class, as set forth below, are bound by this Judgment.

5.      On _____, 2021, this Court appointed Plaintiffs as Class Representatives of

the Settlement Class, and appointed the following counsel as Class Counsel to represent the

Settlement Class: (i) Goldstein Borgen Dardarian & Ho; (ii) Civil Rights Education and

Enforcement Center; and (iii) Disability Law Center of Massachusetts.

6.      On _____, 2021, this Court provisionally certified the following Settlement

Class pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), based on the findings in the Order of the same date: "all persons (including residents of and/or visitors to the City of Boston) with any mobility disability, who, at any time prior to Court judgment granting final approval of the Consent Decree, have been denied full and equal access to the City's pedestrian right of way due to the lack of a curb ramp or a curb ramp that was damaged, in need of repair, or otherwise in a condition not suitable or sufficient for use." This Court finds that the Settlement Class continues to meet the requirements for class certification under the Federal Rules of Civil Procedure and all other applicable laws and rules.

7.     In particular, the Court finds that: (a) joinder of all Settlement Class Members in a single proceeding would be impracticable, if not impossible, because of their numbers and dispersion; (b) there are questions of law and fact common to the Settlement Class; (c) Plaintiffs' claims are typical of the claims of the Settlement Class that they seek to represent for purposes of settlement; (d) Plaintiffs have fairly and adequately represented the interests of the Settlement Class and will continue to do so; (e) Plaintiffs and the Settlement Class are represented by qualified, reputable counsel who are experienced in preparing and prosecuting class actions, including those involving the sort of practices alleged in the Complaint; and (f) the City acted or refused to act on grounds that apply generally to the Settlement Class, so that declaratory and injunctive relief is appropriate.

8.     Class certification is therefore an appropriate mechanism for protecting the interests of the Settlement Class and resolving the common issues of fact and law arising out of Plaintiffs' claims while also eliminating the risk of duplicative litigation. Accordingly, the Court hereby makes final its earlier provisional certification of the Settlement Class and further confirms the appointment of the Class Representatives and Class Counsel to represent the

Settlement Class.

9.      The Court grants final approval of the Settlement set forth in the Consent Decree and finds, after considering all of the factors set forth in Federal Rule of Civil Procedure 23(e)(2), that it is fair, reasonable, adequate, and in the best interests of the Settlement Class as a whole.  The Settlement, which was negotiated at arm's length, offers Settlement Class members comprehensive injunctive relief regarding all of the claims in Plaintiffs' Complaint, and treats Settlement Class Members equitably relative to each other.  The Court grants final approval of the release of the City from the Released Claims as set forth in the Consent Decree.

10.     The Court further finds that the City's Annual Commitment, which requires the installation or remediation of Curb Ramps each year until there is a compliant Curb Ramp at every corner of the City's pedestrian right of way, as set forth in the Consent Decree, is proper and reasonably calculated based on the available information to provide people with mobility disabilities access to the City's pedestrian right of way.  Accordingly, the Settlement shall be consummated in accordance with the terms and conditions of the Consent Decree.

11.     No Class Member has objected to the Settlement.  The absence of any objections further supports the Settlement's final approval.

12.     The Class Representatives and all Settlement Class Members (and their respective heirs, assigns, successors, executors, administrators, agents and representatives) are conclusively deemed to have released and forever discharged the City from all Released Claims as set forth in the Consent Decree.  The Class Representatives and all Settlement Class Members are bound by this Judgment.

13.     The benefits described in the Consent Decree are the only consideration, fees, costs, and expenses that the City shall be obligated to give to any party or entity, including

825540.2

without limitation the Class Representatives, Settlement Class Members, and Class Counsel in connection with the claims released in the Consent Decree and/or the payment of attorneys' fees, costs, and expenses in this action.

14.     The Consent Decree and this Judgment are not admissions of liability or fault by the City, or a finding of the validity of any claims in this action or of any wrongdoing or violation of law by the City.  The Consent Decree is not a concession by the Parties and, to the fullest extent permitted by law, neither this Judgment, nor any of its terms or provisions, nor any of the negotiations connected with it, shall be offered as evidence or received in evidence in any pending or future civil, criminal, or administrative action or proceeding to establish any liability of or admission by the City.

15.     Notwithstanding the foregoing, nothing in this Judgment shall be interpreted to prohibit the use of this Judgment to consummate or enforce the Consent Decree or Judgment, or to defend against the assertion of Released Claims in any other proceeding, or as otherwise required by law.

16.     In accordance with the terms of the Consent Decree, which is attached hereto, the Court reserves exclusive and continuing jurisdiction over Plaintiffs, the Settlement Class Members, the City, and the Consent Decree throughout the term of the Consent Decree, for the sole purpose of supervising the implementation, enforcement, construction, and interpretation of the Consent Decree and this Judgment.  In that regard, any challenges to the Consent Decree's terms or implementation, whether under state or federal law, shall be subject to the exclusive and continuing jurisdiction of this Court.

**IT IS SO ORDERED.**

Dated: _____        _____
                                                                              United States District Judge

825540.2