**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

MICHAEL MUEHE, ELAINE HAMILTON,
CRYSTAL EVANS, and COLLEEN
FLANAGAN, on behalf of themselves and
others similarly situated,

      Plaintiffs,

vs.

CITY OF BOSTON, a public entity,

      Defendant.

Case No.: 1:21-cv-11080-RGS

**PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS,**
**AND EXPENSES, AND MEMORANDUM IN SUPPORT THEREOF**

Plaintiffs Michael Muehe, Elaine Hamilton, Crystal Evans, and Colleen Flanagan, on

behalf of the Settlement Class, hereby respectfully move for an award of $764,898.30 in

attorneys' fees and $14,973.48 in costs and expenses pursuant to the fee-shifting provisions of

the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12205, and Section 504 of the

Rehabilitation Act ("Section 504"), 29 U.S.C. § 794a(b).

## I.     INTRODUCTION

Plaintiffs and Class Counsel—Goldstein, Borgen, Dardarian & Ho ("GBDH"), Civil

Rights Education and Enforcement Center ("CREEC"), and Disability Law Center-

Massachusetts ("DLC")—have secured a game-changing settlement with the City of Boston (the

"City") on behalf of residents and visitors with mobility disabilities.  They seek compensation

for the work Class Counsel has performed to achieve this outstanding outcome, as well as

reimbursement of costs and expenses necessarily incurred along the way.

Boston's pedestrian right of way—the system of sidewalks and other pathways that

separate pedestrian traffic from vehicular traffic—is largely inaccessible to people with mobility

834885.15

disabilities due to missing and noncompliant curb ramps.  When Plaintiffs initiated this matter, the City's own data estimated that less than half of its approximately 23,000 curb ramps were in compliance with federal standards.  Decl. of Linda M. Dardarian in Supp. of Pls.' Mot. for Attys.' Fees, Costs, and Expenses ("Dardarian Decl.") ¶ 23.  And that figure did not take into account the thousands of corners that are missing curb ramps altogether.  *Id.*  Meanwhile, the City has been subject to federal laws that guarantee people with disabilities full and equal access to its programs and facilities since June 3, 1977.  *See* Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 42 Fed. Reg. 22676, 22681 (May 4, 1977); *see also* 28 C.F.R. § 35.151(a)(1), (b)(1) (relevant regulations under the ADA have applied to the City since January 26, 1992).

When people who use mobility devices such as wheelchairs and scooters encounter conditions like these, they must decide whether to risk their safety by traveling in the street or avoid using the pedestrian right of way altogether.  *See, e.g.*, Decl. of Michael Muehe in Supp. of Pls.' Mot. for Prel. Approval of Settlement, ¶¶ 6-7, ECF No. 15.  All that will change under the proposed Settlement, which obligates the City to install or remediate an average of 1,630 curb ramps per year until a compliant curb ramp exists at every corner of the pedestrian right of way. Based on the Parties' best estimates, this will likely occur by the end of 2030.  *See* Dardarian Decl. ¶ 30.  Thus, what the City has not accomplished in the decades since these laws took effect will now be completed on an aggressive schedule.

This extraordinary result for the Class would not have been possible without the determined efforts of Class Counsel, including: (1) conducting an extensive initial investigation into the accessibility of the City's curb ramp system, including through on-site inspections, client interviews, analysis of public records, and creating a database to determine whether the City has complied with accessibility requirements in connection with past alterations; (2) preparing a

834885.15

detailed demand letter outlining Plaintiffs' claims; (3) entering into a structured negotiations agreement with the City; (4) engaging in dozens of detailed settlement discussions with the City, including multiple representatives of the Department of Public Works, over the course of three years; (5) providing expertise on pedestrian right of way access requirements, and exchanging information and analysis regarding the City's policies and practices for construction, maintenance, and inspection in the public right of way, as well as budgetary materials, design documents, and existing data on accessibility; (6) negotiating an initial term sheet; (7) negotiating every detail of the proposed Consent Decree; (8) prompting and facilitating the City's comprehensive curb ramp survey, including extensive discussions regarding the scope and sufficiency of data being collected; (9) preparing the Complaint and other filings to obtain the Court's approval of the Settlement; and (10) conferring with Named Plaintiffs throughout.

Class Counsel performed this work efficiently: each of the attorneys played a specialized role and did not duplicate each other's labor.  By engaging in structured negotiations in lieu of potentially time-consuming litigation, Class Counsel likely saved millions of dollars' worth of attorneys' fees.  Moreover, Plaintiffs' lodestar calculation is based on billing rates that are very reasonable in light of Class Counsel's high level of expertise in complex disability access cases.

Plaintiffs' request for reimbursement of their actual costs and expenses should also be granted, as all were reasonably and necessarily incurred in the course of the investigation, negotiation, or court approval process.  Finally, in addition to attorneys' fees, costs, and expenses through the date of this Motion, Plaintiffs' requested award includes an estimate of fees, costs, and expenses they reasonably anticipate incurring between today and the Fairness Hearing.  Prior to the Fairness Hearing, they will supplement this filing with Class Counsel's actual lodestar and their actual costs and expenses for that time period.  Dardarian Decl. ¶¶ 62-63.

