**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

MICHAEL MUEHE, ELAINE HAMILTON, CRYSTAL EVANS, and COLLEEN FLANAGAN, on behalf of themselves and all others similarly situated,

     Plaintiffs,

vs.

CITY OF BOSTON, a public entity,

     Defendant.

Case No.:  1:21-cv-11080-RGS

**DECLARATION OF LINDA M. DARDARIAN IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES**

I, Linda M. Dardarian, hereby declare:

1.     I am a member in good standing of the Bar of the State of California and a partner at the law firm of Goldstein Borgen Dardarian & Ho ("GBDH"), in Oakland, California.  I am co-lead counsel for Plaintiffs and the proposed Class and am providing this declaration of counsel in support of Plaintiffs' Motion for Attorneys' Fees, Costs, and Expenses.  I have personal knowledge of the facts set forth in this declaration and could and would testify competently to them.

2.     In this Motion, Plaintiffs seek compensation for GBDH's time pursuant to the lodestar method under the fee-shifting provisions of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12205, and Section 504 of the Rehabilitation Act ("Section 504), 29 U.S.C. § 794a(b), as well as that of our co-counsel at Civil Rights Education and Enforcement Center ("CREEC") and Disability Law Center-Massachusetts ("DLC").  Accordingly, this Declaration proceeds as follows: it first summarizes GBDH's extensive expertise in resolving

1

systemic disability access violations and recounts the essential background of this case.  It then describes GBDH's timekeeping practices and the reasonableness of the hours billed to this case, including each biller's background.  Next, it discusses the reasonableness of the hourly rates we seek for our work in this case in light of our qualifications, billing rates for which we have been awarded attorneys' fees in this and other jurisdictions, and billing rates of comparable attorneys litigating in the Boston area.  Finally, it describes the reasonable costs and expenses for which Plaintiffs seek reimbursement pursuant to the ADA and Section 504.  A table that shows the breakdown of GBDH's lodestar by biller, time spent on the case through August 27, 2021, and hourly rate appears in paragraph 45, below.

## BACKGROUND AND EXPERIENCE OF GOLDSTEIN, BORGEN, DARDARIAN & HO

3.      GBDH is one of the oldest and most successful plaintiffs' public interest class action law firms in the country.  Founded in Oakland, California in 1972, GBDH represents individuals against large companies and public entities in complex, class, and collective actions nationally in the firm's three primary practice areas: disability access, wage and hour violations, and employment discrimination.  GBDH also represents plaintiffs in voting rights, consumer rights, and environmental justice cases.  GBDH has long been recognized as one of the top plaintiffs' firms in the United States.  In 1992, the *National Law Journal* ("A National Who's Who of the Top Lawyers in Employment Litigation") called the firm "[i]n a league of their own on the plaintiffs' side, handling the largest class actions nationwide."  Every year since 2004, GBDH partners have been named "Northern California Super Lawyers" by their peers, in recognition of their outstanding legal achievements and high ethical standards.  GBDH partners are rated "AV Preeminent" by Martindale Hubbell, indicating that our peers rank us at the highest level of professional excellence.

4.      GBDH has been at the forefront of ensuring compliance with the Americans with Disabilities Act and obtaining access for persons with disabilities to the services, privileges, and advantages provided by public and private entities nationwide.  GBDH has also successfully litigated and resolved a variety of cutting edge, complex and landmark employment and wage and hour cases against employers in many different industries, including insurance companies, grocery and retail stores, restaurant chains, and financial services companies.  GBDH has won substantial back pay and other monetary relief for class members throughout the country and has obtained changes in employment and other policies and practices that were creating discriminatory barriers to equal employment opportunities and denying workers their lawful wages.

5.      I am a 1987 graduate of Berkeley Law, at University of California, Berkeley.  I have been a member of the California State Bar since 1987, and I am admitted to practice before the United States District Courts for the Northern, Central, and Eastern Districts of California, the United States Court of Appeals for the Ninth Circuit, and the United States Supreme Court. From September 1991 until December 1997, I was an associate at GBDH.  I became a GBDH partner in January 1998 and the managing partner in 2016.  Prior to joining GBDH, I worked at the law firms of Duane, Lyman & Seltzer and Carroll, Burdick & McDonough doing civil litigation.

6.      Since joining GBDH in September 1991, I have been responsible for all facets of class action and other complex litigation, from pre-filing investigation through trial and appeal, and settlement.  Since 1994, I have spent a large part of my practice representing people with mobility, hearing, and visual disabilities, both individually and in class or collective actions.  I am also recognized as one of the innovators and leading practitioners of "Structured

835624.10

Negotiation," a cooperative model for resolving entrenched, systemic civil rights problems and other complex disputes.  *See generally* Lainey Feingold, Structured Negotiation: A Winning Alternative to Lawsuits (2016).

7.    I have been the lead or co-lead counsel in many significant class and complex actions obtaining systemic relief for persons with disabilities.  For the past several years, members of my firm, particularly myself, partner Andrew P. Lee, associate Raymond Wendell, and paralegals Scott G. Grimes, Damon Valdez, and Stuart Kirkpatrick have represented people with mobility disabilities in a number of class actions involving access to large municipalities' pedestrian rights of way, such that we have developed a significant amount of experience in that area.

8.    Most recently, I and my firm, along with co-counsel, were appointed as class counsel in *Lashbrook v. City of San Jose*, No. 20-cv01236-NC (N.D. Cal.), *Hines v. City of Portland*, No. 3:18-cv-00869-HZ (D. Or.) and *Reynoldson v. City of Seattle*, No. 2:15-cv-01608-BJR (W.D. Wash.).  *Lashbrook*, *Hines*, and *Reynoldson* involved classes of residents and visitors to the Cities of San Jose, Portland, and Seattle with mobility disabilities who had been denied access to the Cities' pedestrian rights of way due to the lack of a curb ramp or a curb ramp that was damaged, in need of repair, or otherwise in a condition not suitable or sufficient for use. The claims alleged in the *Lashbrook*, *Hines*, and *Reynoldson* matters are very similar to those alleged by the Plaintiffs in the present action against the City of Boston.

