**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL MUEHE, ELAINE HAMILTON, CRYSTAL EVANS, and COLLEEN FLANAGAN, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF BOSTON, a public entity,<br><br>    Defendant. | Case No.: 1:21-cv-11080-RGS |

**JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MEMORANDUM IN SUPPORT THEREOF; RESPONSE TO OBJECTION**

## I.    INTRODUCTION

Plaintiffs Michael Muehe, Elaine Hamilton, Crystal Evans, and Colleen Flanagan, on behalf of a proposed Settlement Class of individuals with mobility disabilities who live in or visit Boston, and Defendant City of Boston (the "City") hereby jointly request that the Court grant final approval of the proposed Consent Decree and permanent certification of the Class, and that the Court retain jurisdiction over the Consent Decree and the Parties throughout the term of the Consent Decree.

This Court granted preliminary approval of the proposed Settlement on July 12, 2021. ECF No. 23. Since then, the Parties have caused the Notice of Settlement to issue in conformance with the proposed Consent Decree. *See* Dardarian Decl. in Supp. of Jt. Mot. for Final Approval of Class Action Settlement ("Dardarian Decl."), filed herewith; Kirkpatrick Decl.in Supp. of Jt. Mot. for Final Approval of Class Action Settlement ("Kirkpatrick Decl."),

filed herewith; Lederman Decl. in Supp. of Jt. Mot. for Final Approval of Class Action Settlement ("Lederman Decl."), filed herewith.

The proposed Settlement is fair, adequate, and reasonable, and satisfies all of the criteria for final approval under Rule 23 of the Federal Rules of Civil Procedure. The proposed Consent Decree requires the City to install and remediate an average of at least 1,630 curb ramps per year until a compliant curb ramp is present at every corner of the pedestrian right of way. Additional injunctive relief provisions supplement and reinforce the curb ramp construction schedule, including a requirement to maintain all compliant curb ramps in good condition, a system that allows people with mobility disabilities to request curb ramps at particular locations, and provisions related to the removal of snow and puddles that impede curb ramp access. This is a superb result for the Class. Final approval of the Settlement is therefore warranted.

One objection to the Settlement was submitted. The objection has no merit and should not disturb the Court's conclusion that the Settlement is fair, adequate, and reasonable and appropriate for final approval. The objection disregards the functions and purposes of civil rights class actions brought under Federal Rule of Civil Procedure 23(b)(2) and does not address why the injunctive relief ordered under the proposed Consent Decree is anything but outstanding.

## II.    BACKGROUND

### A.    Case History

Curb ramps in the pedestrian right of way are critical for people with mobility disabilities, especially those who use wheelchairs, scooters, walkers, or other assistive devices. Without adequate, ADA-compliant curb ramps with which to access the sidewalk, people with mobility disabilities are often forced to risk their safety by traveling in the street. They may be deterred from using the pedestrian right of way at all. In Boston, thousands of sidewalk corners are missing curb ramps altogether or have curb ramps that do not comply with access standards.

Named Plaintiffs Michael Muehe, Elaine Hamilton, Crystal Evans, and Colleen Flanagan are individuals with mobility disabilities who have been denied full and equal access to the pedestrian right of way in Boston due to missing and noncompliant curb ramps.

On May 7, 2018, Named Plaintiffs, on behalf of themselves and all others similarly situated, sent a letter to City officials detailing how the missing and noncompliant curb ramps throughout Boston deny people with mobility disabilities full and equal access to the pedestrian right of way.  *See* Fox Decl. in Supp. of Pls.' Mot. for Prelim. Approval of Class Action Settlement ¶ 16, ECF No. 14.  Based on extensive investigation of curb ramps throughout the City and Named Plaintiffs' own experiences encountering access barriers in the pedestrian right of way, the letter detailed hundreds of inaccessible curb ramp locations and explained that the City's failure to install and maintain adequate, compliant curb ramps violated the ADA and Section 504.  *Id.* at ¶ 17.  Plaintiffs proposed that the parties work cooperatively to resolve their claims through structured negotiations rather than litigation.  *Id.* at ¶ 18.

The City agreed, and in June 2018, the Parties entered into an agreement that tolled the statute of limitations on Plaintiffs' claims and identified issues to be addressed through structured negotiations.  Dardarian Decl. ¶ 4.  Over the course of three years, the Parties exchanged information regarding the status of existing curb ramps in the City's pedestrian right of way, the City's past and present policies and practices concerning curb ramp construction and remediation, including the types of street resurfacing work that trigger curb ramp installation and remediation requirements, the City's legal obligations under the ADA and Section 504, the City's system for receiving accessibility-related requests from residents, and the resources available to the City for constructing and remediating curb ramps.  The Parties discussed their

settlement positions at length through regular phone calls, several in-person meetings, and many email exchanges.  *Id*.

