**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL MUEHE, *et al*., on behalf of themselves and all others similarly situated,<br><br> Plaintiffs*,*<br><br>v.<br><br>CITY OF BOSTON, a public entity,<br><br> Defendant. | Case No. 1:21-cv-11080-RGS |

**PLAINTIFFS' MOTION AND MEMORANDUM TO ENFORCE CONSENT DECREE
OR IN THE ALTERNATIVE TO SHOW CAUSE WHY DEFENDANT SHOULD NOT
BE HELD IN CONTEMPT FOR VIOLATION OF CONSENT DECREE**

## I.     Introduction

Curb ramps are an essential part of the pedestrian right-of-way, permitting people who use wheelchairs to navigate their cities for business, recreational, medical, and other purposes. "If designed and constructed to be accessible, a curb ramp provides an accessible route that people with disabilities can use to safely transition from a roadway to a curbed sidewalk and vice versa."[1] The Department of Justice – responsible for implementing the Americans with Disabilities Act, 42 U.S.C. § 12134(a) – has promulgated the 2010 ADA Standards for Accessible Design ("ADAS"), 36 C.F.R. pt. 1190, which are specific design requirements to ensure that curb ramps are accessible and safe. When curb ramps are not designed and constructed in accordance with the ADAS, they can be both inaccessible and dangerous. The United States Access Board – tasked with developing accessibility standards, 29 U.S.C. § 792(b)

---

[1] U.S. Dep't of Just., ADA Best Practices Tool Kit for State and Local Governments, Chapter 6, Curb Ramps and Pedestrian Crossings Under Title II of the ADA (2007), https://archive.ada.gov/pcatoolkit/chap6toolkit.htm (relevant excerpts attached hereto as Fox Decl., Ex. 4).

– prepared a ten-minute video illustrating a number of challenges encountered by wheelchair-users in the pedestrian right-of-way; several passages provide stark illustrations of the dangers of poorly designed or executed curb ramps.[2]

Many of the ramps installed or remediated (the term "produce" as used in this Memorandum includes "install" and "remediate") by Boston in 2021 (the "2021 Ramps") do not comply with the ADAS and thus violate the Consent Decree. The noncompliant features of many of these ramps make them not only inaccessible but dangerous. For example, numerous ramps force wheelchair users into the path of cars – often with momentum as they roll down the ramp.

Boston is in material violation of other provisions of the Consent Decree, including: (1) installing or remediating more than 650 fewer Complaint Curb Ramps[3] than required by the Consent Decree; (2) providing unreliable and incomplete measurements and other data concerning Curb Ramps, undermining Class Counsel's attempts to assess compliance; and (3) failing to put in place adequate processes to maintain the accessibility of Curb Ramps. Wheelchair-using Bostonians continue to face many of the same – and some new – challenges and risks they faced before entry of the Consent Decree.

The parties have engaged in extensive meet and confer discussions about these issues,[4] and at Boston's request, on July 3, 2024, Class Counsel provided a draft of this motion to Boston, and asked for Boston's response by July 22, 2024. Having received no response, Class

---

[2] U.S. Access Board, "Accessible Sidewalks: Design Issues for Pedestrians Who Use Wheelchairs," at 1:52 – 5:40 and 6:41 – 8:35 ("Access Board Video"), https://usa-accessboard.app.box.com/s/muxcrgqooh16q44aqbiq27da76okuway. The video was part of the Access Board's "Accessible Sidewalks Video Series," https://www.access-board.gov/prowag/other/accessible-sidewalks-video-series/.

[3] Capitalized terms have the meaning assigned to them in the Consent Decree. *See id*. ¶ 1, ECF No. 12-2.

[4] *See* Fox Decl. ¶¶ 12-16.

Counsel emailed Boston, stating that Class Counsel intended to finalize and file the motion. In a July 24 email, Boston indicated that it did not intend to respond to the draft motion but rather would address these issues through its responsive pleading to the present motion. Fox Decl. ¶ 17.

According to the plain language of the Consent Decree, either party can file a motion to enforce its requirements; there is no obligation to establish that the opposing party acted in contempt of the Decree. Consent Decree ¶ 16.2, ECF No. 12-2. Plaintiffs so move, and, in an abundance of caution, move in the alternative for an order to show cause why Boston should not be held in civil contempt for violating the Consent Decree. Below and in the attached declarations and exhibits, Class Counsel demonstrate both that Boston violated the clear terms of the Consent Decree, and that its conduct constitutes contempt under First Circuit precedent.