834885.15

## II.    BACKGROUND

### A.    Beginning in 2017, Class Counsel Investigated the City's Curb Ramp System and Found Widespread Violations of the ADA and Section 504.

Both the ADA and Section 504 guarantee people with disabilities full and equal access to the City's programs and facilities.  More specifically, under the ADA, when a public entity constructs or alters a street, road, or highway, it must install curb ramps at all locations where a road-level walkway joins a raised sidewalk.  *See* 28 C.F.R. § 35.151(i).  Moreover, those curb ramps must be accessible to people with mobility disabilities in accordance with certain technical specifications.  *See id.* § 35.151(c).  This requirement was effective on January 26, 1992.  *Id.* § 35.151(a)(1), (b)(1).  Section 504 imposes analogous requirements on all recipients of federal financial assistance, effective since June 3, 1977.  *See* Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 42 Fed. Reg. 22676, 22681 (May 4, 1977).

Under these regulations, any project that alters the usability of a street—including reconstruction, rehabilitation, resurfacing, and widening of streets—is an alteration that triggers the City's obligation to install compliant curb ramps on adjacent corners of the pedestrian right of way.  *See* Dep't of Justice/Dep't of Transportation Joint Technical Assistance on the Title II of the Americans with Disabilities Act Requirements to Provide Curb Ramps when Streets, Roads, or Highways are Altered through Resurfacing, *available at* https://www.ada.gov/doj-fhwa-ta.htm.  Even in the few locations where no new construction or alteration has occurred since 1977, the City is required to operate every service, program, and activity such that, "when viewed in its entirety, [it] is readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150(a).

4

Each of the Named Plaintiffs has a mobility disability and has long struggled to access the City's pedestrian right of way due to missing and noncompliant curb ramps.[1]  Early in 2017, Class Counsel began investigating the City's compliance with the new construction and alteration provisions of the ADA and Section 504 regulations.  Class Counsel submitted multiple requests under Massachusetts Public Records Law, Mass. Gen. Laws ch. 66, § 10, ultimately obtaining records concerning street resurfacing with more than 144,000 entries, as well as records concerning past surveys of curb ramps totaling more than 47,000 entries.  Class Counsel created a database to analyze this voluminous data, including reviewing images available on Google Street View to determine whether compliant ramps had been installed in connection with previous street resurfacing projects.  *See* Declaration of Timothy P. Fox in Support of Plaintiffs' Motion for Attorneys' Fees, Costs, and Expenses ("Fox Decl."), filed herewith, ¶¶ 9-15.  Class Counsel also analyzed the City's ADA transition plan available on its website.

Through this process, Class Counsel determined that violations of the new construction and alteration provisions of the ADA and Section 504 were widespread throughout the City.  On May 7, 2018, they sent a letter to the City on behalf of Plaintiffs detailing how the missing and noncompliant curb ramps throughout the City deny people with mobility disabilities full and equal access to the City's pedestrian right of way.  The letter explained that the City's failure to install and maintain adequate, compliant curb ramps violated the ADA and Section 504.  *Id.* ¶ 17. In light of this evidence, Plaintiffs proposed that the Parties work cooperatively to resolve their claims through structured negotiations rather than litigation.  *Id.* ¶ 18.

---

[1] The declarations that Named Plaintiffs submitted in support of their Motion for Preliminary Approval of Class Action Settlement detail these experiences.  *See* Declaration of Michael Muehe ¶¶ 4-7, ECF No. 15; Declaration of Elaine Hamilton ¶¶ 4-6, ECF No. 16; Declaration of Crystal Evans ¶¶ 4-7, ECF No. 17; Declaration of Colleen Flanagan ¶¶ 4-5, ECF No. 18.

**B.**    <u>**The Parties Engaged in Structured Negotiations in Lieu of Litigation.**</u>

The City agreed with Plaintiffs' proposal to attempt to resolve their claims through structured negotiations rather than immediately litigating.  In June 2018, the Parties entered into an agreement that tolled the statute of limitations on Plaintiffs' claims and identified specific issues for the Parties to negotiate.  Dardarian Decl. ¶ 24.  Over the course of three years, the Parties exchanged information regarding the status of existing curb ramps in the City's pedestrian right of way, the City's past and present policies and practices concerning curb ramp construction and remediation, the City's legal obligations under the ADA and Section 504, issues with the City's system for receiving accessibility-related requests from residents, and the resources available to the City for constructing and remediating curb ramps.  Dardarian Decl. ¶ 25.  The Parties discussed their settlement positions at length through regular phone calls, several in-person meetings, and many email exchanges.  Because of the great complexity of both the curb ramp system and the efforts that will be required to bring it into compliance with the ADA and Section 504, this negotiation required a great deal of discussion with counsel and many City representatives over a long period of time.  Dardarian Decl. ¶ 26.