9.    The *Lashbrook* settlement received final approval in September 2020.  *Lashbrook v. City of San Jose*, No. 20-cv-01236-NC, ECF No. 25 (N.D. Cal. Sept. 2, 2020).  The *Lashbrook* settlement requires the City of San Jose to appropriate $13 million dollars each fiscal year toward the construction and remediation of curb ramps until 2030.  After 2030, San Jose is

4

required to appropriate a minimum of ten percent of its pavement budget toward the construction and remediation of curb ramps until it fulfills its obligations under the settlement.  It ensures that San Jose will remediate all missing and noncompliant curb ramps by 2038.  In approving the settlement, the court appointed GBDH and CREEC as Class Counsel and praised the settlement as "remarkable."

10.     The *Hines* settlement received final approval in September 2018.  *Hines v. City of Portland*, No. 3:18-cv-00869-HZ, ECF No. 40 (D. Or. Sept. 27, 2018).  The *Hines* settlement requires the City of Portland to construct or remediate 1,500 curb ramps per year, guaranteeing the construction or remediation of 18,000 curb ramps over a twelve-year period.  The City of Portland will spend over $100 million constructing and remediating curb ramps.  As part of the approval of the settlement agreement, the court appointed GBDH and CREEC as Class Counsel.

11.     The *Reynoldson* settlement received final approval in November 2017.  *Reynoldson v. City of Seattle*, No. 2:15-cv-01608-BJR, ECF No. 61 (W.D. Wash. Nov. 1, 2017).  The settlement agreement requires the City of Seattle to construct or remediate 1,250 curb ramps per year, guaranteeing the construction or remediation of 22,500 curb ramps over the course of the settlement period.  The City of Seattle will spend nearly $300 million constructing and remediating curb ramps.  As part of the approval of the settlement agreement, the court appointed GBDH, CREEC, and other co-counsel as Class Counsel, and awarded Plaintiffs' $1,388,729 in attorneys' fees, expenses and costs.

12.     I and my firm were also certified class co-counsel in *Ochoa v. City of Long Beach*, a case on behalf of all persons with mobility disabilities who have been denied access to the City of Long Beach's pedestrian right of way.  Order Granting Plaintiffs' Motion for Class Certification and Plaintiffs' Amended Motion for Class Certification, *Ochoa v. City of Long*

*Beach*, No. 2:14-cv-04307-DSF-FFM, ECF No. 90 (C.D. Cal. Sept. 15, 2015). Plaintiffs in the *Ochoa* matter alleged that the City has unlawfully failed to make its pedestrian right of way, including curb ramps and sidewalks, accessible to persons with mobility impairments, in violation of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and California Law. The claims alleged in the *Ochoa* matter are also very similar to those alleged in this action against the City of Boston. On October 17, 2017, the District Court for the Central District of California entered an order approving the *Ochoa* class action settlement. *Ochoa v. City of Long Beach*, No. 2:14-cv-04307-DSF-FFM, ECF No. 175 (Oct. 17, 2017). The settlement agreement requires the City of Long Beach to install 4,500 curb ramps within the first five years of the term of the agreement, spend up to $50 million remediating curb ramps, and up to $125 million remediating and maintaining other pedestrian facilities. Upon granting final approval of the settlement, the court awarded class counsel $3.36 million in attorneys' fees, costs, and expenses.

13.     Additionally, I and my firm, along with other co-counsel, were certified class counsel in *Willits v. City of Los Angeles*, No. CV 10-05782 CBM (MRW). *Willits* was brought on behalf of all persons with mobility disabilities who have been denied access to the City of Los Angeles's pedestrian right of way. Plaintiffs in the *Willits* matter sought injunctive relief, alleging that the City unlawfully failed to make its pedestrian right of way, including curb ramps and sidewalks, accessible to persons with mobility disabilities, in violation of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and California Law. The claims alleged in the *Willits* matter, too, are very similar to those alleged in this action against the City of Boston. On January 3, 2011, the District Court certified a class of approximately 280,000 persons with mobility disabilities who live within the Los Angeles area,

835624.10

and approved GBDH as class counsel. *See Willits v. City of Los Angeles*, No. CV 10-05782 CBM RZX, 2011 WL 7767305, at *4-5 (C.D. Cal. Jan. 3, 2011).

14.     Plaintiffs obtained final approval of the *Willits* class settlement in August 2016. *Willits v. City of Los Angeles*, No. CV 10-05782 CBM (MRW), ECF No. 415 (C.D. Cal. August 26, 2016). The *Willits* class settlement agreement requires the City of Los Angeles to fund significant access improvements to the City's pedestrian right of way over a thirty-year period and guarantees spending of more than $1.4 billion in improvements to existing pedestrian facilities, as well as unlimited amounts on newly constructed and altered facilities. I was one of the lead negotiators of this settlement for the Plaintiffs. And, after years of extensive litigation and appeals, the court ordered the City of Los Angeles to pay class counsel approximately $13 million in attorneys' fees, costs, and expenses.

15.     I and my firm were certified class co-counsel in *Nevarez v. Forty Niner Football Company, LLC*, a case on behalf of persons with mobility disabilities and their companions who have been denied access to Levi's Stadium due to access barriers at the Stadium, its parking lots, the pedestrian right of way connecting the parking lots to the Stadium, and in the services and amenities offered at the Stadium. After contested class certification proceedings, the court certified injunctive relief classes comprised of persons with mobility disabilities and their companions, as well as a damages class comprised of persons with mobility disabilities seeking statutory damages pursuant to the California Unruh Civil Rights Act based, in part, on ADA predicate violations. *Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 570 (N.D. Cal. 2018). The *Nevarez* action resulted in a class action settlement, approved by the Court in July 2020, that requires the defendants to remediate more than 2,000 physical access barriers within and around the Levi's Stadium, pay Class Counsel $13,457,152.40 in attorneys' fees, expenses

7

and costs, and create a separate $24 million settlement fund for compensating class members—the largest class damages settlement ever achieved in a case challenging physical access to a place of public accommodation. *Nevarez v. Forty Niners Football Co., LLC*, No. 5:16-cv-07013-LHK (SVK), ECF No. 392 (N.D. Cal. July 23, 2020).

16.     I am also lead Class Counsel in the most significant class action to increase access to healthcare services for persons with mobility, visual, hearing and speech impairments, *Olson v. Sutter Health*, No. RG06-302354 (Alameda Superior Court), in which plaintiffs obtained a ten-year consent decree requiring Sutter Health to remove architectural barriers in all of its acute care and foundation facilities (clinics and doctor offices); install diagnostic and treatment medical equipment that is accessible to patients with mobility disabilities (*i.e.*, accessible examination chairs, tables, weight scales; and mammography equipment, as well as lift equipment); revise its policies and procedures to increase accessible patient care services; ensure that the websites and mobile applications for Sutter Health and all if its affiliates are accessible to individuals who are blind, low vision, deaf, hard of hearing, or have other disabilities, and to train medical staff to become more sensitive to the needs of patients and visitors with disabilities.