The Parties reached a final agreement on all aspects of the settlement on June 30, 2021. The proposed Consent Decree is summarized in Plaintiffs' Motion for Preliminary Approval of Class Action Settlement (ECF No. 11 at 8-15) and filed in its entirety as Exhibit 2 to the Declaration of Linda M. Dardarian in support thereof (ECF No. 12-2).  Because Named Plaintiffs represent a proposed class of individuals with mobility disabilities, the Settlement requires court approval.  The agreement also contemplates this Court's continuing jurisdiction over the Parties and the proposed Consent Decree.  Accordingly, Plaintiffs filed their Complaint in this action on June 30, 2021, and moved for preliminary approval of the Settlement on July 2, 2021.  ECF Nos. 1, 11.  The Court granted preliminary approval on July 12, 2021.  ECF No. 23.

### B.  Notice to the Class

After preliminary approval, the Parties effected notice to the Settlement Class pursuant to the terms of the proposed Consent Decree.  *See* Dardarian Decl. ¶¶ 17-21; Kirkpatrick Decl. ¶¶ 3-7; Lederman Decl. ¶¶ 3-6.

The Court-approved Notice of Settlement explained the litigation and the terms of the proposed Consent Decree, including the injunctive relief, release of claims, and service awards requested for Named Plaintiffs.  It explained that Class Counsel could apply to the Court for an award of reasonable attorneys' fees, costs, and expenses based on the lodestar method.  The Notice also informed Class Members of how to object to the Settlement and provided a toll-free number for Class Members to obtain further information about the Settlement or Settlement documents.  Class Members had until September 20, 2021 to object to the Settlement.  *See* Consent Decree § 14.7.1 & Ex. B.

On Thursday, July 22, 2021, Class Counsel provided a copy of the Notice of Settlement to 58 disability-rights or services organizations by email and two by U.S. Mail.  Kirkpatrick Decl. ¶ 4.  These 60 organizations—including local, regional, and national organizations—were identified on a list that was filed as Exhibit D to the Consent Decree.  ECF No. 12-2.  Thirty-one organizations confirmed receipt.  None of the emails sent to the other organizations were returned as undeliverable, indicating that the Notice of Settlement was received.  Kirkpatrick Decl. ¶ 5.

On or before July 30, 2021, each of three Class Counsel firms posted on their websites a copy of the Notice of Settlement in an accessible electronic format that can be recognized and read by software commonly used by individuals with visual impairments to read web pages. Dardarian Decl. ¶ 19.  On the same date, the City posted the Notice of Settlement on its official website with a translation function.  By August 2, 2021, it posted translations of the Notice into the following languages: Arabic, Brazilian Portuguese, Cabo Verdean Creole, French, Haitian Creole, Russian, Simplified Chinese, Somali, Spanish, and Vietnamese.  Lederman Decl. ¶ 5. The Notice was posted in an accessible electronic format that can be recognized and read by software commonly used by individuals with visual impairments to read web pages. *Id.* ¶ at 6. In addition, the Notice of Settlement was published in both the Boston Globe and the Boston Herald on August 11, August 18, August 25, and September 1, 2021.  *Id.* at ¶ 3.  The Notice was therefore published, posted, and mailed by the deadlines set forth in the Proposed Consent Decree.

On September 23, 2021, William Norkunas submitted an objection to the proposed Settlement.  ECF No. 37.  On September 27, 2021, the Court ruled that the objection did not conform with Federal Rule of Civil Procedure 23(e) but gave Mr. Norkunas until October 8,

840924.13

2021 to file a complaint objection.  ECF No. 38.  Mr. Norkunas filed a response on October 5, 2021.  ECF No. 42.  The Parties respond to Mr. Norkunas' objection in Section V below.

**C.**      **Curb Ramp Survey**

Section 3 of the Consent Decree required the City to complete a comprehensive survey of missing and noncompliant curb ramps in its pedestrian right of way by August 1, 2021, and to share the results with Class Counsel by September 1, 2021.  The survey is now complete.  It revealed a total of 22,817 missing and/or noncompliant curb ramps throughout Boston.  *See* Suppl. Fox Decl. in Supp. Pls.' Mot. for Attys.' Fees, Costs, and Expenses ¶ 7, ECF No. 46. Based on these results, the City must install or remediate an average of at least 1,630 curb ramps per year (unless it can demonstrate "extreme impracticability") until a compliant curb ramp is present at every corner of the City's pedestrian right of way.  *See* Consent Decree §§ 5.1.1-.4. This means that, barring extenuating circumstances, the Consent Decree will remain in effect until the end of 2034, or perhaps earlier, at which point a compliant curb ramp will be present at every corner.  *See id.* at § 5.1.1.