## II.    Background

Plaintiffs, Boston residents who use wheelchairs, initiated this case to challenge the failure of Defendant City of Boston to provide compliant curb ramps at intersections throughout Boston's pedestrian right of way. The case was resolved following three years of pre-suit negotiations and, in mid-2021, and the Parties requested certification of a settlement class and entry of a consent decree. *See* Class Action Compl., ECF No. 1; Unopposed Mot. for Prelim. Approval of Class Action Settlement and Mem. in Supp. Thereof, ECF No. 11. On November 2, 2021, this Court entered the Consent Decree.[5] *See* Consent Decree, ECF No. 12-2; Final Judgment, ECF No. 70. As relevant here, the Decree requires Boston: to produce a specific number of curb ramps each year (the "Annual Commitment") which must comply with the

_____

[5] This Court overruled the single objection to the settlement. Final J. and Order Approving Class Action Settlement, ECF No. 70 ("Final Judgment"). The objector subsequently appealed to the First Circuit, which granted summary affirmance of this Court's order on November 21, 2022. Judgment, ECF No. 93.

ADAS, Consent Decree ¶¶ 1.3 & 5; to produce, by December 31 of each year, an Annual Report to Class Counsel covering Boston's implementation efforts during that year, including measurements, photographs, and other data concerning Curb Ramps produced during that year, *id.* ¶ 12; and to maintain Accessible Curb Ramps so that those ramps are readily accessible to and usable by persons with disabilities, permitting only "isolated or temporary interruptions in access due to maintenance or repairs," *id.* ¶ 11. As detailed in the Argument section below, Boston has violated each of these requirements.

Many of these violations continue. For example, as detailed below, Boston has recently revised its curb ramp inspection manual – the manual that inspectors use to determine whether ramps comply with the ADAS. The revisions, however, will likely exacerbate the violations identified in this motion, as they remove important provisions necessary to promote compliance, and fail to address many of the problems encountered with the installation of the 2021 Ramps.

## III.  Legal Background

The plain language of the Consent Decree, which controls its interpretation,[6] unambiguously provides that "either Party may file a motion with the District Court to enforce the Settlement Consent Decree" and does not require a contempt motion to seek enforcement. *Id.* ¶ 16.2. As a result, Plaintiffs may seek to enforce the requirements of the Decree without moving for – or meeting the standards for – contempt.

Should this Court choose to apply a contempt standard, the requirements are easily met here. "To prove civil contempt, a movant must show that (1) the alleged contemnor had notice of

---

[6] *United States v. Bayer Cropscience*, No. CV 12-10847-NMG, 2015 WL 4572377, at *3 (D. Mass. July 29, 2015) (holding that consent decrees should be construed as contracts, and under contract law, the plain language of the contract controls (citing *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 (1975), *Artuso v. Vertex Pharm., Inc.*, 637 F.3d 1, 7 (1st Cir. 2011))).

the order, (2) 'the order was clear and unambiguous,' (3) the alleged contemnor 'had the ability to comply with the order,' and (4) the alleged contemnor violated the order." *Hawkins v. Dep't of Health & Hum. Servs. for New Hampshire, Com'r*, 665 F.3d 25, 31 (1st Cir. 2012) (citation omitted). While the movant must establish the first, second, and fourth prongs by clear and convincing evidence, the "alleged contemnor bears the burden of production in defending a contempt motion based on inability to comply with the terms of the order in question." *United States v. Puerto Rico*, 642 F.3d 103, 108 n.8 (1st Cir. 2011) (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983)). The alleged contemnor "must go beyond a mere assertion of inability and establish that he has made in good faith all reasonable efforts to meet the terms of the court order he is seeking to avoid." *Eresian v. Mantalvanos*, No. 12-30223-FDS, 2015 WL 1061550, at *2 (D. Mass. Mar. 11, 2015) (internal quotations omitted).

Plaintiffs establish the first, second, and fourth prongs through the clear and convincing evidence discussed below. The fact that the parties negotiated the Consent Decree and submitted it to the Court as part of a proposed judgment, and the fact that Boston has not come into compliance despite years of efforts by Class Counsel, weigh in favor of a finding of contempt. *Massachusetts v. E*Trade Access, Inc.*, 834 F. Supp. 2d 43, 45-46 (D. Mass. 2011).