The Parties reached a final agreement on all aspects of the settlement on June 30, 2021.  Because Named Plaintiffs represent a proposed class of individuals with mobility disabilities, the settlement requires court approval.  The agreement also contemplates enforcement as a consent decree.  Accordingly, Plaintiffs filed their Complaint in this action on June 30, 2021.  ECF No. 1.  This Court granted preliminary approval of the Settlement on July 12, 2021.  ECF No. 23.

**C.**    <u>**The Proposed Settlement Is a Game Changer for the Class.**</u>

The Consent Decree establishes a schedule for the City to install and remediate curb ramps that will culminate in "curb ramp saturation"—a compliant curb ramp at every corner of the pedestrian right of way.  Based on their extensive investigations, Plaintiffs estimate that at

the commencement of their negotiations, the City had at least 15,000 missing or noncompliant curb ramps.  Dardarian Decl. ¶ 23.

For each year during the term of the Consent Decree, the City must install or remediate a minimum number of missing and noncompliant curb ramps.  This requirement, known as the "Annual Commitment," increases from 1,200 to 1,630 between years 2021 and 2024.  Consent Decree § 5.1.1, Ex. 2 to Dardarian Decl. in Supp. Mot. Prelim Approval, ECF No. 12-2.  The Parties will meet and confer to determine the Annual Commitment for years 2025 through 2030, which will average out to 1,970 curb ramps per year unless the City will otherwise achieve curb ramp saturation by the end of 2030 or the City can demonstrate extreme impracticability, difficulty, or expense.  *Id.* §§ 5.1.3-4.  Thus, based on Plaintiffs' estimate of the current number of missing and noncompliant curb ramps, the City is likely to achieve curb ramp saturation by the end of 2030 or sooner.  If not, the Consent Decree will stay in effect, and the City will continue installing and remediating at least 1,630 curb ramps per year until it achieves curb ramp saturation.  *Id.* § 2; Dardarian Decl. ¶ 30.

The Consent Decree contains numerous additional provisions that give shape and force to the Annual Commitment.  The City is conducting a comprehensive survey of missing and noncompliant curb ramps throughout its pedestrian right of way, which will give the Parties further information about the work required to reach curb ramp saturation and how long it will take.  Consent Decree § 3.1.  The Decree also requires the City to prioritize construction of curb ramps in locations that are particularly important to many people with mobility disabilities, and to create an "Implementation Plan" that takes these priorities into account.  *Id.* §§ 8.2.1, 9.1.  In addition, the City must maintain a program through which people with mobility disabilities may submit requests for the construction or remediation of curb ramps in specific locations throughout the City, either through the City's website or by phone.  *Id.* § 10.1.  The City is

834885.15

required to maintain all compliant curb ramps within its jurisdiction in good condition, and in compliance with accessibility technical specifications, so that they are readily accessible to and usable by people with mobility disabilities, including by addressing puddles of melted snow that interfere with access to curb ramps.  *Id.* §§ 11.1, 11.4.  The City is also hiring an ADA Coordinator who must have a minimum of 20 hours per week to devote solely to responsibilities related to accessibility of the pedestrian right of way.  *Id.* § 4.

Class Counsel will continuously monitor the City's compliance with every provision of the Consent Decree.  The City must provide Plaintiffs with annual written reports regarding the status of this work, including the number of curb ramps constructed and remediated and their locations, and the number of locations of curb ramps constructed and remediated via the curb ramp request program.  Class Counsel may inspect newly constructed or altered curb ramps and review the City's survey and curb ramp construction databases.  *Id.* § 13.  If Class Counsel believe the City is out of compliance at any time, the Consent Decree provides a dispute resolution process, ultimately with court enforcement.  *Id.* § 16.

The Consent Decree is a triumph for Boston residents and visitors with mobility disabilities.  Within a relatively short time frame—most likely by the end of 2030—it will finally resolve a longstanding obstacle to their autonomy and equal access.  As explained in greater detail in the declaration of Class Counsel filed herewith, this timeline compares very favorably with those required under comparable settlements.  Dardarian Decl. ¶¶9-11; *see also* Dardarian Decl. in Supp. Prelim. Approval ¶ 8, ECF No. 12.  Named Plaintiffs have all expressed their happiness with the Settlement and pride in having helped obtain this victory.  *See* Decl. of Michael Muehe in Supp. of Pls.' Mot. for Service Awards ¶ 8, filed concurrently; Decl. of Elaine Hamilton in Supp. of Pls.' Mot. for Service Awards ¶ 7, filed concurrently; Decl. of Crystal

8

Evans in Supp. of Pls.' Mot. for Service Awards ¶ 7, filed concurrently; Decl. of Colleen

Flanagan in Supp. of Pls.' Mot. for Service Awards ¶ 8, filed concurrently.