17.     I have served as Class Counsel in other landmark disability access actions on behalf of people with mobility and other disabilities, including *Lane v. State of Tennessee*, No. 3:98-0731 (M.D. Tenn.).  The *Lane* case enforced the rights of persons with mobility disabilities under the Americans with Disabilities Act and the United States Constitution to have access to the state courts in dozens of Tennessee counties by requiring architectural barrier removal and transfer of programs to accessible facilities.  I also was co-class counsel in *Lieber, et al. v. Macy's West, Inc.*, No. C96-02955 MHP (N.D. Cal.) and *Camalo, et al. v. Macy's West, Inc.*, No. C98-2350 MHP (N.D. Cal.), brought under the Americans with Disabilities Act, California

Unruh Civil Rights Act, and the California Disabled Persons Act.  Those consolidated cases resulted in a class settlement including systemic injunctive relief that required Macy's to remove architectural barriers at all Macy's stores in California and improve customer service for people with disabilities.  It also created what was at that time the largest class damages funds in any disability rights public accommodation class action.

18.     I have also focused much of my work over the past 27 years in Structured Negotiation to resolve systemic access barriers for individuals with disabilities.  For example, I represented the plaintiff in a settlement negotiation with UCSF Medical Center that required the medical center to remove architectural barriers and install accessible medical equipment on behalf of patients with mobility disabilities.  I have also negotiated landmark agreements for persons with visual impairments that provide talking pill bottles for pharmacy patients, alternative formats (including Braille, large print, electronic, and audio) for printed materials, accessible commercial websites, accessible point of sale machines, audio description of movie content at cinemas nationwide, and the installation of "talking ATMs" at all locations of major banks across the country.  Such entities include American Cancer Society, American Express, Bank of America, BankOne/Chase, Best Buy, Caremark pharmacy, Cinemark Theaters, CVS/pharmacy, Equifax, Experian & TransUnion, E*Trade, Kaiser Permanente, Major League Baseball Advanced Media, Radio Shack, Rite Aid, Safeway, 7-Eleven, Staples, Target, Trader Joe's, Walgreens, Wal-Mart, Wells Fargo Bank, and Wellpoint (Blue Cross), among others.  I also negotiated for the installation of accessible (audible) pedestrian signals throughout San Francisco in *CCB v. City and County of San Francisco*.

19.     During my years at GBDH, I have also litigated large non-disability class and complex actions, including *Bazerman v. American Airlines, Inc.*, No. 1:17-CV-11297-WGY (D.

Mass.), a class action filed in this District on behalf of American Airlines passengers who were charged to check a bag that should have been free.  Attached hereto as Exhibit 1 is a true and correct copy of the order granting final approval and awarding attorneys' fees, costs, and expenses to the plaintiff in *Bazerman*.  Attached hereto as Exhibit 2 is a true and correct copy of the transcript from the fairness hearing in *Bazerman*, in which the Honorable William G. Young praised our representation as "exemplary."  Other notable class actions include *Munguia- Brown v. Equity Residential,* No. CV 16-01225-JSW-MEJ (N.D. Cal.) (certified class action on behalf of California tenants of Equity Residential properties who were charged fees for late payment of rent); *Balero, et al. v. Lumber Liquidators, Inc.*, No. CV 15-01005 JST (N.D. Cal.) (class action on behalf of California consumers who purchased laminate wood flooring products manufactured in China and sold by Lumber Liquidators, which Lumber Liquidators falsely advertised as compliant with California formaldehyde emission limits); *Center for Self-Improvement and Community Development v. Lennar Corporation, et al.*, No. CGC07-465738 (San Francisco Superior Court) (toxic tort action against Lennar for generating dust containing asbestos, hexavalent chromium, and other hazardous materials during construction of housing in Bayview Hunters Point); *Butler v. Countrywide Home Loans, Inc.*, No. BC 268250 (Los Angeles Superior Court) ($30 million California class action on behalf of "account executives" seeking overtime, meal period compensation, recovery of unlawfully deducted wages and other monetary relief); *Lin v. Siebel Software Systems, Inc.*, No. CIV 435601 (San Mateo Superior Court) ($27.5 million California class action on behalf of software engineers, seeking unpaid overtime wages); *San Francisco BayKeeper v. Dow Chemical Co.*, No. C97-01988 (Contra Costa County Superior Court) (Safe Drinking Water and Toxic Enforcement Act of 1986 action to protect Contra Costa County water supply from discharges of carcinogens and reproductive toxins); *Citizens for a*

*Better Environment v. Union Oil Co.*, No. C-94-0712 TEH (N.D. Cal.) (Clean Water Act citizens

suit to limit refinery discharges of selenium into San Francisco Bay); *Shores v. Publix Super*

*Markets*, No. 95-1162-CIV-T-25E (M.D. Fla.) (gender discrimination class action challenging

defendant's job assignment, promotion, training and compensation practices, resulting in

monetary relief of $92 million and injunctive relief covering stores company-wide); *Butler v.*

*Home Depot*, No. C-94-4335 SI (N.D. Cal.) (gender discrimination class action challenging

defendant's job application, assignment, promotion, training and compensation practices,

resulting in monetary relief of $87.5 million and injunctive relief covering Home Depot's

western region); *Pines, AARP, et al. v. State Farm General Ins. Co.*, SA CV 89-631 (C.D. Cal.)

(nationwide ADEA collective action); *Stender v. Lucky Stores, Inc.*, C-88-1467 MHP (N.D. Cal.)

(gender discrimination class action challenging initial job placement, allocation of hours,

movement from part-time to full-time employment, and promotion); and *Kraszewski v. State*

*Farm General Ins. Co.*, No. C 79-1261 TEH (N.D. Cal.) (statewide Title VII sex discrimination

class action; settled for $250 million).