**III.**      **THE PROPOSED SETTLEMENT MEETS THE STANDARDS FOR FINAL APPROVAL.**

Rule 23(e) of the Federal Rules of Civil Procedure governs settlements of class action lawsuits.  It provides that a class action "may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).  The court approval process has three principal steps: (1) a preliminary approval hearing, at which the court makes a preliminary determination regarding the fairness, reasonableness, and adequacy of the settlement terms; (2) notice to class members of the proposed settlement and given an opportunity to express any objections; and (3) a formal fairness hearing, at which the court decides whether the proposed

settlement should be finally approved as fair, adequate, and reasonable to the class.  Federal Judicial Center, *Manual for Complex Litigation* § 21.632-34 (4th ed. 2018).

A class action settlement may only be approved if the court determines it is "fair, reasonable, and adequate," considering whether:

A.  the class representatives and class counsel have adequately represented the class;

B.  the proposal was negotiated at arm's length;

C.  the relief provided for the class is adequate, taking into account:

    i.  the costs, risks, and delay of trial and appeal;

    ii.  the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    iii.  the terms of any proposed award of attorneys' fees, including timing of payment; and

    iv.  any agreement required to be identified under Rule 23(e)(3); and

D.  the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

These factors weigh strongly in favor of final approval of the Settlement.

**A.**    **<u>Named Plaintiffs and Class Counsel Have Adequately Represented the Class.</u>**

That Named Plaintiffs and Class Counsel have adequately represented the Class is demonstrated by the excellent results for Class Members.  After decades of stalled progress toward a curb ramp system that complies with the ADA and Section 504, the City will now achieve full compliance on an accelerated schedule.  Moreover, the Court acknowledged Named Plaintiffs' and Class Counsel's adequacy in representing the Class's interests in certifying the Settlement Class and preliminarily approving the Settlement.  ECF No. 23.  Named Plaintiffs and Class Counsel have no conflicts of interest with the Settlement Class, as set out in their

declarations.[1]  They vigorously advanced the interests of the Settlement Class through an extensive investigation and three years of comprehensive, arm's length negotiations.  Therefore, this factor supports final approval of the proposed Settlement.

**B.      The Consent Decree Was Negotiated at Arm's Length.**

This Settlement is the result of a prolonged and vigorous negotiation between the Parties that began shortly after Plaintiffs sent the City a demand letter on May 7, 2018.  Dardarian Decl. ¶ 4.  Settlement discussions were then conducted under a formal agreement that preserved all Parties' rights and clearly identified the topics that would be addressed through structured negotiations.  *Id.*  Over the course of the next three years, the Parties engaged in regular meetings and telephone calls in which they exchanged detailed information regarding the City's pedestrian right of way, budgetary concerns, and obligations under the ADA and Section 504, including technical requirements applicable to curb ramps.  *Id.*

Moreover, although the City agrees that Plaintiffs are prevailing Parties entitled to reasonable attorneys' fees, costs, and expenses, it contests the amount that Plaintiffs request.  *See* Def.'s Opp'n Pls.' Mot. Attys.' Fees, ECF No. 40.  The absence of a "clear sailing" agreement in a class action settlement is a strong indicator that there was no collusion.  *See, e.g.*, *Tyler v. Michaels Stores, Inc.*, 150 F. Supp. 3d 53, 57 n.8 (D. Mass. 2015).  Thus, the Settlement is the product of an arm's length negotiation between capable and experienced counsel and is entitled to a presumption of fairness, reasonableness, and adequacy.  *See, e.g.*, *Rolland v. Cellucci*, 191

---

[1] Muehe Decl. ¶ 10, ECF No. 15; Hamilton Decl. ¶ 9, ECF No. 16; Evans Decl. ¶ 10; ECF No. 17; Flanagan Decl. ¶ 8, ECF No. 18; Dardarian Decl. in Supp. of Pls.' Mot. for Prelim. Approval of Class Action Settlement ¶ 47, ECF No. 12; Murphy Decl. in Supp. of Pls.' Mot. for Prelim. Approval of Class Action Settlement ¶ 10, ECF No. 13; Fox Decl. in Supp. of Pls.' Mot. for Prelim. Approval of Class Action Settlement ¶ 12, ECF No. 14.