A quick word on Exhibit A to the Henderson Declaration. On or about September 9, 2022, Boston provided Plaintiffs with an Excel spreadsheet listing the curb ramps it produced in 2021. Following review of that spreadsheet and as part of the meet and confer process, Plaintiffs provided Boston with a table identifying 73 of those curb ramps that illustrated the violations discussed in this Motion. Fox Decl., Ex. 11 at 6-12. In response, Boston added columns to Plaintiffs' table providing notes and its position on the violation identified by Plaintiffs. Fox Decl., Ex. 12 at 8-10.

Exhibit A sets forth the 73 curb ramps identified in Plaintiffs' February 9, 2024 table, additional examples of noncompliance ramps, data relating to those ramps from Boston's original 2021 ramp spreadsheet, and Boston's ramp-by-ramp response to the February 9 letter. It also cites to photos that support Plaintiffs' arguments. To fit the information into a PDF for the ECF filing system, the font had to be reduced to four point size, and so Plaintiffs also provide the same data in a Google Sheet at this link: https://bit.ly/4fvvCs8. Plaintiffs have filed the photographs identified in Exhibit A as a PDF document, collectively attached as Exhibit B to the Henderson Declaration, and have also made these photographs, as well as photographs produced by Boston of all 2021 ramps, available on Google Drive. *See* Henderson Decl. ¶¶ 6-9.

## IV.    Argument

### A.  Boston Did Not Produce the Number of Ramps Required by the Consent Decree

Paragraph 5.1 of the Consent Decree sets forth the minimum number of Compliant Curb Ramps that Boston must produce during a year, referred to as the "Annual Commitment." The Annual Commitment for 2021 was 1,200 Compliant Curb Ramps, for 2022 was 1,350, and for 2023 was 1,500, for a combined total of 4,050 ramps through 2023. Although Paragraph 5.3 of the Consent Decree permits a shortfall for delays outside of Boston's control, that shortfall is capped at 250 ramps, which must be cured within two years.

In 2021, Boston produced only 783 ramps, over 400 ramps short of the Annual Commitment. Fox Decl., Ex. 6 at 1, 7. At the time, Class Counsel chose not to challenge this shortfall in reliance on Boston's assertion that it was caused by historically wet weather and the ongoing impact of COVID, and Boston's commitment to produce 1,741 curb ramps in 2022 to make up for the 2021 shortfall. *Id* at 7-11.

In 2022, however, Boston actually produced only 1,586 curb ramps, making the 2021/2022 total 181 ramps short of the Consent Decree requirement for those two years. Fox

6

Decl., Ex. 7 at 4, 7. Boston was thus required to make up for the shortfall (which began in 2021) by the end of 2023. Boston once again committed to do this by promising to produce additional ramps – 1,681 – in 2023, *id.* at 7, but, once again, failed to abide by this promise, producing only 1,025 ramps in 2023. Fox Decl., Ex. 8 at 3, 5. As a result, Boston is currently 656 ramps below the Annual Commitment requirement. Boston does not dispute this. Parties' Joint Status Statement at 4, ECF No. 100 (May 20, 2024).

This, however, understates the problem. As demonstrated below, many of the ramps that Boston seeks to count towards the 2021 Annual Commitment may not be counted because they do not comply with the Consent Decree. The consistent violations as well as inaccuracies and gaps in reported information suggest that similar problems exist with the 2022 and 2023 counts.

### B.  Many 2021 Ramps Do Not Comply with the Consent Decree.

#### 1.  Consent Decree Standards Governing Curb Ramps

The Consent Decree obligates Boston to produce a specific number of "Accessible Curb Ramps" each year. Consent Decree ¶ 5.1. "Accessible" is defined as compliant with Title II of the ADA and its regulations, including the ADAS. *Id.* ¶ 1.3. A "Curb Ramp" is defined as "a short ramp cutting through a curb or built up to it." *Id.* ¶ 1.9; ADAS 106.[7]

ADAS 406 governs curb ramps and dictates, for example, the permissible running slope (in the direction of travel), cross slope (perpendicular to the direction of travel), and counter slope (where the curb ramp meets the gutter); the required clear width; the quality of the curb ramp's surface; the slope of any side flares; and the need for and dimensions of landings. *See, e.g., id.* 406.1 - 406.4. Crucially, ADAS 406 also regulates the location of curb ramps to ensure that pedestrians are safe from vehicular traffic. *See, e.g., id.* 406.5, 406.6.