### III.   ARGUMENT

Under the ADA and Section 504, individuals with disabilities who succeed in actions to

improve the accessibility of public programs, services, and activities are entitled to recover their

reasonable attorneys' fees, costs, and expenses.  42 U.S.C. § 12205; 29 U.S.C. § 794a(b); *see*

*also Hutchinson v. Patrick*, 636 F.3d 1, 8 (1st Cir. 2011) (affirming award of attorneys' fees and

costs to plaintiffs under ADA's fee-shifting provision).  Prevailing plaintiffs in a civil rights class

action may request attorneys' fees based on the lodestar method, in which reasonable rates are

multiplied by the number of hours reasonably spent on the case.  *See Diaz v. Jiten Hotel Mgmt.,*

*Inc.*, 741 F.3d 170, 172 n.1, 177-79 (1st Cir. 2013).  "Where a plaintiff has obtained excellent

results, his attorney should recover a fully compensatory fee.  Normally this will encompass all

hours reasonably expended on the litigation."  *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).

### A.   Plaintiffs Are Prevailing Parties.

It is undisputed that Plaintiffs are prevailing parties in this lawsuit such that an award of

attorneys' fees, costs, and expenses is warranted under the ADA and Section 504.  *See* Consent

Decree § 19, ECF No. 12-2 at 33.  A plaintiff is the "prevailing party" for purposes of an award

of attorneys' fees if she has obtained "at least some of" the relief she was seeking.  *Buckhannon*

*Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001) (quoting

*Hanrahan v. Hampton*, 446 U.S. 754, 758 (1980)); *De Jesus Nazario v. Morris Rodriguez*, 554

F.3d 196, 199 (1st Cir. 2009).

Here, Plaintiffs have obtained the precise relief they sought on behalf of the Class in their

initial demand letter, as well as in their Complaint.  The City will construct an accelerating

number of curb ramps per year, averaging to about 1,630, until a compliant curb ramp is present

at every corner of the City's pedestrian right of way.  Consent Decree § 5.1.1.  The curb ramp

834885.15

construction schedule alone provides a tremendous benefit to the Class: what the City has not accomplished in the decades since Section 504's effective date in 1977 it will now complete on an aggressive timeline, subject to Court enforcement.  The Consent Decree also requires the City to prioritize locations that are particularly important to many individuals with mobility disabilities; to make its curb ramp request system more efficient and user-friendly; to hire an ADA coordinator; to address puddles of melted snow that interfere with access to curb ramps; and to complete a City-wide survey of curb ramp accessibility.  Dardarian Decl. ¶ 31.  The comprehensive injunctive relief required under the Consent Decree is more than sufficient to qualify Plaintiffs as prevailing parties under *Buckhannon Bd. & Care Home*, 532 U.S. at 603.

**B.**   **Plaintiffs' Requested Fee Award Is Reasonable Under a Lodestar Analysis.**

The lodestar analysis begins by "multiplying the number of hours productively spent by a reasonable hourly rate to calculate a base figure."  *De Jesus Nazario v. Morris Rodriguez*, 554 F.3d 196, 207 (1st Cir. 2009).  The base figure may then be adjusted "based on several different factors, including the results obtained."  *Id.* at 207.  Here, Class Counsel have elected not to request an upward multiplier, even though the excellent results obtained in this case might support one.  Dardarian Decl. ¶ 59.

**1.**   **Class Counsel's Hours Are Reasonable.**

Class Counsel's hours spent on this matter are documented by contemporaneous time records showing discrete entries that describe each item of work performed to the tenth of an hour.  Dardarian Decl. ¶ 32 & Ex. 3; Fox Decl. ¶¶ 18-19 & Ex. A; Decl. of Thomas Murphy in Supp. of Pls.' Mot. for Attorneys' Fees, Costs, and Expenses ("Murphy Decl."), filed herewith, ¶¶ 19-20 & Ex. A.  These time records are *prima facie* evidence in support of Class Counsel's requested attorneys' fees award.  *See, e.g.*, *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 297 (1st Cir. 2001) (requirement satisfied where each attorney attested that she kept accurate, contemporaneous time records); *Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir. 1992)

("Once established, the lodestar represents a presumptively reasonable fee ...."). All totaled, Class Counsel seek compensation for 962.5 hours performed by attorneys and 449.5 hours performed by other legal professionals. *See* Dardarian Decl. Ex. 11. These figures have already been reduced based on billing judgment. Dardarian Decl. ¶ 32; Fox Decl. ¶ 18; Murphy Decl. ¶ 20. Class Counsel should therefore be compensated for all of this labor, which was reasonable and necessary to obtain an excellent settlement on behalf of the Class.

**a.**      <u>**Class Counsel Worked Efficiently to Obtain Comprehensive Injunctive Relief for the Class.**</u>

Class Counsel's staffing of this case was efficient and reasonable. The three firms, CREEC, DLC, and GBDH, shared the workload and avoided unnecessary duplication of work, the majority of which was performed by four attorneys and a handful of other legal professionals. Each firm brought complementary areas of expertise to bear on a complex, technical case, all of which contributed to the excellent result achieved. In addition, the attorneys focused on work that was appropriate to their levels of experience and billing rates, with associates doing most of the drafting of pleadings and briefs, and paralegals performing time-consuming tasks like data collection and analysis. The First Circuit has observed that a team approach is particularly apt where complex matters of public importance are at stake, and that courts should be careful not to penalize attorneys who take on challenging cases on a contingent basis. *See, e.g.*, *Gay Officers Action League*, 247 F.3d at 297 ("Given the complexity of modern litigation, the deployment of multiple attorneys is sometimes an eminently reasonable tactic.").