20.     In addition to my case work, I often lecture on disability rights, employment,

litigation and class action issues, including making presentations at the Impact Fund Class

Action Conference (2020), Jacobus tenBroek Disability Rights Symposium (2018), the Disability

Rights Bar Association Annual Conference (2019, 2016-17, 2014, and 2012), the International

Conference on Technology and Persons with Disabilities (regularly from 2012 to 2017), Law

Seminars International, the American Bar Association (ABA), and the National Employment

Lawyers Association (NELA) conventions.  I have also taught at Stanford Law School's

Advocacy Skills Workshop.

835624.10

21.     I have served as Executive Co-Editor of the Fourth Edition of Lindemann & Grossman, Employment Discrimination Law (2007), the leading treatise on employment discrimination law.  I was also the Executive Co-Editor for the 2002, 2007 and 2008 Supplements.  I received California Lawyer Magazine's California Lawyer of the Year ("CLAY") Award in 2014 for extraordinary achievement in Disability Rights.  I have been designated as a "Super Lawyer" for Northern California every year since 2005, and one of Northern California Top 50 Women Lawyers in 2009.  I am rated as an "AV Preeminent" attorney by Martindale Hubble and have been recognized as one of "The Best Lawyers in America" every year since 2010.  I and my firm were named 2021 Elite Trial Lawyer Award finalists by the National Law Journal for our work in disability rights.  In addition, I have received honors from the World Institute on Disability, the American Council of the Blind, and the American Foundation for the Blind for my work on behalf of individuals with disabilities. Until January 2021, I was the Vice Chair of the Board of Directors of the Disability Rights Bar Association, and I am a past Chair of the Board of Directors of Disability Rights Advocates.

## CASE BACKGROUND

22.     I have reviewed evidence from the City of Boston (the "City") that my firm and my co-counsel at CREEC and DLC (collectively, "Class Counsel") obtained through our investigations and negotiations in this case.  This evidence demonstrates that inaccessible curb ramps, including those with surface gaps, excessively steep slopes, and other non-compliant features are widespread throughout the City's pedestrian right of way, and that thousands of corners are missing curb ramps altogether.  These conditions similarly impede physical access to the pedestrian right of way for all of the City's residents and visitors who have mobility disabilities, including those who use wheelchairs, scooters and other assistive devices.

23.     Specifically, the evidence we obtained showed that less than half of the City's 23,000 curb ramps were in compliance with applicable disability access standards.  This figure does not include corners that are missing curb ramps altogether.  Based on our extensive investigation of the City's pedestrian right of way, we estimated that at the commencement of this case, the City had at least 15,000 missing or noncompliant curb ramps.  The Declaration of Tim Fox in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement (ECF No. 14 at 4-5) elaborates further on our investigation of the City's pedestrian right of way.

24.     On May 7, 2018, on behalf of our clients and a potential class of people with mobility disabilities who reside in or visit Boston, my colleagues at CREEC and DLC and I sent the City a letter detailing access barriers in the City's pedestrian right of way.  The letter asserted that the City's failure to install and maintain adequate, compliant curb ramps violated the ADA and Section 504.  It explained the City's obligations under these statutes and the ways in which the City was failing to meet these obligations.  We proposed that the Parties work cooperatively to resolve their claims through structured negotiations rather than litigation.  The City agreed, and in June 2018, the Parties entered into an agreement that tolled the statute of limitations on Plaintiffs' claims and identified issues to be addressed through structured negotiations.

25.     Over the course of the next three years, the Parties negotiated vigorously.  We exchanged extensive information regarding the status of existing curb ramps in the City's pedestrian right of way, the City's past and present policies concerning curb ramp construction and remediation, the City's legal obligations under the ADA and Section 504 (including the technical standards that apply to curb ramps), the City's existing system for receiving accessibility-related requests from residents, and the resources available to the City for constructing and remediating curb ramps.

26.     The Parties discussed their settlement positions at length through dozens of telephone conferences held regularly throughout the three-year period, several in-person meetings, and many email exchanges.  This investigation and information exchange have enabled Plaintiffs to understand the scope of the problem and evaluate the City's realistic capabilities.  In addition, in June 2020, the City began a comprehensive survey of its curb ramps, which it is concluding this month.  Because of the great complexity of both the curb ramp system and the efforts that will be required to bring it into compliance with the ADA and Section 504, this negotiation required a great deal of discussion with counsel and many City representatives over a long period of time.

27.     The process of settling a case like this one is exponentially more complicated than settling a class action for primarily monetary relief.  Rather than being negotiated chiefly by reference to the defendant's probable exposure at trial, here many additional factors influenced the Parties' bargaining positions with respect to each interdependent component of the Settlement.  First and foremost, Class Counsel worked with the City to create a schedule by which the City would make a binding commitment to bring the City's curb ramps into full compliance with the ADA and Section 504.  This schedule depended not just on Plaintiffs' showing that the current condition of the City's curb ramps violated these statutes, but on what was attainable for the City in light of budgetary concerns, the City's organizational structure, changes caused by the coronavirus pandemic, and the climate, terrain, and politics of Boston, among other considerations.  Thus, while ambitious, the schedule is tailored to the City's unique circumstances: it accelerates over the term of the Consent Decree and builds in flexibility for unforeseen events or budgetary fluctuations.  At the same time, it ensures accountability, with

835624.10

monitoring, dispute resolution and Court enforcement mechanisms if the City fails to comply with the Decree's terms.

28.     Moreover, many other components of the Settlement are necessary to give shape and force to the curb ramp construction schedule, such as the comprehensive curb ramp survey, the online request system, the technical specifications for curb ramps installed or remediated under the Consent Decree, the system for prioritizing certain locations, and Class Counsel's continuing right to monitor the City's compliance with the Consent Decree.  Each of these provisions had to be separately negotiated.

29.     The Parties reached a final agreement on all aspects of the settlement on June 30, 2021.  The Proposed Consent Decree is attached in its entirety as Exhibit 2 to my Declaration in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement (ECF No. 12-2).  Based on my extensive experience litigating and negotiating class actions that improve access to the pedestrian right of way for people with mobility disabilities, I believe that this is an excellent settlement.  The requirement that the City install or remediate an average of 1,630 curb ramps per year compares quite favorably to the requirements set out in similar settlements.  At the same time, based on information gained through investigating and negotiating this case, I believe that this commitment is realistic and attainable for the City.