F.R.D. 3, 6 (D. Mass. 2000); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280-81 (S.D.N.Y. 1999).

**C.**     **The Settlement Provides an Outstanding Result for the Settlement Class in Light of the Potential Costs, Risks, and Delay of Litigation.**

The Consent Decree establishes a schedule for the City to install and remediate curb ramps that will culminate in "curb ramp saturation"—a compliant curb ramp at every corner of the pedestrian right of way.  Based on the results of the comprehensive survey that was required under the proposed Consent Decree, the City will be required to install or remediate an average of at least 1,630 curb ramps per year throughout the Consent Decree and will achieve curb ramp saturation by the end of 2024.  Dardarian Decl. ¶ 5.

The Consent Decree contains numerous additional provisions that give shape and force to the curb ramp construction schedule.  The City must prioritize construction of curb ramps in locations that are particularly important to many people with mobility disabilities, and to create an "Implementation Plan" that takes these priorities into account.  Consent Decree. §§ 8.2.1, 9.1. In addition, the City must maintain a program through which people with mobility disabilities may submit requests for the construction or remediation of curb ramps in specific locations throughout the City, either through the City's website or by phone.  *Id.* at § 10.1.  The City is required to maintain all compliant curb ramps within its jurisdiction in good condition, and in compliance with accessibility technical specifications, so that they are readily accessible to and usable by people with mobility disabilities, including by addressing puddles of melted snow that interfere with access to curb ramps.  *Id.* at §§ 11.1, 11.4.  The City is also hiring an ADA Coordinator who must have a minimum of 20 hours per week to devote solely to responsibilities related to accessibility of the pedestrian right of way.  *Id.* at § 4.  Detailed monitoring and dispute

840924.13

resolution provisions will allow Class Counsel to continuously ensure that the City remains in compliance with the terms of the Consent Decree.  *Id.* at §§ 13, 16.

These results are excellent in light of the potential costs, risks, and delay of litigation, which are considerable.  First, litigation, trial, and potential appeal of this matter would demand significant resources from the Parties and the Court, including extensive fact and expert discovery, data analysis, and depositions of class members, City employees, and experts.  *See* Dardarian Decl. ¶ 8.  Prior cases against cities for inaccessible pedestrian rights of way illustrate the complexity and expense that litigation would entail.  In *Ochoa v. City of Long Beach*, Case No.: 2:14-cv-04307-DSF (FFMx) (C.D. Cal.),[2] a settlement was reached only after two-and-a-half years of contested litigation, including extensive discovery and motion practice.  Dardarian Decl. ¶ 9. The parties propounded and responded to hundreds of discovery requests, exchanged over 30,000 pages of documents, and conducted twenty-four depositions.  *Id.*  Similarly, in *Willits v. City of Los Angeles*, Case No. CV 10-05782 CBM (C.D. Cal.), the parties engaged in several years of extremely contentious litigation that involved proceedings in state and federal court at the trial and appellate court levels.  Dardarian Decl. ¶ 10.  Before reaching a settlement, the parties propounded and responded to hundreds of discovery requests, exchanged over 4 million pages of documents, and conducted thirty-four depositions.  *Id.*  Litigation of this matter would be similarly protracted and costly.

Second, proceeding in litigation without settling would have raised significant risks to Plaintiffs and the Class.  For example, the City could have argued that pedestrian paths are not "services, programs, or activities" within the meaning of Title II of the ADA.  The First Circuit

---

[2] Goldstein, Borgen, Dardarian & Ho, which represents Plaintiffs and the Settlement Class here, served as class counsel in both the *Ochoa* and *Willits* matters as well.  Dardarian Decl. ¶¶ 9-10.

840924.13

has not addressed this question, and some federal courts have applied a less demanding framework to pedestrian rights of way.  *See, e.g.*, *Babcock v. Michigan*, 812 F.3d 531, 536 (6th Cir. 2016).  The City could have also argued that Plaintiffs' claims are barred by the statute of limitations as to curb ramps that have not been subject to new construction or alterations within the past three years.  Litigating these defenses would have consumed time and resources. Dardarian Decl. ¶ 12.  Finally, even if Plaintiffs prevailed on the merits, there is a significant risk that the Court would decline to order injunctive relief as robust and comprehensive as that required under the Consent Decree, which will result in a compliant curb ramp at every corner, to the maximum feasible extent.  *Id.*

The method of providing relief to the Settlement Class is also fair, reasonable, and adequate.  The curb ramp construction schedule under the proposed Consent Decree is ambitious but realistic.  Dardarian Decl. ¶ 13.  Curb ramp improvements will be prioritized based on proximity to locations that are important to people with mobility disabilities, in accordance with 28 C.F.R. § 35.150.