---

[7] The ADAS are available online at https://www.ada.gov/law-and-regs/design-standards/2010-stds/#top (relevant excerpts attached hereto as Fox Decl., Ex. 1).

As detailed below, Class Counsel faced difficulties monitoring the 2021 Ramps because of the unreliability and incompleteness of Boston's inspection data and ramp photos.

### 2. Much of the Information Gathered and Reported by Boston Concerning the 2021 Ramps Is Missing or Inaccurate, Requiring a New Survey.

Boston produced photos and a spreadsheet with measurements of the 2021 Ramps after they were remediated purporting to show that the ramps comply with ADAS, but Class Counsel have determined that this information is incomplete and unreliable. For example:

- Boston failed to identify many curb ramps as diagonal ramps, which is significant because diagonal curb ramps must meet requirements, and require measurements, that other types of curb ramps do not. *See infra* Section IV.B.3.

- Boston does not understand built-up curb ramps to be curb ramps at all and continues to exclude most such ramps from its definition; as a result, it failed to take important measurements of these ramps. *See infra* Section IV.B.4.

- Boston's August 2020 "ADA Curb Ramp Inspection Manual"[8] (the "2020 Ramp Inspection Manual") required inspectors to identify curb ramp material, but did not include asphalt as an option, even though Boston's own photos show that many are constructed of asphalt. The current ADA Curb Ramp Inspection Manual[9] ("2024 Ramp Inspection Manual") does not require inspectors to identify any ramp materials. Many asphalt ramps predictably will deteriorate quickly. *See infra* Section IV.C.

- Boston failed to identify many ADAS violations that are apparent on a simple visual inspection of photographs of the ramps, including ramps that project into vehicular

---

[8] *See generally* Fox Decl. Ex. 9.
[9] *See generally* Fox Decl. Ex. 10.

traffic lanes, ramps that are not aligned with crosswalks, and ramps that are not flush with the street. *See infra* Sections IV.B.3-6.

- Boston provided measurements for only one ramp on some corners in which two ramps had been installed or remediated in 2021.

Examples of unreliable findings from Boston's inspection data are included in Exhibit A and are marked with a check mark in Column H: "Unreliable Survey."

Because Boston's inspection data for the 2021 Ramps was incomplete and unreliable, Class Counsel could not rely on that data to monitor compliance, and instead had to review photos produced by Boston or available on the Internet, and inspect in person a small number of ramps. Many ADAS requirements – such as requirements governing the width, slope, and cross slope of curb ramps – are not verifiable by a review of photos, particularly because Boston's photos did not include relevant measuring devices such as tape measures and slope meters to show the required measurements. A new survey – performed and documented accurately – is essential to ensure that all noncompliant 2021 Ramps are identified and fixed.

Even Class Counsel's limited review identified numerous ADAS violations, as discussed below, and it is likely that a new survey would reveal additional violations. All of the examples of noncompliant ramps identified herein and in the exhibits were identified by Boston as ADA compliant (or subject to variances unrelated to the noncompliant feature).

### 3.   A Number of 2021 Diagonal Curb Ramps Violate the Consent Decree.

A diagonal curb ramp is defined as any ramp "placed diagonally at an intersection."[10] The diagram on the left below[11] shows a diagonal curb ramp; the photo on the right[12] is an example of such ramp:

   

Because diagonal curb ramps expose wheelchair users to traffic from two directions, "it is important that clear space 48" long min. is available at the bottom that is **outside active vehicle traffic lanes**." Technical Guide § 406.6 (emphasis added). If the diagonal ramp is at a marked crossing such as a crosswalk, the 48-inch space must be within the markings; and if it has flared sides, each side must have a segment of curb at least 24 inches long beyond the flare within the marked crossing. ADAS 406.6.[13]

---

[10] U.S. Access Board, Technical Guide: Ramps and Curb Ramps § 406.6 (2015), https://www.access-board.gov/files/aba/guides/ramps-ABA.pdf ("Technical Guide") (relevant excerpts attached hereto as Fox Decl., Ex. 2). The Access Board drafted the technical standards that were eventually adopted by the DOJ as the ADAS. *See* 75 Fed. Reg. 56236, 56238 (Sept. 15, 2010).

[11] Technical Guide § 406.6.

[12] Chris Riley, *PHOTO: Wet weather taking shape in Vacaville*, The Reporter, Jan. 31, 2024, https://www.thereporter.com/2024/01/31/photo-wet-weather-taking-shape-in-vacaville/.