The process of settling a case like this one is exponentially more complicated than settling a class action for primarily monetary relief. Rather than being negotiated chiefly by reference to the defendant's probable exposure at trial, here many additional factors influenced the Parties' bargaining positions with respect to each interdependent component of the Settlement. First and foremost, Class Counsel worked with the City to create a reasonable

11

schedule for bringing the City's curb ramps into full compliance with the ADA and Section 504. This schedule depended not just on Plaintiffs' showing that the current condition of the City's curb ramps violated these statutes, but on what was attainable for the City in light of budgetary concerns, the City's organizational structure, changes caused by the coronavirus pandemic, and the climate, terrain, and politics of Boston, among other considerations.  Thus, while ambitious, the schedule is tailored to the City's unique circumstances: it accelerates over the term of the Consent Decree and builds in flexibility for unforeseen events or budgetary fluctuations. Dardarian Decl. ¶ 74; Consent Decree §§ 5.1.4, 5.3, ECF No. 12-2 at 13, 15).

Moreover, many other components of the Settlement are necessary to give shape and force to the curb ramp construction schedule, such as the comprehensive curb ramp survey, the online request system, the technical specifications for curb ramps installed or remediated under the Consent Decree, the system for prioritizing certain locations, and Class Counsel's continuing right to monitor the City's compliance with the Consent Decree.  Each of these provisions had to be separately negotiated.  Dardarian Decl. ¶ 28.  In sum, negotiating this Settlement on behalf of the Class was a serious undertaking that required the attention of four attorneys and other staff over the course of three years.

In light of the complicated nature of the investigation, negotiation, and settlement of this case, Class Counsel's approach to allocating tasks was sensible and effective.  For example, Tim Fox from CREEC led the investigation and demand letter phase of the case, including analyzing records of construction in the City's public right of way, creating a database to identify specific access violations, and preparing the initial demand letter and exhibits thereto.  Fox Decl. ¶¶ 8-16. Tom Murphy from DLC helped plan and strategize at the outset of the case, obtained and reviewed public documents for case development, and spent significant time interviewing and communicating with Named Plaintiffs.  Murphy Decl. ¶¶ 13-18.  Linda Dardarian from GBDH

took the lead in negotiations, analyzed and revised all work product, and provided high-level strategy and analysis.  Dardarian Decl. ¶ 38.  Raymond Wendell, an associate at GBDH, drafted written work product such as an initial term sheet, the first and subsequent drafts of the Consent Decree, notice to the Class, and the settlement approval and attorneys' fee briefs and supporting declarations, and also performed legal research.  Dardarian Decl. ¶ 40.  A more junior associate assisted Mr. Wendell with legal research and drafting pleadings.  Dardarian Decl. ¶ 41.  Paralegals from GBDH and CREEC analyzed data on curb ramp violations, including by using Google Street View to locate access barriers, and then charted those barriers in comparison to the City's street construction and resurfacing data so that the Parties could understand and appreciate the scope of the City's ADA and Section 504 violations.  Dardarian Decl. ¶¶ 42-44.

### b.       Class Counsel Have Already Exercised Billing Judgment.

Class Counsel have reviewed their billing records on an entry-by-entry basis to exercise billing judgment and eliminate inefficient or duplicative work, clerical entries, and other billing entries that are otherwise inadequate or non-compensable.  Dardarian Decl. ¶ 32; Fox Decl. ¶ 18; Murphy Decl. ¶ 20.  This exercise resulted in an overall reduction to the lodestar of 5.6%.  Dardarian Decl. ¶ 33.  This reduction is sufficient to address unnecessary duplication, clerical time, and other billing errors.  *See. e.g.*, *Brenner v. J.C. Penney Co., Inc.*, No. 13-cv-11212-RGS, 2013 WL 6865667, at *3 (D. Mass. Dec. 26, 2013) (attorneys' fees award should account for all hours spent on the litigation unless "duplicative, unproductive, excessive, or otherwise unnecessary") (quoting *Grendel's Den Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir. 1984)); *Davis v. City & County of San Francisco*, 976 F.2d 1536, 1543 (9th Cir. 1992) (5% billing reduction by counsel sufficient to address clerical time and other billing errors), vacated in part on other grounds, 984 F.2d 345 (9th Cir. 1993).

c.       **Class Counsel Saved a Great Deal of Time by Engaging in Structured Negotiations.**

By engaging in structured negotiations and working collaboratively with the City over the course of three years—rather than spending that time wrapped up in time-consuming litigation—Class Counsel likely saved the City millions of dollars in attorneys' fees.  The economies achieved through this approach are illustrated by the substantial difference between the attorneys' fees requested here and those awarded in similar cases that were litigated.