30.     It is difficult to attach a precise monetary value to the injunctive relief required under the Consent Decree.  Under the Annual Commitment, the City must install or remediate an average of 1,630 curb ramps per year, unless it would otherwise achieve curb ramp saturation before the end of 2030 or it can show extreme impracticability, difficulty, or expense.  Consent Decree § 5.1.4 (ECF No. 12-2 at 14).  Based on our experience in similar cases, the average cost to a city like Boston to install a curb ramp is approximately $7,500, with the range of costs

835624.10

running from about $4,000 on the low end to $30-50,000 on the high end for very complicated

corners.  Consequently, the value of the curb ramp commitment provided by this Settlement is

likely over $100 million.  In terms of achieving an increase over the level of work the City was

performing prior to these negotiations, as explained by my co-counsel Tim Fox, immediately

prior to our intervention, the City was constructing fewer than 800 curb ramps per year, on

average.  *See* Declaration of Timothy P. Fox in Support of Plaintiffs' Motion for Attorneys'

Fees, Costs, and Expenses, filed herewith, ¶ 15.  Assuming that the City was going to maintain

that level of spending over the next two decades, of which there was no guarantee, it is likely that

as a result of this Settlement the City will increase annual spending on curb ramp construction by

at least $6,225,000, for a total increase in spending of more than $62 million over the term of the

Consent Decree.

31.     This figure underestimates the value of the Settlement, because it does not take

into account the time and money the City will spend (or has already spent as a result of this

Settlement): (1) conducting a comprehensive survey of its curb ramp system; (2) creating an

"Implementation Plan" that takes into account the priorities set out in the Consent Decree; (3)

maintaining a curb ramp request system accessible through its website or by telephone; (4)

maintaining all compliant curb ramps in good condition; (5) addressing puddles of melted snow

that interfere with access to curb ramps and other weather-related conditions; (6) employing an

ADA Coordinator; (7) providing annual written reports so that Class Counsel can monitor the

City's progress; and (8) resolving any disputes that might arise.  Moreover, it does not take into

account the Settlement's value for the many thousands of individuals with mobility disabilities

who live in, work in, or visit Boston and will benefit from greatly improved access to the

pedestrian right of way for years to come.  It also does not take into account that as a result of the

835624.10

Settlement the City is compelled by court order to install or remediate 1,630 ramps per year in compliance with the technical specifications under federal law.  Under any estimate of the value of the Settlement, Plaintiffs' requested award of $764,898.30 in attorneys' fees (exclusive of costs and expenses) represents a tiny fraction of the settlement's total benefit to Class Members.

## REASONABLENESS OF REQUESTED HOURS

32.     Class Counsel have kept accurate, detailed, contemporaneous records of our time spent on this case.  In all instances, the timekeeper indicates the date and amount of time spent on a task to one-tenth of an hour, describes the work that was performed during the indicated time period, and identifies the case to which the time should be charged.  I reviewed my firm's billing records and applied billing judgment to eliminate or reduce entries that were excessive, unreasonably duplicative, inappropriate for the biller (such as clerical or administrative tasks billed by attorneys), insufficiently detailed, or otherwise erroneous or non-compensable.  I deducted a few entries for multiple billers on conferences, leaving in the records for, at times, fewer billers or a single biller.  I also deducted all time by certain billers who spent less than 15 hours on the case, even though their work was productive and essential to the successful resolution of this case.  For example, I deleted the 7 hours spent on the case by my partner Andrew P. Lee, who has a deep background in the legal and technical requirements applicable to pedestrian right of way access for people with mobility disabilities and lent his expertise to help analyze proposed methodologies for the comprehensive curb ramp survey that the City is conducting under the settlement.  A true and correct copy of the resulting billing records, after exercising billing judgment, is attached hereto as Exhibit 3.

835624.10

33.     My co-counsel Tim Fox from CREEC and Tom Murphy from DLC likewise applied billing judgment to their firms' billing records.  All together, Class Counsel's exercises of billing judgment have resulted in an approximately 5.6% reduction from our original lodestar.

34.     Through August 27, 2021, Class Counsel have devoted a total of 1,401 hours (after billing judgment) to investigating this case and negotiating, finalizing, and seeking the Court's approval of the Settlement.  This figure also includes work spent on this Motion.  For that work, Class Counsel seek a total lodestar of $684,898.30.

35.     We will continue to devote time to this case over the next two months until final approval of the settlement is granted and final judgment entered in the case.  This will include time spent responding to the City's opposition to this Motion, which the City has the option to file; obtaining, analyzing and responding to the results of the comprehensive curb ramp survey, which we expect to receive on August 31, 2021; continuing to oversee the class notice process; responding to Class Member inquiries about the Settlement; drafting a motion for final approval of the Settlement; responding to any objections submitted by Class Members; and appearing at the Fairness Hearing.  Class Counsel anticipate spending an additional estimated lodestar of $80,000 on these tasks through the Effective Date of the Settlement.  This estimate is based on our extensive experience finalizing class action settlements and litigating contested attorneys' fee petitions.  Prior to the Fairness Hearing, we will supplement this Motion with our actual time records and lodestar for this work.  Regardless of the amount of fees Class Counsel actually incur between August 28, 2021 and the Effective Date, we will not seek to recover more than the requested $80,000 for that time, but will seek to recover our actual lodestar up to that amount.

36.     As reflected in Class Counsel's contemporaneous billing records, to date, Class Counsel spent time: (1) conducting an extensive initial investigation into accessibility of the

City's curb ramp system, including through on-site inspections, client interviews, and analysis of public records; (2) preparing a detailed demand letter outlining Plaintiffs' claims; (3) entering into a structured negotiations agreement with the City; (4) engaging in dozens of sessions of detailed settlement discussions with the City over the course of three years; (5) exchanging extensive information and analysis regarding the City's policies and practices for construction, maintenance, and inspection in the public right of way, as well as budgetary materials, design documents, and existing data on the accessibility of the City's curb ramps; (6) providing expertise on technical specifications for curb ramps; (7) negotiating an initial term sheet; (8) negotiating every detail of the proposed Consent Decree; (9) prompting and facilitating the City's comprehensive curb ramp survey, including extensive discussions regarding the scope and sufficiency of data being collected; (10) preparing the Complaint and other filings to obtain the Court's approval of the Settlement; and (11) conferring with Named Plaintiffs throughout.