The Parties' agreement regarding attorneys' fees also supports adequacy, because the Consent Decree only provides that Named Plaintiffs are prevailing parties pursuant to the ADA and are therefore entitled to reasonable attorneys' fees, costs, and expenses; the City did not agree to a particular fee award. To the contrary, the City has opposed Plaintiffs' fee petition. ECF No. 40.  In addition, any award of attorneys' fees, costs, and expenses will be awarded separately from relief to the Class, rather than coming from funds that would otherwise go to Class Members.  Thus, Plaintiffs' request for an award of attorneys' fees, costs, and expenses does not have the effect of "pursuing their self-interest to the detriment of the class's interest." *Laguna v. Coverall N. Am., Inc.*, 753 F.3d 918, 925 (9th Cir. 2014).  Finally, the Parties have

11

made no agreements apart from the Settlement that must be disclosed under Rule 23(e)(3). Dardarian Decl. ¶ 14.

As a result, this factor weighs strongly in favor of final approval. *See, e.g., Hill v. State St. Corp.*, No. 1:09-cv-12146-GAO, 2015 WL 127728, at *7 (D. Mass. Jan. 8, 2015) ("The complexity of this case and the expense and delay that would result if this case were litigated through further motion practice, trial and appeals strongly support approval of the Settlement.").

**D.        The Proposed Settlement Treats Class Members Equitably Relative to Each Other.**

The Consent Decree does not provide preferential treatment to any subset of the Settlement Class.  All Settlement Class Members will share equally in the City-wide removal of curb ramp barriers.  Once a particular curb ramp barrier is removed, Settlement Class Members will benefit equally from the improved access at that location.  In addition, all Class Members will have an equal opportunity to avail themselves of the improved curb ramp request system.

Subject to Court approval, each of the Named Plaintiffs will also receive a $5,000 service award, which is a fair and reasonable payment to recognize and compensate them for the efforts and risks they took in stepping forward to assert these claims, their participation in meetings with the City, and the work they did to advance the investigation and negotiation of this matter. *See* Plaintiffs' Motion for Service Awards, ECF No. 30.  Service awards of $5,000 or more are routine in the First Circuit and do not render a class action settlement unfair. *See, e.g., Carlson v. Target Enter., Inc.*, 447 F. Supp. 3d 1, 5 (D. Mass. 2020) ("Incentive awards are an appropriate means for encouraging individuals to undertake the responsibility of representative lawsuits."); *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 468 (D.P.R. 2011) (internal citation omitted) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit.").

12

## IV.      THE CLASS SHOULD BE CERTIFIED ON A PERMANENT BASIS.

On July 12, 2021, the Court granted Plaintiffs' Motion for Preliminary Approval of the Settlement, and in so doing necessarily determined that the Settlement Class satisfied the applicable requirements of Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure.  ECF No. 23; *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-20 (1997) (for approval of settlement under Federal Rule of Civil Procedure 23(e), courts must find that proposed class meets all applicable Rule 23 requirements except manageability).  Since then, nothing has occurred that would alter that conclusion in any way.  Dardarian Decl. ¶ 15.  Accordingly, for the reasons set out in Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement (ECF No. 11 at 21-27), the Settlement Class should be certified on a permanent basis.

## V.      RESPONSE TO OBJECTION

On October 5, 2021, William Norkunas filed an objection to the proposed Settlement. ECF No. 42.  No other objections have been submitted.  Dardarian Decl. ¶ 22.  Plaintiffs respond to Mr. Norkunas' objections as follows:

### 2.1      *All 58 million disabled persons will be harmed that reside in America and visit Boston.*

Preliminarily, not all Americans with disabilities are Settlement Class Members or affected by this Settlement, which is only on behalf of people with *mobility* disabilities who either reside in or visit Boston.  *See* Consent Decree § 1.18 (definition of Settlement Class). Moreover, Mr. Norkunas does not explain how the Settlement harms people with disabilities.

To the contrary, the Consent Decree requires the City to install an ADA-compliant curb ramp at every corner of the pedestrian right of way by the end of 2034, to the great benefit of individuals with mobility disabilities who travel on the pedestrian right of way in Boston.  It also benefits Settlement Class Members by improving the City's curb ramp request system, prioritizing curb ramp locations in accordance with their importance to people with mobility

13

disabilities, requiring the City to maintain compliant curb ramps in good condition and to hire an ADA coordinator, and providing for removal of snow and puddles that impede access to curb ramps.