[13] A dynamic demonstration of the dangers of diagonal curb ramps outside marked crossings appears between the 7:46 and 8:06 marks in the Access Board Video. *See supra* Section I, n.2.

Boston's approach to diagonal curb ramps started out bad and has gotten worse. Although Boston's 2020 Ramp Inspection Manual correctly defined diagonal curb ramps as ramps placed diagonally at an intersection, Boston later changed this definition (without notifying Class Counsel) to "a single ramp that connects to two separate, reciprocal ramps,"[14] and used this incorrect definition for purposes of its inspections of completed 2021 Ramps, causing many diagonal curb ramps to be misidentified and improperly measured, and resulting in numerous noncompliant and unsafe ramps. In May 2024, Boston acknowledged that the correct definition of a diagonal curb ramp means those placed diagonally at an intersection.[15] Nevertheless when Boston revised its ADA Curb Ramp Inspection Manual, it deleted the definition of diagonal curb ramp, using instead the term "apex ramp," but without any definition of that term. 2024 Ramp Inspection Manual at 3. As result, nothing in the 2024 Ramp Inspection Manual informs inspectors what a diagonal curb ramp is.

Worse, nothing in the current 2024 Ramp Inspection Manual instructs inspectors to confirm a crucial requirement of diagonal curb ramps. Although the manual instructs inspectors that there must be a 48-inch-long clear space within marked crosswalks at apex ramps, it says nothing about ensuring that there is a 48-inch clear space outside of active traffic lanes at the bottom of diagonal ramps not located at crosswalks. *See* ADAS 406.6 ("The bottom of diagonal curb ramps shall have a clear space 48 inches . . . minimum outside active traffic lanes of the roadway.") As a result, wheelchair users are at risk of being hit by cars when they navigate down diagonal curb ramps not located at crosswalks – perhaps the most dangerous type of curb ramp, as they lead directly into traffic without even the minimal protection a crosswalk might offer.

---

[14] Fox Decl., Ex. 12 at 5 n.3.
[15] Fox Decl., Ex. 13 at 1.

For almost two years, Class Counsel have tried to convince Boston to change its approach to diagonal ramps, without success. At this point, Court intervention is essential.

In Exhibit A, diagonal ramps that do not have the required clearance are identified in Column G, "Violation Type," as "Lack of required clearance at the bottom of diagonal ramp;" diagonal ramps that do not comply with requirements governing marked crossings are identified as "Crosswalk Violations."

### 4.  A Number of 2021 Built-Up Ramps Violate the Consent Decree.

In contrast to curb ramps that are located within a sidewalk, "built-up curb ramps" extend into the roadway, as in the illustration above left.[16] Boston created many built-up ramps by adding a chunk of asphalt next to the curb, as in the example below right.[17]




The Federal Highway Administration explains, "[t]here are a number of maintenance, design and pedestrian safety problems with the installation of built-up curb ramps" and that "[t]hey should not be the first choice of curb ramp application."[18] These ramps are unsafe because "[u]sers are more exposed to cars in the roadway" and there is "[n]o clear boundary

---

[16] U.S. Dep't of Just., ADA Accessibility Survey Instructions: Curb Ramps ("DOJ Curb Ramp Survey Instructions") § 4.7.6, https://archive.ada.gov/pcatoolkit/app1curbramps.htm (relevant excerpts attached hereto as Fox Decl., Ex. 3).

[17] Henderson Decl., Ex. B at 175 (8513.1.1).

[18] Federal Highway Administration, "Designing Sidewalks and Trails for Access: Part II of II: Best Practices Design Guide," ("FHWA Best Practices") § 7.2.5 (2017), https://www.fhwa.dot.gov/environment/bicycle_pedestrian/publications/sidewalk2/sidewalks207.cfm#bui.

between the ramp and the street."[19] Boston has recognized that using asphalt as a bridge from the sidewalk to the pavement "can sometimes result in a poor transition for wheelchair users."[20]

### a. Boston Improperly Refuses to Treat Certain Built-Up Curb Ramps as Curb Ramps.

Boston incorrectly asserts that the curb ramp requirements set forth in ADAS 406 do not apply to a built-up curb ramp that either (1) has a slope of less than five percent, or (2) serves a curb less than six inches high.[21]

ADAS 303.4, however, explicitly requires that any change in level greater than one-half inch "shall be ramped, and shall comply with 405 or 406," the provisions governing ramps and curb ramps, respectively. Given that virtually all curbs in Boston are higher than one-half inch, any built up asphalt or concrete that is used to address such a change in level must comply with the requirements for ramps or curb ramps, and must be measured to ensure such compliance.