For instance, in *Willits, et al. v. City of Los Angeles*, No. CV-10-5782 CBM RZX (C.D. Cal.), plaintiffs with mobility disabilities alleged that they had been denied access to Los Angeles' pedestrian right of way due to missing curb ramps and poor sidewalk conditions.  After years of extensive litigation and appeals, the court ordered the city to pay class counsel approximately $13 million in attorneys' fees, costs, and expenses.  Dardarian Decl. ¶¶ 13-14.[2]  Similarly, in *Ochoa, et al. v. City of Long Beach*, No. CV 14-04307 DSF FFM (C.D. Cal.), which also addressed both curb ramps and sidewalks, the parties spent just under three years engaged in simultaneous litigation and settlement negotiation.  The court granted an award of $3.36 million in attorneys' fees, costs, and expenses.  Dardarian Decl. ¶ 12.

In *Reynoldson, et al. v. City of Seattle*, Case No. 15-1608 (W.D. Wash.), plaintiffs with mobility disabilities challenged the City of Seattle's failure to install sufficient, compliant curb ramps.  There, the parties initially entered into a structured negotiations agreement, but after about three years, the plaintiffs filed a lawsuit.  Thereafter, the parties engaged in very limited litigation, including by leveraging formal discovery mechanisms, which finally allowed them to reach a settlement.  The court granted the plaintiffs nearly $1.4 million in attorneys' fees, costs, and expenses.  Dardarian Decl. ¶ 11.

---

[2] GBDH served as Class Counsel in *Willits*, *Ochoa*, and *Reynoldson*.  CREEC also served as Class Counsel in *Reynoldson*.

By contrast, Class Counsel's lodestar through August 27, 2021 totals $684,898.30 after reductions based on billing judgment, plus $4,973.48 in costs and expenses.  These much lower figures underscore the efficiency of Class Counsel's structured negotiations approach and, more broadly, of their work on this case.

      **d.**      **The Requested Fee Award Includes an Estimate of Hours Class Counsel Will Work Between Today and the Fairness Hearing**.

Class Counsel will still expend significant time on this case through final settlement approval, including: analyzing and responding to the results of the City's comprehensive curb ramp survey that are due on August 31, 2021; drafting a reply to the City's opposition to this Motion, if filed; continuing to oversee the class notice process; responding to Class Member inquiries about the Settlement; drafting a motion for final approval of the Settlement; responding to any objections submitted by Class Members; and appearing at the Fairness Hearing. Dardarian Decl. ¶ 35.  All of this time is compensable under the fee-shifting provisions of the ADA and Section 504.  *See, e.g.*, *McCafferty v. Local 254, Service Emps. Int'l Union, AFL-CIO*, 186 F.3d 52, 62 (1st Cir. 1999) (it is "well established" that time spent establishing right to recover attorneys' fees is compensable).  Especially if the City opposes this Motion, Class Counsel anticipate spending up to $80,000 of additional lodestar on these tasks.  Dardarian Decl. ¶ 35.  The actual amount of this additional lodestar, up to a cap of $80,000, will be determined by records that Class Counsel submit prior to the Fairness Hearing.  *Id.*

      **2.**      **Class Counsel's Hourly Rates Are Reasonable and Do Not Exceed Those of Attorneys with Commensurate Skill, Experience, and Reputation in the Boston Market.**

The next step in the lodestar analysis is for the Court to determine "a reasonable hourly rate or rates—a determination that is often benchmarked to the prevailing rates in the community for lawyers of like qualifications, experience, and competence." *Matalon v. Hynnes*, 806 F.3d 627, 638 (1st Cir. 2015).  Here, because of Class Counsel's particular credentials in resolving

complex disability access cases, Plaintiffs would be justified in seeking their fees based on the prevailing rates in their home jurisdictions.  *See, e.g.*, *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany and Albany Cnty. Bd. of Elections*, 522 F.3d 182, 191 (2d Cir. 2008).  However, Class Counsel have instead opted to seek rates indexed to those charged by attorneys of comparable skill, experience, and reputation who practice in Boston, which are significantly lower than the partner and paralegal rates customarily awarded to Class Counsel. Dardarian Decl. ¶ 50.  For the four attorneys who performed the vast majority of work on this case, they seek the following rates:

| Attorney | Years of Experience | Hourly Rate Sought |
| --- | --- | --- |
| Linda M. Dardarian, Partner at GBDH | 34 | $795 |
| Timothy Fox, Co-Executive Director of CREEC | 30 | $725 |
| Thomas Murphy, Senior Attorney at DLC | 26 | $500[3] |
| Raymond Wendell, Associate at GBDH | 8 | $495 |

Plaintiffs also seek prevailing Boston private firm rates for a small number of hours billed by additional attorneys.  Additionally, they seek rates ranging from $221 to $255 for paralegals, who, among other tasks, conducted complex data analysis that helped drive the investigation and successful negotiation of the injunctive relief settlement.  Dardarian Decl. ¶¶ 42-44.