37.     Class Counsel's staffing of this case was efficient and reasonable.  CREEC, DLC, and GBDH shared the workload and made every effort to avoid unnecessary duplication of work, the vast majority of which was performed by four attorneys and a handful of other legal professionals.  Each firm brought complementary areas of expertise to bear on a complex, technical case, all of which contributed to the excellent result achieved.  In addition, the attorneys focused on work that was appropriate to their levels of experience and billing rates, with associates doing most of the drafting of pleadings and briefs, and paralegals performing time-consuming tasks like data collection and analysis.  A summary of the roles fulfilled by GBDH's attorneys and staff on this case are as follows:

38.     ***Linda M. Dardarian.***  I am a partner at GBDH with 34 years of experience, including an extensive background in complex disability access matters and Structured

835624.10

Negotiations, as summarized in paragraphs 6 through 21, above.  As the head of GBDH's disability rights practice, my work on this case focused on strategy, settlement negotiations, and high-level supervision of the GBDH legal team.  I took lead on all negotiation sessions with the City and strategic direction and decision making during the years-long negotiation process, and was responsible for corresponding with the City on a day-to-day basis.  I also reviewed and revised all written work product, including settlement correspondence, the initial term sheet, the Consent Decree, the Settlement Notice, the Complaint, Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, Plaintiffs' Motion for Service Awards, and this Motion. As shown in the table in paragraph 45, I have spent 207.3 hours on this matter through August 27, 2021.  At my requested hourly rate of $795, this results in a lodestar of $164,803.50.

39.     ***Raymond Wendell.***  An associate at GBDH, Mr. Wendell graduated *cum laude* from Harvard Law School in 2013 and grew up in the Boston area.  Prior to joining GBDH in 2014, he clerked for the Honorable Marilyn L. Huff in the United States District Court for the Southern District of California.  During his time at GBDH, Mr. Wendell has been responsible for all facets of employment, disability, and consumer class actions and other complex litigation, from pre-filing investigation, discovery, and motion practice through class certification, trial, appeal, and/or settlement approval.  Mr. Wendell has served as a member of class counsel on several systemic disability discrimination cases, including *Willits v. City of Los Angeles*, No. CV 10-05782 CBM (RZx) (C.D. Cal.), *Ochoa v. City of Long Beach*, No. 14-cv-04307-DSF (C.D. Cal.), and *Reynoldson v. City of Seattle*, No. 2:15-cv-01608-MJP (W.D. Wash.).  Mr. Wendell was also class counsel in a case that was filed in this District, *Bazerman v. American Airlines, Inc.*, No. 1:17-CV-11297-WGY (D. Mass.).  As mentioned above, in *Bazerman*, Judge Young praised Mr. Wendell's and the rest of the GBDH team's representation as "exemplary."  *See* Ex.

2 at p. 11.  In 2020, Mr. Wendell was selected as one of the nation's top lawyers under the age of 40 by Law360.

40.     Mr. Wendell was responsible for drafting nearly all of the written work product in this case, including settlement correspondence, the initial term sheet, the Consent Decree, the Settlement Notice, Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, this Motion, and several declarations.  He participated in nearly all of the negotiation and co-counsel strategy sessions, which also provided context for his written work.  He also conducted legal research and reviewed the work product of lower rate billers, including the Complaint.  As shown in the table in paragraph 45, he has spent 363.0 hours on this matter through August 27, 2021.  At his requested hourly rate of $495, this results in a lodestar of $179,685.00.

41.     *Katharine Fisher.*  An associate at GBDH, Ms. Fisher graduated from Berkeley Law School in 2015.  Prior to joining GBDH, Ms. Fisher was a legal fellow in the Gender Equity & LGBT Rights and Work & Family Programs at the Legal Aid at Work (formerly Legal Aid Society – Employment Law Center).  Ms. Fisher has litigated several class actions involving disability rights, consumer justice, and wage and hour violations.  In this case, Ms. Fisher drafted Plaintiffs' Motion for Service Awards and worked with the Plaintiffs on their declarations in support of that motion.  As shown in the table in paragraph 45, she has spent 20.2 hours on this matter through August 27, 2021.  At her requested hourly rate of $465, this results in a lodestar of $9,393.00.

42.     *Scott Grimes.*  A senior paralegal and statistician with 32 years of case management and complex litigation experience, Mr. Grimes also has a master's degree in statistics.  His work in this matter involved analyzing databases of the City's construction in the public right of way and access barriers in the City's curb ramp system, which helped the Parties

understand and appreciate the scope of the City's ADA and Section 504 violations.  He also supervised distribution of the Settlement Notice and production of various filings, including Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, Plaintiffs' Motion for Service Award, and this Motion.  As shown in the table in paragraph 45, he has spent 93.4 hours on this matter through August 27, 2021.  At his requested hourly rate of $255, this results in a lodestar of $23,817.00.

43.     ***Damon Valdez.***  A paralegal with approximately 28 years of litigation experience, Mr. Valdez's primary duties in this matter involved identifying and tracking ADA and Section 504 violations in the City's curb ramp system.  As shown in the table in paragraph 45, he has spent 110.9 hours on this matter through August 27, 2021.  At his requested hourly rate of $225, this results in a lodestar of $24,952.50.

44.     ***Stuart Kirkpatrick.***  A paralegal with nine years of litigation experience, Mr. Kirkpatrick's primary duties in this matter included identifying and tracking ADA and Section 504 violations in the City's curb ramp system, reviewing documents regarding the City's construction in the public right of way and access barriers in the City's curb ramp system, helping distribute the Settlement Notice, and assisting with numerous court filings, including Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, Plaintiffs' Motion for Service Award, and this Motion.  As shown in the table in paragraph 45, he has spent 203.9 hours on this matter through August 27, 2021.  At his requested hourly rate of $225, this results in a lodestar of $45,877.50.

45.     In summary, the following table shows the amount of time spent on this matter by GBDH timekeepers through August 27, 2021 (totaling 998.7 hours), multiplied by their requested hourly rates, and the resulting total lodestar:

22

| Name | Position | Years of Experience/ Grad. Year | Hours | Requested Rate | Total |
|---|---|---|---|---|---|
| Linda M. Dardarian | Partner | 34 years/1987 | 207.30 | $795 | $164,803.50 |
| Raymond Wendell | Associate | 8 years/2013 | 363.00 | $495 | $179,685.00 |
| Katharine Fisher | Associate | 6 years/2015 | 20.20 | $465 | $9,393.00 |
| Scott G. Grimes | Senior Paralegal | 32 years | 93.40 | $255 | $23,817.00 |
| Damon Valdez | Paralegal | 29 years | 110.90 | $225 | $24,952.50 |
| Stuart Kirkpatrick | Paralegal | 9 years | 203.90 | $225 | $45,877.50 |
| **GBDH's Total Lodestar** | | | | | $448,528.50 |

A table showing the amount of time spent on this matter by all of the timekeepers for GBDH, CREEC and DLC through August 27, 2021, their requested hourly rates, and the resulting total lodestar is attached hereto as Exhibit 11.