**2.2     I object to the filing under FRCP, Rule 23(b)(2).**

A class action may be certified under Rule 23(b)(2) where the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples [of 23(b)(2) class actions]."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997); *Nat'l Ass'n of the Deaf v. Mass. Inst. of Tech.*, Case No. 3:15-cv-30024-KAR, 2020 WL 1495903, at *2 (D. Mass. Mar. 27, 2020) (challenge to MIT's failure to caption online content was "a quintessential Rule 23(b)(2) case"); *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972) (Rule 23(b)(2) is "uniquely suited to civil rights actions") (quoting Comm.'s Notes to Rule 23).

The claims brought in this case are precisely the type of claims to which Rule 23(b)(2) was intended to apply.  Plaintiffs seek broad declaratory and injunctive relief—system-wide improvements to the City's pedestrian rights of way—on behalf of a large class of all City residents and visitors with mobility disabilities who are being denied access due to alleged deficiencies in the City's policies and practices.  Certification of a 23(b)(2) class prevents the City from being subject to conflicting rulings, enables Named Plaintiffs to address barriers that they have not personally confronted, and provides sweeping benefits to unnamed Class Members without the need for them to come forward and litigate individual actions.  It also allows for a release of certain class claims, which serves as consideration for the broad injunctive relief provided.  *See, e.g.*, *City Partnership Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1044 (1st Cir. 1996) (class release permitted "in order to achieve a comprehensive settlement that

would prevent relitigation of settled questions at the core of a class action") (quoting *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)).

**2.3     *No opt out provision applicable to this objector.***

There is generally no opt-out procedure available in class actions certified under Rule 23(b)(2), because an opt-out procedure would in many cases defeat the very purpose of a class action for injunctive relief. *See, e.g.*, *Wal-mart Stores, Inc. v. Dukes*, 564 U.S. 338, 361-62 (2011) (Rule 23(b)(2) classes are mandatory because "individual adjudications would be impossible or unworkable").  This is just such a case: if Mr. Norkunas could sue the City for failure to install and maintain compliant curb ramps under the ADA and Section 504, the City could end up being subject to conflicting adjudications that would impede its ability to reach full compliance.  Dardarian Decl. ¶ 16.  The Decree does, however, provide Mr. Norkunas with a method to request curb ramps at particular locations, and to have those requests enforced by Class Counsel.

**2.4     *Forever barred.***

Mr. Norkunas is not forever barred from filing suit against the City under the ADA and Section 504.  The Class Release only applies to non-monetary claims relating to curb ramps, and it expires at the end of the term of the proposed Consent Decree, likely by the end of 2034.  It excludes claims for monetary damages, personal injury, or property damage, as well as claims based on components of the City's pedestrian right of way other than curb ramps.  Consent Decree § 18.1.  The Class Release is narrowly tailored to the injunctive relief ordered under the proposed Consent Decree and is therefore reasonable and appropriate.  *See City Partnership Co.*, 100 F.3d at 1044.

**2.5**     *Structured Negotiations.*

Even though this matter was not resolved through traditional litigation, it was thoroughly investigated and negotiated at arm's length.  Class Counsel spent many hours documenting access violations in the City's pedestrian right of way in order to send the City a detailed, compelling demand letter proposing a structured negotiations approach.  Thereafter, the Parties engaged in three years of settlement discussions in which they exchanged a great deal of information and vigorously negotiated each and every term of the proposed Consent Decree. The end result holds the City to an ambitious curb ramp construction schedule and exacting technical standards.  Dardarian Decl. ¶¶ 4-6.  Therefore, the fact that the case was resolved through a structured negotiations process does not detract from the fairness, adequacy, and reasonableness of the Settlement.