Ultimately it is not the slope of a curb ramp that dictates coverage by ADAS 406, but rather the fact that it is required to address a change in level – the curb – that is greater than one-half inch. This makes sense from the perspective of pedestrian safety. Under Boston's theory, a five-inch curb could be served by a built up asphalt curb ramp – which, to comply with slope limitations, would need to be at least five feet long[22] – with no requirements for compliant cross slope (ADAS 405.3, incorporated by reference in ADAS 406.1), landings (ADAS 406.4), or, most dangerously, location (ADAS 406.5) – that is, the noncompliant curb ramp could fall outside marked crossings and project at least five feet into vehicular traffic lanes.

---

[19] *Id.*
[20] Fox Decl., Ex. 7 at 11.
[21] Fox Decl., Ex. 13 at 2-3.
[22] Curb ramps are required to have a running slope of at most 1:12. ADAS 406, incorporating by reference ADAS 405.2. To satisfy this standard, a curb of five inches in height would require a ramp of at least 60 inches or five feet in length.

Based on its incorrect definition of built-up curb ramp, Boston did not take all necessary measurements of these ramps; indeed, none of the 2021 ramps it reported was identified as being built-up, or made of asphalt, even in part, despite extensive photographic evidence of built-up asphalt curb ramps, *see generally* Henderson Decl. Ex. B. It is thus impossible to tell whether they comply with slope, cross slope, landing, and other requirements. Photos, however, demonstrate that many such ramps violate the ADAS because they project into vehicular traffic lanes, as discussed below.

### b. A Number of 2021 Built-Up Ramps Project Into Vehicular Traffic Lanes and Thus Violate the Consent Decree

ADAS 406.5 requires that "[c]urb ramps and the flared sides of curb ramps shall be located so that they do not project into vehicular traffic lanes." Curb ramps that protrude into vehicular travel lanes at locations without crosswalks are not permitted and are dangerous as they put wheelchair-users in the direct path of cars who may not be expecting pedestrians in unmarked portions of the street.[23] As the DOJ Curb Ramp Survey Instructions state, "[t]he 'path of cars' includes anywhere cars are allowed to drive, including roadways [and] parking spaces . . .." *Id.* § 4.7.6. The photos below illustrate the danger of a built-up ramp that projects into vehicular traffic lanes: a wheelchair-user descending either ramp would risk being hit by the cars in the photos while parking, unparking, or turning.

---

[23] *Cf.* FHWA Best Practices Table 7-1 ("Pedestrians outside of the marked crosswalk are less likely to be seen by drivers because they are not in an expected location."). https://www.fhwa.dot.gov/environment/bicycle_pedestrian/publications/sidewalk2/sidewalks207.cfm.

 

Henderson Decl. Ex. B at 67 (2978.1.1), 166 (8172.3.1). Examples of ramps that violate the

ADAS because they project into vehicular traffic lanes are identified in Column G of Exhibit A

as "Projection into vehicular traffic lane."

Boston defends this violation in part by referring to the commentary to a separate set of

standards, the Access Board's Public Right-of-Way Accessibility Guidelines ("PROWAG"), 36

C.F.R. pt 1190.1,[24] which have not yet been formally adopted by the DOJ as part of the ADAS

and thus do not yet apply to this case. *See generally* Ex. A, Column J. In any event, that

commentary does not address built-up ramps but rather PROWAG's requirement that all

perpendicular ramps have a clear area 48 inches by 48 inches beyond the bottom of the ramp.

PROWAG R304.2.4. The commentary explains that *this provision* does not require an extra 48

inches of shoulder. 88 Fed. Reg. 53604, 53631 (Aug. 8, 2023). Boston's reliance on this

commentary is misplaced as Class Counsel are not applying PROWAG's requirement for a 48 by

48 clear area, but rather the ADAS (and thus Consent Decree) requirement that curb ramps not

"project into vehicular traffic lanes," ADAS 406.5. In any event, the referenced ramps fail to

comply with either PROWAG or ADAS.

---

[24] Available online at the following web address: https://www.access-
board.gov/prowag/complete.html.

Boston also defends these violations by asserting "you cannot park within 20 ft of an intersection." *See* Ex. A, Column J. This is not a relevant factor in the ADAS and does not, ultimately, prevent a car turning the corner or maneuvering into a parking space from running over a wheelchair-user on a noncompliant built-up ramp.