###### a.     Class Counsel Have a Great Deal of Expertise in Complex Disability Access Cases.

Class Counsel were uniquely positioned to negotiate this Settlement on behalf of the Class.  The three firms have complementary areas of expertise, each of which contributed to the excellent result obtained.  Class Counsel's qualifications are further detailed in the declarations

---

[3] As explained in Section III.B.2.b below, Mr. Murphy seeks reimbursement for DLC billers at a lower rate, because DLC uses hourly rates for nonprofits set by the Massachusetts Law Reform Institute rather than the legal marketplace for private law firms in the Boston area.

of Counsel filed herewith.  Dardarian Decl. ¶¶ 3-21, 38-41; Fox Decl. ¶¶ 2-6; Murphy Decl. ¶¶ 2-9.

GBDH and CREEC are recognized as two of the leading firms nationwide in handling systemic disability access class actions, particularly with respect to pedestrian rights of way. They have successfully settled class actions against numerous cities for access to the pedestrian right of way on behalf of people with mobility disabilities.  GBDH served as class counsel in *Willits v. City of Los Angeles*, No. CV 10-05782 CBM RZX (C.D. Cal.) and *Ochoa v. City of Long Beach*, No. CV 14-04307 DSF FFM (C.D. Cal.).  CREEC served as class counsel in *Denny v. City and County of Denver*, Case Number 2016CV030247 (Denver District Court) and *King v. City of Colorado Sprin*gs, No. 1:19-cv-00829-JLK (D. Colo.).  GBDH and CREEC both served as class counsel in *Lashbrook v. City of San Jose*, 20-CV-01236-NC (N.D. Cal.); *Reynoldson v. City of Seattle*, No. CV 15-01608 BJR (W.D. Wash.), and *Hines v. City of Portland*, No. 3:18-cv-00869-HZ (D. Or.).  Dardarian Decl. ¶ 9-14; Fox Decl. ¶¶ 3-4.

DLC is a private nonprofit organization, and the designated protection and advocacy system for people with disabilities in Massachusetts, pursuant to federal statutory authority.  *See* 29 U.S.C. § 794e.  It has litigated many systemic access claims on behalf of people with disabilities.  Murphy Decl. ¶¶ 4-7.  DLC is locally focused and integrally connected with the Massachusetts disability community, and as such, it was specially disposed to represent the Class in negotiations with the City.  Murphy Decl. ¶ 14.

       b.       **Plaintiffs Seek Attorneys' Fees Based on Hourly Rates that Are Eminently Reasonable.**

In spite of their unique credentials, the Class Counsel firms of GBDH and CREEC set their rates by reference to the Boston legal market rather than their home jurisdictions.  In contrast, DLC set its rates below the relevant private firm market, as further explained below. All of the rates that Class Counsel used to calculate their fee request are reasonable.

GBDH is located in the San Francisco Bay Area, and is requesting lower rates than those it typically uses (and has recently been approved for) to account for the somewhat lower prevailing rates in Boston.  Dardarian Decl. ¶ 50.  In setting these rates, GBDH started with the rates for which they recently received a fee award in the District of Massachusetts, *Max Bazerman v. American Airlines, Inc.*, No. 1:17-CV-11297-WGY (ECF No. 104) (D. Mass. Apr. 8, 2019)—in which the firm's representation was lauded as "exemplary" by the Honorable William G. Young.  GBDH adjusted those rates slightly to account for market increases and inflation since the time of that ruling.  Dardarian Decl. ¶¶ 51-52 & Ex 1.  They also relied on the *2020 Real Rate Report Snapshot* published by Wolters Kluwer, which is based on actual hourly fees paid to 112,000 attorneys and paralegals, including over 500 litigation attorneys in the Boston area, from 2019.  Dardarian Decl. ¶¶ 53-56 & Ex. 6.  Courts often rely on these rates because they reflect a large sample of actual hourly rates paid to attorneys.  *See Tyler v. Michaels Stores, Inc.*, 150 F. Supp. 3d 53, 69-70 (D. Mass. 2015); *see also Retta v. Millennium Prods., Inc.*, No. 2:15-cv-1801-PSG-AJWx, 2017 WL 5479637, at *12 (C.D. Cal. Aug. 22, 2017) ("Courts have found that the Real Rate Report is 'a much better reflection of true market rates than self-reported rates in all practice areas.'") (collecting cases) (internal citation omitted).

CREEC is located in Denver, Colorado and has a prominent, nationwide disability rights practice.  Its regular rates reflect the high quality and complexity of its work.  Those rates have been approved in the past year, including in a case addressing access barriers in the pedestrian right of way of the City of San Jose.  *See* Dardarian Decl. Ex. 4.  Like GBDH, however, CREEC used reduced, Boston-based rates to calculate its lodestar here, which it also determined by reference to the *2020 Real Rate Report Snapshot*.  Fox Decl. ¶¶ 19-20.