## REASONABLENESS OF REQUESTED RATES

46.     As set out in paragraphs 38 through 44 above, my colleagues at GBDH and I have extensive expertise in multiple areas relevant to this lawsuit.  In light of our credentials and the complexity of this matter, our work merits compensation at the higher end of the market.

47.     GBDH periodically (typically on an annual basis) establishes hourly rates for the firm's billing personnel.  GBDH establishes those rates based on the prevailing market rates for attorneys and law firms in the San Francisco Bay Area that have attorneys and staff of comparable skill, experience, and qualifications.  Those rates are charged to defendants with whom we have settlement agreements that require monitoring, and those defendants pay us by the hour on a regular billing basis, much like a paying client.  They are also the rates that we presumptively claim in our fee applications in all of our contingent, fee-shifting cases, and they

835624.10

are the rates that are typically awarded to us for complex litigation in California.  For this case's

billers, our rates for the year 2020 that were approved by state and federal courts are as follows:

$945 for me, $490 for Raymond Wendell, $465 for Katharine Fisher, $350 for Scott Grimes, and

$285-325 for other paralegals.  Our regular 2021 rates have increased since then.

48.     For example, in *Artie Lashbrook v. City of San Jose*, No. 5:20-cv-01236-NC, ECF

No. 25 (N.D. Cal. Sept. 2, 2020), the court approved as reasonable GBDH's 2020 hourly rates,

ruling that they were "within the market range of hourly rates charged by attorneys of

comparable experience, reputation, and ability for similar litigation."  Those rates were as

follows: $945 for me, $325 for Scott Grimes, and $285 for Stuart Kirkpatrick.  Attached hereto

as Exhibit 4 is a true and correct copy of the order granting final approval and awarding

attorneys' fees, costs, and expenses to the plaintiff in *Lashbrook*.

49.     Additionally, on July 23, 2020, as class counsel in *Abdul Nevarez et al. v. Forty

Niners Football Company, LLC, et al.*, No. 5:16-cv-07013-LHK, ECF No. 416 (N.D. Cal. Jul.

23, 2020), GBDH was awarded our full lodestar, adjusted by an upward multiplier of 1.124,

based on our 2019 hourly rates, which were as follows: $925 for me, $475 for Raymond

Wendell, $450 for Katharine Fisher, $325 for Scott Grimes, $295 for Damon Valdez, and $275

for Stuart Kirkpatrick.  Attached hereto as Exhibit 5 is a true and correct copy of the order

granting final approval and awarding attorneys' fees, costs, and expenses to the plaintiffs in

*Nevarez*.

50.     Even though this case is filed in the District of Massachusetts, I believe we would

be justified in seeking attorneys' fees based on our regular, Bay Area rates.  We are uniquely

qualified to resolve complex disputes regarding disability access, particularly with regard to the

pedestrian right of way.  *See, e.g.*, *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of*

*Albany and Albany Cnty. Bd. of Elections*, 522 F.3d 182, 191 (2d Cir. 2008).  Instead, we are taking a more conservative approach by requesting significantly reduced rates for most of our billers that we calculated by reference to prevailing rates in the Boston legal market.

51.     Our starting point for reducing our rates was a prior class action settlement in which we were awarded fees by a court in the District of Massachusetts in early 2019: *Max Bazerman v. American Airlines, Inc.*, No. 1:17-CV-11297-WGY, ECF No. 104 (D. Mass. Apr. 8, 2019).  In *Bazerman*, the court awarded our full lodestar, adjusted by an upward multiplier of 1.157.  The rates we used to calculate our lodestar were as follows: $740 for me, $450 for Raymond Wendell, $235 for senior paralegal Scott Grimes, and $210 for experienced paralegals.

52.     As is standard in the legal market, we increase our rates every year to reflect simple inflation and other market changes.  For this case, we identified appropriate hourly rates by adjusting our *Bazerman* hourly rates by the rate of increase of the consumer price index published by the United States Bureau of Labor Statistics between January 2019 (when the plaintiff in *Bazerman* filed his motion for attorneys' fees) and July 2021.[1]  From there, we adjusted upward or downward by $5 to $10, yielding the following hourly rates: $795 for me, $495 for Raymond Wendell, $255 for Scott Grimes, and $225 for Damon Valdez and Stuart Kirkpatrick.  The $465 rate for Katharine Fisher was set in proportion with these, based on her experience.

53.     The rates that we requested in *Bazerman*, which formed the basis of the attorneys' fee that the court approved, were based on the then-current edition of the *Real Rate Report Snapshot* published by Wolters Kluwer.  Accordingly, in setting GBDH's requested rates for this

---

[1] *See* United States Bureau of Labor Statistics, CPI Inflation Calculator, bls.gov/data/inflation_calculator.htm.

case, I referred to the 2020 version of the *Real Rate Report Snapshot* ("*2020 Real Rate Report*"),

which is the most up-to-date version currently available.  We often use this report because it is

based on a large dataset reflecting actual hourly rates paid to billing attorneys and paralegals,

including over 500 litigation attorneys in the Boston area.  The *2020 Real Rate Report* provides

data on 2019 billing rates for the first quartile, median, and third quartile, broken down by

market, litigation or non-litigation practice, partner or associate status, and practice area.  A true

and correct copy of relevant excerpts from the *2020 Real Rate Report* is attached hereto as

Exhibit 6.