**2.6**     *Service awards / incentive awards are not appropriate under the ADA, and money damages not permitted.*

Mr. Norkunas cites an Eleventh Circuit case that does not reflect the law in this Circuit, where service awards are routinely approved.  *See, e.g.*, *Carlson*, 447 F. Supp. 3d at 5; *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d at 468; *In re Lupron Mktg. & Sales Practices Litig.*, MDL No. 1430, Master File No. 01-cv-10861-RGS, 2005 WL 2006833, at *7 (D. Mass. Aug. 27, 2005) ("Incentive awards serve an important function in promoting class action settlements").  Service awards are particularly appropriate where, as here, the named plaintiffs put substantial and meaningful work toward resolving the case.  *See, e.g.*, *Veilleux v. Elec. Me., LLC*, No. 1:16-CV-571-LEW, 2020 WL 6565260, at *2 (D. Me. Nov. 9, 2020) (finding $5,000 service award reasonable given the duties undertaken by named plaintiffs); *In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-MD-2472-WES-PAS, 2020 WL 4038942, at *8 (D.R.I. July 17, 2020) (approving $5,000 service awards to two consumer class representatives whose

efforts benefited  absent class members such that "their efforts should not go

unrecognized"), *report and recommendation adopted*, 2020 WL 5201275 (D.R.I. Sept. 1, 2020);

*Cullinane v. Uber Techs., Inc.*, No. 14-14750-DPW, 2020 U.S. Dist. LEXIS 38798, at *19-20

(D. Mass. Jan. 29, 2020) (awarding $5,000 to each of three named plaintiffs for efforts on behalf

of the class); *Ark. Teacher Ret. Sys. v. State St. Bank & Tr. Co*., No. 11-CV-10230-MLW, 2018

WL 11026335, at *34-35 (D. Mass. June 28, 2018), report and recommendation adopted in part,

rejected in part, 512 F. Supp. 3d 196 (D. Mass. 2020) ($10,000 service award for each of six

named plaintiffs who spent a range of 25 to 50 hours on the case); *In re Puerto Rican Cabotage*

*Antitrust Litig.*, 815 F. Supp. 2d at 469 (awarding $8,000 incentive award per plaintiff for

providing information to counsel, reviewing filings, and executing affidavits); *In re Relafen*

*Antitrust Litig*., 231 F.R.D. 52, 82 (D. Mass. 2005) (awarding $8,000 incentive award per

consumer plaintiff who reviewed litigation documents, provided discovery, and was deposed).

In addition, here, unlike absent Class Members, the Named Plaintiffs are executing a

general release of claims, including for monetary damages.  The Settlement does not provide for,

nor does it release Class Member claims for, money damages.  Consent Decree § 18.

**2.7**     ***(Proposed) consent decree not in the best interests of the 58 million disabled people.***

Again: (1) this Settlement is only on behalf of people with mobility disabilities who

reside in or visit Boston, not all Americans with disabilities; and (2) Mr. Norkunas does not

explain why the comprehensive injunctive relief ordered under the proposed Consent Decree

harms people with disabilities or is not in their best interests.

**2.8**     ***Injurious and harmful exceptions to barrier removal given to the City.***

The proposed Consent Decree imposes a very demanding construction schedule and

exacting technical standards on the City, and exceptions are very minimal.  First, in situations

where the construction of a compliant curb ramp would be technically infeasible or structurally

impracticable, the City must still install a ramp that is compliant to the maximum extent feasible. Consent Decree § 10.4.  These are the precise defenses set out in the ADA and are very difficult to establish.  *Id.* at §§ 1.20-21; Dardarian Decl. ¶ 6.

Second, in fulfilling its obligations under the Annual Commitment, the City is permitted to "bank" up to 250 curb ramps per year to be applied to the following year, and it may also operate a "deficit bank" (allowing it to make up for a deficit the following year) if it "experiences unexpected delays in major capital improvement projects based on facts outside of the City's control."  Consent Decree § 5.3.  While this provision gives the City some flexibility in the timing of curb ramp construction, it does not alter the requirement to install or remediate an average of at least 1,630 curb ramps per year throughout the term of the Consent Decree.

Third, the proposed Consent Decree requires the City to install or remediate an accelerating number of curb ramps between 2021 and 2024, and then to make up the difference from years 2025 through 2030 such that the number of curb ramps installed or remediated for the first ten years of the term of the proposed Consent Decree averages out to 1,630.  *Id.* at § 5.1.1. There is one exception, which applies if the City "can demonstrate extreme impracticability, difficulty or expense."  *Id.* at § 5.1.4.  This is a very high standard, and the City has the burden of proving that it is met.  Finally, the proposed Consent Decree contains a standard "Force Majeure" clause, which does not excuse the City's performance altogether, but merely tolls the City's obligations as to specific affected locations for the duration of the force majeure's effect. *Id.* at § 25.  Moreover, the City's performance under the Decree will be monitored by Class Counsel and enforced by the Court.  *Id*. at §§ 13,14, & 16.

Therefore, there are no exceptions set out in the proposed Consent Decree that detract from the fairness, adequacy, and reasonableness of the Settlement.