### 5. A Number of 2021 Ramps at Marked Crossings Violate the Consent Decree.

As noted above, ADAS 406.5 requires that "[c]urb ramps at marked crossings shall be wholly contained within the markings, excluding any flared sides," and that ramps with flared sides must have a segment of curb at least 24 inches long beyond the flare within the marked crossing. In Exhibit A, examples of ramps that are not wholly contained within crosswalks are identified in Column G as "Crosswalk Alignment."

### 6. A Number of 2021 Ramps Have Transitions That Are Not at the Same Level and thus Violate the Consent Decree.

ADAS 406.2 requires that "adjacent surfaces at transitions at curb ramps to walks, gutters, and streets shall be at the same level." As the FHWA explains, "[t]ransitions from ramps to gutter and streets should be flush and free of level changes. Maneuvering over any vertical rise such as lips and defects can cause wheelchair users to propel forward when wheels hit this barrier." FWHA Best Practices Table 7-1.[25] In Column G of Exhibit A, ramps that violate this requirement are identified as "Lip/vertical change/non-flush transition."

Boston defends these ramps in part because they were "compliant at install" or "flush at install," *see id*. Column K, suggesting that it recognizes that the later photos supplied by Class Counsel demonstrate non-compliance within a year or two of installation. This again underscores the need for a maintenance program. *See infra* Section IV.C.

---

[25] A compelling demonstration of this problem appears between the 1:48 and 2:05 marks in the Access Board Video. *See supra* Section I, n.2.

### C.  Boston's Maintenance Program Fails to Ensure Compliance the Consent Decree.

Paragraph 11.1 of the Consent Decree requires Boston to maintain Accessible Curb Ramps so that those ramps are readily accessible to and usable by persons with disabilities, permitting only "isolated or temporary interruptions in access due to maintenance or repairs." Boston is in violation of this requirement, as demonstrated by the speed at which ramps produced by Boston in 2021 have come out of compliance.

Class Counsel have identified 16 ramps that are currently noncompliant which Boston contends were compliant when they were installed – meaning they came out of compliance between the date of Boston's inspection of ramps shortly after they were produced, and the date of Class Counsel's photos showing noncompliance. The speed at which these ramps became noncompliant is astonishing: on average, it took less than 2 years for the ramps to become noncompliant. Fox Decl. ¶ 18.

In part the reason for this is Boston's decision to install inexpensive, built-up asphalt ramps, which are prone to deteriorating quickly. According to the FHWA:

> Asphalt is a less common material for sidewalks than concrete and typically has a significantly shorter life than concrete. However, the initial cost to install asphalt is typically significantly less than concrete. … Asphalt can be used in other tighter settings, such as corners and curb ramps, where a hand mechanical tamper is used, but results typically do not match that of concrete. Often when asphalt is used for a path or sidewalk, concrete is used for the curb ramps.
>
> If flares are built-up, they can require more maintenance, especially if driven over by cars parking.[26]

Boston's current and proposed curb ramp maintenance program is materially inadequate to meet its maintenance obligations under the Consent Decree. Boston proposes to add newly

---

[26] Federal Highway Administration, "A Guide for Maintaining Pedestrian Facilities for Enhanced Safety," § 3.1.2 (2013), https://safety.fhwa.dot.gov/ped_bike/tools_solve/fhwasa13037/chap3.cfm.

produced curb ramps to its asset management program, but that program would result in an inspection of a ramp only approximately once every five years, and inspectors would simply "eyeball" the ramps, and would not take any measurements of ramps to ensure that they remain in compliance. Fox Decl., Ex. 14.

Boston does not meet the only exception in the Consent Decree's maintenance requirement for isolated or temporary interruptions due to maintenance or repairs.[27] First, the rapid failure of Boston's curb ramps is widespread, not isolated. Second, these violations are not temporary, given that Boston's proposed maintenance program would only touch on ramps about once every five years. Finally, these ramps are noncompliant not because they are being maintained or repaired, but because Boston is using cheap building materials and not instituting an effective maintenance program.

Boston can choose to save money by using asphalt, but that choice comes with consequences. If Boston is going to use a material that is known to deteriorate quickly, then it needs to substantially bulk up its maintenance program to identify and quickly address these ramps when they predictably fall out of compliance.