DLC used its regular billing rates to calculate fees for this matter, which are based on rates established for legal services organizations in Massachusetts by the Massachusetts Law

834885.15

Reform Institute, rather than the prevailing rates for private law firms in the Boston area. Murphy Decl. ¶¶ 21-22. DLC's rates have been approved by courts in this jurisdiction, including in *NAD et al. v. Harvard University*, No. 3:15-cv-30023-KAR (ECF No. 218) (Feb. 26, 2020) and *NAD et al. v. Massachusetts Institute of Technology*, No. 3:15-cv-30024-KAR (ECF No. 217) (Jul. 21, 2020). Mr. Murphy has elected to seek compensation at $500 per hour, even though the Real Rate Report indicates that an appropriate market rate for Mr. Murphy's work would be between $650 and $833, in light of his experience. Dardarian Decl. Ex. 6 at 20.

Class Counsel's requested rates are within the range of rates awarded by courts in Massachusetts in complex and class action cases over the past ten years, particularly when adjusted to account for inflation. In *Crane v. Sexy Hair Concepts, LLC*, No. 17-cv-10300-FDS, 2019 WL 2137136, at *2 (D. Mass. May 14, 2019), for example, the court awarded fees in excess of class counsel's lodestar. Class counsel, a Boston-based plaintiffs' firm, based its lodestar calculation on hourly rates ranging from $720 to $925 for partners, from $350 to $575 for associates, and $225 for all paralegals. Adjusted for inflation,[4] those rates are equivalent to hourly rates ranging from $778 to $999 for partners, from $378 to $621 for associates, and $243 for all paralegals. *See* Dardarian Decl. ¶ 57 & Ex. 7; *see also NPS LLC v. Ambac Assurance Corp.*, 190 F. Supp. 3d 212, 220-24 (D. Mass. 2016) (awarding rates of $657 to $742 for partners—which are $747 to $844 in 2021 dollars—and $329 to $491 for associates—$374 to $558 in 2021 dollars).

C.   **The Court Should Award Plaintiffs Their Requested Costs and Expenses.**

Plaintiffs are entitled to reimbursement of their costs and expenses along with attorneys' fees. 42 U.S.C. § 12205; 29 U.S.C. § 794a(b). Reimbursement of Class Counsel's modest expenses is particularly appropriate in light of the excellent result obtained in the case. *See In re*

---

[4] *See* United States Bureau of Labor Statistics, CPI Inflation Calculator, bls.gov/data/inflation_calculator.htm.

*Fidelity/Micron Secs. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999).  To date, Class Counsel have incurred $4,973.48 in out-of-pocket expenses for legal research, court filing fees, printing, necessary travel, conference calls, and other litigation expenses.  Dardarian Decl. ¶ 62 & Ex. 8; Fox Decl. ¶ 21 & Ex. B; Murphy Decl. ¶ 24 & Ex. B.  These are standard expenses typical of class actions and were necessarily incurred.  *See, e.g.*, *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297 (E.D.N.Y. 2010).  Between today and the Fairness Hearing, Class Counsel anticipate incurring approximately $10,000 in additional reimbursable costs and expenses, including for travel related to the Fairness Hearing (should the Court decide to hold the hearing in-person), for a grand total of $14,973.48.  Dardarian Decl. ¶ 63.

## IV.   CONCLUSION

Plaintiffs have demonstrated that they are entitled to an award of attorneys' fees of up to $764,898.30 and reimbursement of up to $14,973.48 in costs and expenses, which includes time and costs reasonably spent to date, plus an estimate of the fees, costs, and expenses that will be incurred between today's date and the Fairness Hearing.  Prior to the Fairness Hearing, Plaintiffs will supplement this Motion with Class Counsel's actual time and their actual costs and expenses incurred after today's submission.

Dated:  August 30, 2021                    Respectfully submitted,

s/ Raymond Wendell
Linda M. Dardarian (*pro hac vice*)
ldardarian@gbdhlegal.com
Raymond Wendell (*pro hac vice*)
rwendell@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
300 Lakeside Drive, Suite 1000
Oakland, CA  94612
Tel:    (510) 763-9800
Fax:    (510) 835-1417

20

Thomas P. Murphy (SBN 630527)
DISABILITY LAW CENTER, Inc.
32 Industrial Drive East
Northampton, MA 01060
(413) 584-6524 (Telephone/Fax)
tmurphy@dlc-ma.org

Timothy Fox (*pro hac vice*)
tfox@creeclaw.org
CIVIL RIGHTS EDUCATION AND
    ENFORCEMENT CENTER
1245 E. Colfax Ave., Suite 400
Denver, CO 80218
(303) 757-7901

Attorneys for Plaintiff and the Settlement Class

834885.15

CERTIFICATE OF SERVICE

I hereby certify that the foregoing document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated on the NEF as non-registered participants on August 30, 2021.

*/s/ Raymond Wendell*
Raymond Wendell

834885.15