54.     One limitation of the *2020 Real Rate Report* is that none of the highlighted

practice areas correspond to the complex class action practice that my firm maintains.  As a

result, I relied on the data reflecting billing rates for Boston litigation attorneys across practice

areas, which has a sample size of over 500 attorneys.  In *Bazerman*, GBDH's billing rates were

based on the third-quartile figures from the then-applicable version of this chart.  Here, the rates

we are requesting are squarely between the median and third-quartile figures for Boston

litigation attorneys across practice areas according to the *2020 Real Rate Report*.  I believe that

this is a quite reasonable comparison based on my firm's skill, experience, and expertise in class

actions, disability access, and pedestrian right of way issues and the quality of the representation

in this case.  The data that I relied on can be found on page 20 of the *2020 Real Rate Report* and

is reprinted below for the Court's convenience.  Because the *2020 Real Rate Report* is based on

data from 2019, I have calculated inflation-adjusted values by reference to the increase in the

consumer price index between June 2019 and July 2021.  The inflation-adjusted values appear in

italics and bold font adjacent to the Real Rate Report's 2019 figures.

**Hourly Rates for Litigation Attorneys in Boston in 2019, 2021 (Adjusted for Inflation)**

| Position | First Quartile | Median | Third Quartile |
|----------|---------------|--------|----------------|
| Partner | $410 / *$436* | $650 / *$693* | $833 / *$888* |
| Associate | $325 / *$346* | $425 / *$453* | $587 / *$626* |

55.    As this chart from the *2020 Real Rate Report* shows, the hourly rates that GBDH is requesting in this case ($795 for senior partner and $465 to $495 for associates) fall squarely between the median and third-quartile figures for litigation attorneys in Boston.  The *2020 Real Rate Report* therefore confirms that the requested rates are reasonable.

56.    Although the *2020 Real Rate Report* does not contain data specific to Boston-area paralegals, it contains nationwide data.  According to a chart appearing on page 10, the billing rate for the first quartile of paralegals in 2019 was $150; for the median, $213; and for the third quartile, $289.  Adjusted for inflation, the billing rate for the first quartile of paralegals would be $160; for the median, $227; and for the third quartile, $308.  The rates we are requesting for GBDH's highly experienced paralegals ($225 to $255) are therefore between the median and the third quartile for paralegals nationwide.

57.    Recent awards of attorneys' fees ordered in complex and class cases filed in federal and state courts in Massachusetts further confirm that our requested rates are reasonable.  For instance, *Crane v. Sexy Hair Concepts, LLC*, No. 17-cv-10300-FDS, 2019 WL 2137136, at *2 (D. Mass. May 14, 2019) was a class action alleging unfair and deceptive trade practices under Massachusetts law.  The court ordered an award of attorneys' fees that exceeded class counsel's lodestar.  *Id.*  Class counsel, a Boston-based plaintiffs' firm, based its lodestar calculation on hourly rates ranging from $720 to $925 for partners, from $350 to $575 for associates, and $225 for all paralegals.  Adjusted for inflation, those rates are equivalent to

27

hourly rates ranging from $778 to $999 for partners, from $378 to $621 for associates, and $243 for all paralegals.  Attached hereto as Exhibit 7 is a true and correct copy of the declaration of counsel setting out the hourly rates used to calculate the lodestar, which my staff downloaded from PACER.

58.     *NPS LLC v. Ambac Assurance Corp.*, 190 F. Supp. 3d 212, 220-24 (D. Mass. 2016) was a complex commercial action.  The court awarded hourly rates ranging from $657 to $742 for partners and from $329 to $491 for associates.  Adjusted for inflation, those rates are equivalent to hourly rates ranging from $744 and $840 for partners and from $373 and $556 for associates.

59.     In my professional judgment and based on my decades of experience litigating and resolving complex civil rights disputes, the extensive injunctive relief required under the Consent Decree represents a truly outstanding result for the Class.  In light of the excellent outcome, Plaintiffs could justifiably request an upward adjustment of the lodestar.  *See, e.g.*, *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. 05-CV-11148-PBS, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009).  However, we have opted not to request an upward multiplier and instead only seek an award of our full lodestar.

## REASONABLENESS OF COSTS AND EXPENSES

60.     GBDH is seeking reimbursement of its reasonable out-of-pocket costs and expenses incurred in this matter pursuant to the ADA and Section 504.  *See* 42 U.S.C. § 12205; 29 U.S.C. § 794a(b).

61.     The items we have included in our costs and expenses are billed separately and are not included in my firm's lodestar.  For accounting purposes and to ensure that all costs and expenses are accurately assigned to the appropriate case, it is my firm's practice to assign a unique billing code for each case that we investigate, litigate, or negotiate.  This case had a

unique billing code, and all expense records, receipts, and billing statements reflecting costs and expenses associated with this case were assigned to that billing code.

62.     My firm's total costs and expenses in this matter through August 27, 2021 come to $2,044.54.  Those costs include in-house copying and printing, telephone charges, electronic legal research, and travel expenses.  GBDH paid these costs and expenses on a regular and timely basis as they were incurred.  All of these costs and expenses have been necessarily and reasonably incurred.  A table accurately summarizing these costs and expenses, followed by an itemization of the costs and expenses, is attached hereto as Exhibit 8.

63.     Based on my extensive experience obtaining final approval of class action settlements in various courts, I anticipate that, if the Court sets the hearings on this motion and the motion for final approval of the settlement to take place in person, Class Counsel will incur approximately $10,000 in additional costs and expenses between today and the Fairness Hearing, bringing Class Counsel's anticipated total for the case to $14,973.48 ($2,044.54 for GBDH, $2,226.94 for CREEC, $702.00 for DLC, plus anticipated cap of $10,000).  If the Court sets the hearing to take place virtually, these future costs will be significantly lower.  Prior to the fairness hearing, Class Counsel will supplement this Motion with our actual cost figures for this time period.

64.     Attached hereto as Exhibit 9 is a true and correct copy of the order granting final approval and awarding attorneys' fees, costs, and expenses, and service awards of $5,000 to each of the plaintiffs in *Hines v. City of Portland,* No. 3:18-cv-00869-HZ, ECF No. 40 (D. Or. Sept. 27, 2018).

835624.10

65.     Attached hereto as Exhibit 10 is a true and correct copy of the order granting

service awards of $5,000 to each of the plaintiffs in *Reynoldson v. City of Seattle*, No. 2:15-cv-

01608-BJR, ECF No. 60 (W.D. Wash. Nov. 1, 2017).

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct, and that this Declaration was executed this 30th day of August, 2021, in Oakland,

California.

Linda M. Dardarian

*Attorneys for Plaintiff and the proposed Settlement Class*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated on the NEF as non-registered participants on August 30, 2021.

*/s/ Raymond Wendell*
Raymond Wendell

31

835624.10