840924.13

**2.9     *Far too much "escape from compliance language" in the proposed Consent Decree.***

Again, the proposed Consent Decree imposes demanding requirements on the City, with

very minimal exceptions.

**2.10    *Lack of adequate, helpful, timely, and proper notice to the class.***

The Notice of Settlement describes in detail and in plain language the terms of the

proposed Consent Decree and the legal rights of Class Members.  *See* Consent Decree § 14.7.1 &

Ex. B.  Because of the scope of the Settlement Class and the nature of the claims, it was not

possible to identify and deliver the Notice to individual Settlement Class Members.  Instead, the

Notice was published for four consecutive weeks in the two most prominent Boston newspapers,

posted on the City's website and Class Counsel's websites, and distributed to 60 different local,

regional, and national disability rights and services organizations.  *See* Dardarian Decl. ¶¶ 17-20;

Kirkpatrick Decl. ¶¶ 3-7; Lederman Decl. ¶¶ 3-6.  This was the best notice practicable under the

circumstances.  Fed. R. Civ. P. 23(c)(2)(B); *see also* W. Rubenstein, A. Conte, & H. Newberg,

Newberg on Class Actions § 8.5 (5th ed. 2014).  Moreover, the Court approved the Parties'

notice program in granting preliminary approval of the Settlement.  ECF No. 23.

**2.11    *Plaintiff's demand for legal fees is ridiculously high, diverting City funds that could
otherwise be used to make the required ADA modifications.***

Mr. Norkunas misapprehends the requirements of the Settlement.  There is no common

fund from which any award of attorneys' fees, costs, and expenses are to be awarded that might

take away from class members' recovery, as in some class action settlements.  Instead, the

injunctive relief ordered under the proposed Consent Decree, which was negotiated and resolved

before the Parties broached the topic of attorneys' fees, is entirely independent of any fee award

and must be performed regardless of the fees paid to Class Counsel.  Dardarian Decl. ¶ 7.  While

the City has opposed Plaintiffs' fee petition, there is no indication that whatever fees are awarded

to Plaintiffs will be paid out of capital budgets or funds that would otherwise be used for curb ramp construction or maintenance.  Moreover, the amount of attorneys' fees to be awarded is not part of the Settlement here, which contains no "clear sailing" provision.  Instead, it is a determination for this Court to make independently of its decision whether to finally approve the Settlement.

Plaintiffs add that the ADA is enforced primarily by private litigants, and it is the prospect of a fully compensatory fee award that enables them to pursue important claims in the public interest.  *See, e.g.*, *City of Riverside v. Rivera*, 477 U.S. 561, 578 (1986).  In previous filings, Plaintiffs have explained in great detail their position that the attorneys' fees award they request, which is based on the time they actually spent investigating and negotiating this matter, is reasonable.  *See* ECF Nos. 25-28, 44-47.  The City has also explained its position that Plaintiffs' requested attorneys' fees award is not reasonable.  *See* ECF No. 40.

In sum, none of Mr. Norkunas' objections should prevent the Court from granting final approval of the Settlement.

## VI.   CONCLUSION

The Parties jointly request that the Court: (1) grant final approval of the Settlement; (2) certify the Settlement Class on a permanent basis; and (3) retain jurisdiction over the Parties and the Consent Decree throughout the term of the Consent Decree.

840924.13

Dated: October 14, 2021                Respectfully submitted,

*/s/ Raymond Wendell*
Linda M. Dardarian (*pro hac vice*)
ldardarian@gbdhlegal.com
Raymond Wendell (*pro hac vice*)
rwendell@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
(510) 763-9800; (510) 835-1417 (Fax)

Thomas P. Murphy (SBN 630527)
DISABILITY LAW CENTER, INC.
11 Beacon Street, Suite 925
Boston, MA 02108
(617) 723-8455; (617) 723-9123 (Fax)

Timothy Fox
tfox@creeclaw.org
CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
104 Broadway, Suite 400
Denver, CO 80203
(303) 757-7901

Attorneys for Plaintiff and the Proposed Class


CITY OF BOSTON,

By its attorney,
Henry C. Luthin
Corporation Counsel

*/s/ Adam Cederbaum*
Adam Cederbaum (BBO#661549)
Chief of Government Services
Jason Lederman (BBO#686893)
Senior Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4034
*adam.cederbaum@boston.gov*
*jason.lederman@boston.gov*

840924.13

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated on the NEF as non-registered participants on October 14, 2021.

*/s/ Raymond Wendell*
Raymond Wendell

794366.7
840924.13