### D.  Attorneys' Fees

Should Class Counsel prevail on this motion in whole or in part, they will be entitled to recover their reasonable attorneys' fees, costs, and expenses. Consent Decree ¶ 20.4. Class Counsel will address those fees as well as other fees owed pursuant to the Consent Decree but as yet unpaid in a separate fee petition following the resolution of this motion.

---

[27] Consent Decree ¶ 11.1. This is consistent with the ADAS standard as applied by the courts. *See, e.g.*, *Chapman v. Pier 1 Imports (U.S.) Inc.*, 779 F.3d 1001, 1007 (9th Cir. 2015) ("accessible routes or other feature[s] cannot be built in compliance with the ADA, only to be blocked or changed later so that it is inaccessible" (internal quotations omitted)); *Hillesheim v. Myron's Cards & Gifts, Inc.*, 897 F.3d 953, 956 (8th Cir. 2018) ("An obstruction is not isolated or temporary unless it is promptly removed.").

### E.  Remedies

A trial court has wide discretion in its choice of sanctions after a finding of contempt, including imposition of monetary sanctions. *See Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 77-78 (1st Cir. 2002), *cert. denied* 537 U.S. 974 (2002). At this time, Class Counsel do not seek imposition of fines. Instead, Class Counsel respectfully request that the Court issue an Order as follows:

(1) Requiring Boston, by December 31, 2025, to install or remediate at least 7,310 curb ramps (inclusive of ramps installed or remediated to date) thereby bringing it into compliance with the Annual Commitment provisions of the Consent Decree.

(2) Requiring Boston to reinspect the 2021 Ramps, using inspection forms and methodology agreed to by the parties, and requiring the parties to discuss and agree on whether ramps produced in 2022 and 2023 also need to be reinspected. If the parties are unable to reach agreement within 45 days of the Order requiring the inspections, any disputes will be submitted to the Court.

(3) Requiring Boston to remediate any noncompliant Ramps produced in 2021 through 2023 not subject to exceptions specified in the Consent Decree within 60 days of the reinspection or other notice of noncompliance, whichever is earlier, subject to a reasonable extension of that deadline should weather not permit remediation within that timeframe.

(4) Requiring the parties, within 45 days of an Order granting this motion in whole or in part, to meet and confer to try to reach agreement on an appropriate maintenance policy, with any remaining disputes to be resolved by the Court.

(5) Scheduling quarterly status conferences with the Court to ensure that Boston's implementation of the Consent Decree is not delayed and that disputes are resolved promptly. Class Counsel recognize that this Court has a busy docket, and so in the alternative, they request

that the Court appoint a Special Master pursuant to Fed. R. Civ. P. 53, with the costs and

expenses to be paid by Boston. *See, e.g., Massachusetts v. E Trade Access, Inc.*, No. CIV. 03-

11206-NMG, 2013 WL 4048189, at *1 (D. Mass. May 22, 2013) (after a finding of contempt,

appointing Special Master to ensure defendant's ongoing compliance with class action settlement

with the Defendant responsible for costs and expenses). Should the Court decide to appoint a

Special Master, Class Counsel respectfully requests that a 45-day deadline be set for the Parties

to meet and confer to try to reach agreement on a proposed Special Master and a proposed order

of appointment, and if not, to submit those issues to the Court, and to satisfy the other

requirements of Rule 53.

## V.     Conclusion

For the reasons set forth above, Plaintiffs respectfully request that the Court grant this

Motion and order the remedies set forth in Section IV.E above.

Date: August 7, 2024

Respectfully submitted,

PLAINTIFFS AND SETTLEMENT CLASS

/s/ Timothy P. Fox
Timothy Fox (*pro hac vice*)
tfox@foxrob.com
Amy F. Robertson (*pro hac vice*)
arob@foxrob.com
FOX & ROBERTSON, PC
1 Broadway, Suite B205
Denver, CO 80203
(303) 951-4164

Linda M. Dardarian (pro hac vice)
ldardarian@gbdhlegal.com
Raymond Wendell (pro hac vice)
rwendell@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
Tel: (510) 763-9800
Fax: (510) 835-1417

Thomas P. Murphy (SBN 630527)
DISABILITY LAW CENTER, INC.
32 Industrial Drive East
Northampton, MA 01060
(413) 584-6524 (Telephone/Fax)
tmurphy@dlc-ma.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated on the NEF as non-registered participants on August 7, 2021.


/s/ Jordon Henderson
Jordon Henderson
Paralegal
Fox & Robertson, P.C.